**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA

      Plaintiff,

  v.

[8] Georgia Ellyse Fort,

      Defendant.

Case No. 26-cr-00025-LMP-DLM

**ORAL ARGUMENT REQUESTED**

**GEORGIA ELLYSE FORT'S MOTION TO DISMISS**
**SUPERSEDING INDICTMENT UNDER THE FIRST AMENDMENT**
**(FORT MOTION NO. 1)**

**BALLARD SPAHR**
Leita Walker
Matthew S. Ebert
Isabella Salomão Nascimento
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3211
walkerl@ballardspahr.com
ebertm@ballardspahr.com
salomaonascimentoi@ballardspahr.com

Seth D. Berlin (*pro hac vice*)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 508-1122
berlins@ballardspahr.com

**THE LAW FIRM OF KEVIN C. RIACH, PLLC**
Kevin C. Riach
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Tel: (612) 203-8555
kevin@riachdefense.com

*Counsel for Defendant Georgia Ellyse Fort*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ......................................................................................................... 1

FACTS ........................................................................................................................... 4

I.     FORT IS A PROFESSIONAL JOURNALIST ........................................................ 5

II.    FORT'S MEDIA COVERAGE OF OPERATION METRO SURGE ................... 6

    A.     Operation Metro Surge ................................................................... 6

    B.     "Operation Pullup" at Cities Church ............................................ 10

        1.     The pre-protest assembly ............................................... 10

        2.     Arrival at Cities Church ................................................. 12

        3.     The journalists conduct interviews ................................. 15

        4.     Outside the Church ........................................................ 20

        5.     Local law enforcement response .................................... 21

    C.     News Coverage After the Protest .................................................. 24

III.   THE INDICTMENTS ......................................................................................... 26

    A.     The Government's Failed Attempts to Charge Fort By Complaint ....................................................................................... 26

    B.     Having Struck Out Three Times with Multiple Judges, in Desperation the Government Sought a Grand Jury Indictment ......... 29

    C.     The Bald Allegations Against Fort ............................................... 34

IV.   THIS PROSECUTION IS IMPACTING FORT'S ONGOING REPORTING ................................................................................................... 35

V.    THE GOVERNMENT'S CONTENT-BASED ENFORCEMENT OF SECTIONS 241 AND 248 ................................................................................ 37

STANDARD OF REVIEW ......................................................................................... 43

i

ARGUMENT ..................................................................................................... 48

I.  THE STATUTES AT ISSUE EXPRESSLY INCORPORATE THE
    CONSTITUTION'S LIMITS ON PROSECUTING FORT FOR
    ENGAGING IN PROTECTED FIRST AMENDMENT
    ACTIVITIES .......................................................................................... 48
    ......................................................................................................................

II. FORT ATTENDED THE PROTEST SOLELY AS A JOURNALIST,
    AND HER CONDUCT IS SQUARELY PROTECTED BY THE
    FIRST AMENDMENT .......................................................................... 50

    A.  Fort Was Functioning as a Journalist at the Protest ................... 50

    B.  Settled Law Establishes That Fort's Activities as a Journalist
        Are Protected By the First Amendment ....................................... 54

    C.  The First Amendment Likewise Precludes Prosecuting Fort for
        Conspiracy ................................................................................... 65

III. AS APPLIED TO FORT, THE STATUTES ARE NOT CONTENT
     NEUTRAL AND CANNOT SURVIVE STRICT SCRUTINY ........... 68

     A.  As Applied, the Statutes Are Content-Based .............................. 71

     B.  The Government Cannot Satisfy Strict Scrutiny ......................... 74

IV.  IF THE GOVERNMENT CONTENDS THE STATUTES
     NEVERTHELESS APPLY TO FORT, THEY WOULD BE
     UNCONSTITUTIONALLY VAGUE ................................................... 76

V.   DISMISSAL WITH PREJUDICE IS WARRANTED ......................... 79

CONCLUSION ................................................................................................. 80

ii

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)..................................................................................................... 69

*Action v. Gannon*,
450 F.2d 1227 (8th Cir. 1971) ..................................................................................... 58

*Animal Legal Defense Fund v. Reynolds*,
89 F.4th 1071 (8th Cir. 2024)....................................................................................... 57

*Animal Legal Defense Fund v. Wasden*,
878 F.3d 1184 (9th Cir. 2018) ...................................................................................... 56

*Associated Press v. NLRB*,
301 U.S. 103 (1937)....................................................................................................... 57

*Associated Press v. United States*,
326 U.S. 1 (1945)...................................................................................................... 54, 57

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)......................................................................................................... 63

*Barnard v. Jackson County*,
43 F.3d 1218 (8th Cir. 1995) ....................................................................................... 46

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)............................................................................................ 56, 57, 75

*Board of Education, Island Trees School District v. Pico*,
457 U.S. 853 (1982)....................................................................................................... 55

*Bell Atlantic Corp. v. Twombly*,
550 US 544 (2007).......................................................................................................... 67

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)................................................................................................... 4, 44

*Branzburg v. Hayes*,
408 U.S. 665 (1972)............................................................................................ 55, 57, 62

*Chiles v. Salazar*,
607 U.S. ---, 2026 WL 872307 (Mar. 31, 2026)..................................... 44, 69, 71, 73

*Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*,
   454 U.S. 290 (1981)..................................................................................... 65, 68

*Citizens United v. FEC*,
   558 U.S. 310 (2010)............................................................................. 57, 70, 74

*Cohen v. California*,
   403 U.S. 15 (1971)........................................................................................ 44

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991)...................................................................................... 57

*Counterman v. Colorado*,
   600 U.S. 66 (2023)........................................................................................ 49

*Cox Broadcasting Corp. v. Cohn*,
   420 U.S. 469 (1975)...................................................................................... 59

*De Jonge v. Oregon*,
   299 U.S. 353 (1937)...................................................................................... 55

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965)................................................................................... 1, 46

*Dowd v. Calabrese*,
   589 F. Supp. 1206 (D.D.C. 1984)................................................................. 67

*Estes v. Texas*,
   381 U.S. 532 (1965)...................................................................................... 55

*FCC v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012)...................................................................................... 76

*First Choice Women's Resource Centers, Inc. v. Davenport*,
   608 U.S. ---, 146 S. Ct. 1114 (Apr. 29, 2026)............................................. 54

*Florida Star v. B.J.F.*,
   491 U.S. 524 (1989)...................................................................................... 54

*Frederick Douglass Foundation Inc. v. District of Columbia*,
   82 F.4th 1122 (D.C. Cir. 2023)..................................................................... 72

*Gonzalez v. Trevino*,
   602 U.S. 653 (2024)...................................................................................... 78

*Goyette v. City of Minneapolis*,
2021 WL 5003065 (D. Minn. Oct. 28, 2021) .............................................................. 62

*Goyette v. City of Minneapolis*,
338 F.R.D. 109 (D. Minn. 2021)..................................................................... 56, 58, 59

*Green v. Miss USA, LLC*,
52 F.4th 773 (9th Cir. 2022) ........................................................................................ 45

*Grosjean v. American Press Co.*,
297 U.S. 233 (1936)................................................................................................. 59, 71

*Harte-Hanks Communications, Inc. v. Connaughton*,
491 U.S. 685 (1989)...................................................................................................... 46

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................................................................................................... 74

*J.J.C. v. Fridell*,
165 F.R.D. 513 (D. Minn. 1995)................................................................................... 51

*Lewellen v. Raff*,
843 F.2d 1103 (8th Cir. 1988) ..................................................................................... 46

*Loe v. Jett*,
796 F. Supp. 3d 541 (D. Minn. 2025)........................................................................... 75

*Lundell Manufacturing Co. v. American Broadcasting Co.*,
98 F.3d 351 (8th Cir. 1996) .......................................................................................... 47

*McBride v. Merrell Dow & Pharmaceuticals Inc.*,
717 F.2d 1460 (D.C. Cir. 1983).................................................................................... 45

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974)....................................................................................................... 64

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ................................................................................ 46, 47

*Miller v. California*,
413 U.S. 15 (1973)............................................................................................. 43, 44, 45

*Mills v. Alabama*,
384 U.S. 214 (1966)....................................................................................................... 56

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*,
  460 U.S. 575 (1983)..................................................................................58, 59, 70

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)...............................................................................44, 60

*NAACP v. Button*,
  371 U.S. 415 (1963).................................................................................44, 45

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)..............................................................65, 66, 67, 68

*National Organization for Women, Inc. v. Scheidler*,
  267 F.3d 687 (7th Cir. 2001) ...............................................................66, 68

*Nebraska Press Association v. Stuart*,
  427 U.S. 539 (1976)............................................................................64

*Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*,
  951 F.3d 952 (8th Cir. 2020) ....................................................................47

*New York Times Co. v. United States*,
  403 U.S. 713 (1971)................................................................................63

*Nunes v. Lizza*,
  12 F.4th 890 (8th Cir. 2021) .....................................................................47

*PETA, Inc. v. Reynolds*,
  173 F.4th 959 (8th Cir. 2026) ...................................................................57

*Phelps-Roper v. City of Manchester*,
  697 F.3d 678 (8th Cir. 2012) ....................................................................61

*Philadelphia Newspaper, Inc. v. Hepps*,
  475 U.S. 767 (1986)................................................................................44

*Police Department of City of Chicago v. Mosley*,
  408 U.S. 92 (1972)................................................................................69

*Project Veritas v. Schmidt*,
  125 F.4th 929 (9th Cir. 2025) ...................................................................56

*Quraishi v. St. Charles County*,
  986 F.3d 831 (8th Cir. 2021) ..........................................................55, 56, 58

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ................................................................................. 73

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ............................................................................ 70, 74

*Rice v. Kempker,*
374 F.3d 675 (8th Cir. 2004) ................................................................... 63

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980) ............................................................................ 55, 59

*Rosenberger v. Rector and Visitors of University of Virginia,*
515 U.S. 819 (1995) ............................................................................ 70, 74

*Rossignol v. Voorhaar,*
316 F.3d 516 (4th Cir. 2003) ................................................................... 63

*Schenck v. United States,*
249 U.S. 47 (1919) ............................................................................. 43, 47

*In re Search of Real Property and Premises of Natanson,*
2026 WL 1458902 (E.D. Va. May 4, 2026) ............................................ 63

*In re Search of Real Prop. and Premises of Natanson,*
2026 WL 510727 (E.D. Va. Feb. 24, 2026) ............................................. 50

*Shands v. City of Kennett,*
993 F.2d 1337 (8th Cir. 1993) ................................................................. 46

*Shoen v. Shoen,*
5 F.3d 1289 (9th Cir.1993) ...................................................................... 51

*Smith v. Daily Mail Co.,*
443 U.S. 97 (1979) ................................................................................... 56

*Snyder v. Phelps,*
2010 WL 2826988 (July 7, 2010) ............................................................ 61

*Snyder v. Phelps,*
562 U.S. 443 (2011) ............................................................................ 60, 61

*Snyder v. Phelps,*
580 F.3d 206 (4th Cir. 2009) ................................................................... 61

*Terminiello v. Chicago,*
337 U.S. 1 (1949) .................................................................................... 60

*Thornhill v. Alabama,*
310 U.S. 88 (1940) .................................................................................. 55

*Time, Inc. v. Hill,*
385 U.S. 374 (1967) ................................................................................ 55

*Turner Broadcasting Systems, Inc. v. FCC,*
512 U.S. 622 (1994) ................................................................................ 73

*United States v. Alvarez,*
567 U.S. 709 (2012) ............................................................. 45, 70, 71, 74

*United States v. Alvarez,*
617 F.3d 1198 (9th Cir. 2010) ............................................................... 45

*United States v. Baxter,*
127 F.4th 1087 (8th Cir. 2025) ............................................................. 48

*United States v. Cassidy,*
814 F. Supp. 2d 574 (D. Md. 2011) ...................................................... 76

*United States v. Cook,*
472 F. Supp. 3d 326 (N.D. Miss. 2020) ................................................ 76

*United States v. Covington,*
395 U.S. 57 (1969) .................................................................................. 48

*United States v. Dinwiddie,*
76 F.3d 913 (8th Cir. 1996) ................................................................... 74

*United States v. Hasting,*
461 U.S. 499 (1983) ................................................................................ 80

*United States v. Pope,*
613 F.3d 1255 (10th Cir. 2010) ............................................................. 48

*United States v. Stevens,*
559 U.S. 460 (2010) ........................................................................ 45, 78

*United States v. Turner,*
842 F.3d 602 (8th Cir. 2016) ........................................................... 77, 78

*United States v. Wendt*,
    168 F.4th 1068 (8th Cir. 2026) ................................................................ 79

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................................ 77

*von Bulow v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987) .................................................................... 51

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) ................................................................................ 69

*Washington Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ............................................................ 70, 74

*Welch v. Dempsey*,
    51 F.4th 809 (8th Cir. 2022) ................................................................... 56

*Zemel v. Rusk*,
    381 U.S. 1 (1965) .................................................................................... 63

## Statutes

18 U.S.C. § 241 ................................................................................... 26, 35

18 U.S.C. § 248 ................................................................................*passim*

Privacy Protection Act, 42 U.S.C. § 2000aa ..................................................... 50

Minn. Stat. § 595.023 ....................................................................... 51

## Other Authorities

United States Constitution, amend. I........................................................*passim*

Federal Rule of Criminal Procedure 12..................................................... 1, 47

Local Rule 12.1................................................................................. 1

8 C.F.R. § 1003.27................................................................................ 59

28 C.F.R. Part 26, § 26.4(c)(4)(ii) ........................................................ 59

Pursuant to Federal Rule of Criminal Procedure 12(b) and Local Rule 12.1, Georgia Ellyse Fort, an award-winning professional journalist, moves this Court to dismiss the superseding indictment against her with prejudice under the First Amendment to the United States Constitution.  As demonstrated below, the government is trying to criminalize Fort's lawful journalism in covering a protest that received national attention.  This prosecution therefore violates her rights under the First Amendment, and as the U.S. Supreme Court has repeatedly made clear, the "vindication of freedom of expression" should not "await the outcome of protracted litigation."  *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).  Thus, even where, as here, a case involves "the improbability of successful prosecution," the "chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure."  *Id.*  Fort therefore respectfully and urgently asks that this Court immediately dismiss the superseding indictment against her with prejudice.[1]

### INTRODUCTION

There is no question that Fort is a long-practicing and reputable journalist—indeed, this Court has credentialed her as a journalist for covering proceedings in this District.  Nor is there any doubt that Fort was at Cities Church during the protest on January 18, 2026, in her capacity as a journalist.  This has been uniformly established by

---

[1] In two concurrently filed motions, Fort has also sought dismissal on the grounds that (1) the government failed to adequately allege facts that, if proven, would establish the elements necessary to proceed under the terms of the statutes she is charged with violating (Fort Motion No. 2), and (2) this is a vindictive prosecution (Fort Motion No. 3).

1

the government's own evidence gathered during its investigation, its filings in this case, video footage of the events, statements by the protest's organizers, remarks by various senior government officials after the events, and an interview given by the Church's pastor during the protest. It was also confirmed by multiple courts, several times over, when they repeatedly refused to sign the government's complaint against Fort, to sign warrants seeking her journalistic work product and the identifying information of her audience, or to issue warrants for the arrest of multiple other journalists. The superseding indictment itself further makes plain that the sum total of Fort's conduct consisted of actions that journalists routinely and properly take: Fort was invited into a space open to the public, observed events, videorecorded them, conducted interviews, asked questions of key players, sought to include a range of perspectives, and conveyed the information she gathered to her online audience in real time.

Despite all that, the government contends that Fort committed federal crimes. The First Amendment to the United States Constitution and the Freedom of Access to Clinic Entrances ("FACE") Act, 18 U.S.C. § 248, on which this prosecution is premised, say otherwise for a host of reasons.

*First*, the FACE Act expressly excludes "expressive conduct . . . protected [under] the First Amendment to the Constitution" from prosecution. *Id.* at § 248(d)(1).

*Second*, in that regard, the Speech and Press Clauses of the First Amendment protect a journalist from legal liability for, as here, observing and reporting on matters of public concern—asking questions, conducting interviews of key participants, and disseminating her coverage—even where the topic of her reporting may include unlawful

conduct by others.  The government's efforts to criminalize such lawful journalism by alleging a conspiracy likewise run head-long into the First Amendment, which imposes narrow limits on conspiracy liability for activities it protects.  Moreover, this prosecution is also improperly restraining Fort's ongoing reporting, in further derogation of the First Amendment, which erects a virtually insurmountable barrier to such restraints.

*Third*, the superseding indictment unconstitutionally applies the statutes at issue in a content-based manner.  The government's prosecution targets Fort for the topic of her reporting and her perceived viewpoint, as well as her role as a journalist who was, in their view, amplifying a message they did not like.  Specifically, the government is now *prosecuting* Fort for, among other things, filming and disseminating footage of an anti-government protest, even though both the Church itself and parishioners captured and disseminated their own footage of the same events.  In contrast, the government actually *encourages* journalists to provide *favorable* coverage of immigration enforcement, including by inviting them along for immigration raids and telling its agents to be "camera ready" for such coverage.  Moreover, the government is enforcing the FACE Act in a content-based manner, aggressively prosecuting anti-ICE protests—and the journalists covering them—while expressly declining to prosecute (and pardoning) protesters at reproductive health facilities, other than pregnancy crisis centers.  Because the government is enforcing the statutes against Fort in a content-based manner in multiple respects and cannot come anywhere close to satisfying strict scrutiny, as required, the superseding indictment must be dismissed.

3

*Fourth*, each of these First Amendment limitations on this prosecution are both clear and expressly incorporated by reference into the statutes at issue. To the extent that the government claims otherwise, despite the plain text of 18 U.S.C. § 248(d)(1), the statutes would be unconstitutionally vague and therefore unenforceable against Fort—or, at a minimum, subject to the rule of lenity.

Each of these arguments provides a separate and independent basis on which this prosecution violates the Constitution and must be dismissed. In combination, they paint a stunning picture of government intrusion into core, constitutionally protected activities. If the First Amendment is to mean anything, it must halt the government's prosecution against Fort for doing precisely what it protects: covering and reporting on newsworthy events. For all these reasons, and as set forth below, Fort respectfully requests that the Court grant this motion and dismiss the superseding indictment against her with prejudice.

## FACTS

As explained in the "Standard of Review" section, on motions "raising First Amendment issues," courts have "an obligation to make an independent examination of the whole record in order" to avoid "forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984). Accordingly, Fort sets out below the full details of the events and her role in covering them in support of her arguments that the First Amendment requires dismissal of this prosecution.

4

## I.  FORT IS A PROFESSIONAL JOURNALIST

Fort is an award-winning journalist, with nearly 20 years of experience in radio, television, and, more recently, independent online news media.[2]  Since launching her own news program, *Here's the Truth*, in 2023, she has earned a dozen regional Emmy nominations and taken home three wins for her highly respected news coverage.[3]

A Minnesota native and Twin Cities resident, Fort is a trusted news source, reporting on matters of significant public concern and interest to the Twin Cities metro area, greater Minnesota, and the nation.[4]  Her coverage of the George Floyd protests, for example, reached more than 18 million viewers nationwide.[5]

This Court has formally credentialed Fort as a member of the press for the District of Minnesota, and she has regularly covered judicial proceedings in this very courthouse.[6]  For example, she was credentialed to cover the federal trials of Tou Thao, J. Alexander Kueng, and Thomas Lane for depriving Floyd of his civil rights.  Fort has also been credentialed to cover various high-profile proceedings by the courts of the State of

---

[2] About, GeorgiaFort.com, https://perma.cc/8MVS-UQHH.

[3] *Id.*

[4] Georgia Fort (@GeorgiaFort), YouTube, https://perma.cc/2FHB-SVE7; Vickie Evans-Nash, *Still telling the stories that matter*, Minnesota Spokesman-Recorder (Aug. 22, 2025), https://perma.cc/E8GP-SKSY.

[5] *Georgia Fort*, Bush Foundation, https://www.bushfoundation.org/fellows/georgia-fort/; GeorgiaFort.com, *supra* n.2.

[6] Such credentials are ultimately issued at the Court's discretion to individuals who are "employed by a newspaper, television, radio or other media organization."  *See* Media Application, U.S.D.C. for the Dist. Of Minn., https://perma.cc/5TNV-S8DA.

Minnesota, including the state trial of Derek Chauvin for Floyd's murder, his sentencing, and the trial of Kimberly Potter for the death of Daunte Wright.[7]

Fort's work has been widely recognized, including by the Minnesota Society of Professional Journalists, which nominated her as 2024 Journalist of the Year.[8]  Fort serves as the Vice President of the Minnesota chapter of the National Association of Black Journalists.[9]  She is also a 2025 Bush Fellow,[10] as well as the founder of both BLCK Press[11] and the Center for Broadcast Journalism.[12]

## II.   FORT'S MEDIA COVERAGE OF OPERATION METRO SURGE

### A.   Operation Metro Surge

In early December 2025, the federal government launched an unprecedented immigration enforcement campaign in Minnesota known as "Operation Metro Surge."[13] As part of this operation, thousands of agents from Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and other federal

---

[7] Bush Found., *supra* n.5; GeorgiaFort.com, *supra* n.2.

[8] *2025 Page One Awards Winners*, Minn. SPJ (June 18, 2024), https://perma.cc/WWK8-5JYF.  *See also* MN NAWBO (@NAWBO.MN), Facebook (Nov. 24, 2024), https://perma.cc/TX52-SMFA; *Business Journal's 2024 40 Under 40 Honorees*, Minneapolis/St. Paul Bus. J., https://www.bizjournals.com/twincities/c/business-journal-2024-40-under-40-honorees/22484/40-under-40-georgia-fort.html.

[9] Nat'l Ass'n of Black Journalists Minn., https://perma.cc/2RLN-YBTN.

[10] Bush Found., *supra* n.5.

[11] Our Team, Blck Press, https://perma.cc/W7X4-7WPX; News, Blck Press, https://perma.cc/NTV3-FZPU.

[12] About, Ctr. For Broad. Journalism, https://perma.cc/9GPN-BMFQ.

[13] Emmy Martin, *How the arrival of thousands of federal agents has shaken Minnesota*, The Minn. Star Tribune (Jan. 16, 2026), https://perma.cc/N6KM-4E7S.

agencies descended upon the state, especially the Twin Cities.[14]  Equally unprecedented,

was the level of organized community response to Operation Metro Surge, which,

according to the government itself, had not "happen[ed] anywhere else."[15]

In her capacity as a journalist, Fort consistently and actively covered both of these

newsworthy events.[16]  On January 7, she covered the shooting death of Minneapolis

resident Renee Nicole Good by ICE agent Jonathan Ross.[17]  This killing sparked

widespread protests in the community, which Fort covered as well.[18]

A week later, on January 14, Fort covered ICE agents' shooting of Twin Cities

resident Julio Cesar Sosa-Celis in North Minneapolis.[19]  The same evening, ICE agents

---

[14] *Id*.; DHS (@DHSgov), X, (Jan. 6, 2026) https://perma.cc/QA95-XJL7 (describing Operation Metro Surge as "the largest immigration operation ever taking place").

[15] Eric Roper, *Roper: How Minnesota's civic culture fueled a tough ICE resistance, took feds by surprise*, The Minn. Star Tribune (Jan. 29, 2026), https://perma.cc/6CMT-BXHE (quoting Deputy Attorney Todd Blanche's statement about the level of community resistance in the Twin Cities); *see also id.* (quoting former CBP Commander Greg Bovino admitting that the Minneapolis community's resistance was something "he hadn't seen [this] in other cities").

[16] *See, e.g.*, Georgia Fort (@Georgia Fort), *Federal Press Conference in Minneapolis – Immigration Enforcement Update*, YouTube (Oct. 24, 2025), https://perma.cc/A4SS-E2Q9; Georgia Fort (@Georgia Fort), *Live from Protest at Bishop Henry Whipple Federal Building*, YouTube (Jan. 9, 2026), https://perma.cc/T99H-2UM2; Georgia Fort, *I Was Arrested for Doing My Job as a Reporter. Who's Next?*, N.Y. Times (Feb. 5, 2026), https://perma.cc/DF3W-JBCC  (By January 18, 2026, "I was on my 11th straight day of covering the unrest in Minnesota[.]").

[17] Georgia Fort (@Georgia Fort), *Live from protest following the ICE shooting of Renee Good in Minneapolis*, YouTube (Jan. 7, 2026), https://perma.cc/S679-9G6A.

[18] *Id*.; Georgia Fort (@Georgia Fort), *Community Demands Arrests of Agent Who Killed Renee Good*, YouTube (Jan. 8, 2026), https://perma.cc/LV2S-9HWA.

[19] Georgia Fort (@Georgia Fort), *BREAKING: ICE shooting in North Minneapolis*, YouTube (Jan. 14, 2026), https://perma.cc/R6N7-5AUR.

detonated a flash-bang grenade under an SUV, temporarily trapping a family—including multiple children—inside the vehicle as it filled with chemical gases, resulting in a six-month-old losing consciousness and requiring CPR.[20]  Once again, protests against Operation Metro Surge erupted, which Fort also covered.[21]

On January 24, Customs and Border Protection ("CBP") agents shot and killed another Minneapolis resident, Alex Pretti.[22]  Fort again covered both the shooting and the resulting protests in the community.[23]

The government has openly criticized and tried to silence such unflinching press coverage of Operation Metro Surge.  The President, for example, complained that "there is too much media attention on ICE . . . and not enough attention paid to" issues he prefers.[24]  Although the President later fired Secretary of Homeland Security Kristi Noem, at the time he blamed the media for not giving her enough "credit for the job" she was doing in Minnesota.[25]  After the Pretti shooting, federal agents went so far as to immediately arrest and detain *witnesses* to the shooting, effectively preventing them from

---

[20] Louis Krauss, *Family recounts being caught in unrest after man is shot by federal agent*, The Minn. Star Tribune (Jan. 21, 2026), https://perma.cc/LY98-3R3H.

[21] Fort, *BREAKING: ICE shooting in North Minneapolis*, *supra* n.19.

[22] Georgia Fort (@Georgia Fort), *BREAKING: Reports of another ICE shooting in Minneapolis on Nicollet Ave*, YouTube (Jan. 24, 2026), https://perma.cc/72WH-RTM5.

[23] Georgia Fort (@Georgia Fort), *Community Gathers at Memorial for Alex Pretti – Jan. 25, 2026*, YouTube (Jan. 25, 2026), https://perma.cc/2BGL-QQS3.

[24] The White House (@whitehouse), Instagram (Jan. 19, 2026), https://perma.cc/J89A-N8RT.

[25] Jonathan Allen, Peter Nicholas, Henry J. Gomez, Allan Smith and Dan De Luce, *Trump talks Minneapolis, Joe Rogan, the Fed, AI and 2028 in a wide-ranging interview*, NBC News (Feb. 4, 2026), https://perma.cc/593J-A6DL.

telling journalists like Fort what they saw.[26]  Federal agents also assaulted a journalist on the scene, spraying her in the face with chemical irritants, even though she was prominently displaying her press credentials.[27]

When the federal government believes press coverage of immigration enforcement actions will be favorable, however, it affords the press near unfettered access.  For example, the government directed Department of Homeland Security ("DHS") agents to be "camera-ready"[28] and has invited journalists to "ride along" for some of the agency's most high-profile raids.[29]

---

[26] Jonah Kaplan, *Minneapolis man says he was detained for hours after witnessing Alex Pretti shooting,* CBS News (Jan. 25, 2026), https://perma.cc/RUL7-CQAM  (recounting how "agents turned on [witnesses] in the vicinity" immediately after shooting Pretti and took "almost two dozen [people] from the scene" to the "Whipple Building . . . for several hours").

[27] *Reports of shooting involving federal agents, KARE reporter pepper sprayed*, KARE 11 (Jan. 24, 2026), https://perma.cc/8W5R-AW2K.

[28] Josh Campbell, Andy Rose, and Nick Valencia, *Federal agents in immigration operations told to be camera-ready as thousands arrested*, CNN (Jan. 28, 2025), https://perma.cc/MD3P-PEHR.

[29] *See, e.g.*, Jamiles Lartey, *How Trump's Immigration Crackdown Blurs the Lines Between Reality, Rumor and Theater*, The Marshall Project (Feb. 8, 2025), https://perma.cc/42LC-RNVR (indicating ICE would "invite[] media along to maximize coverage" of them in action); *Dramatic immigration raid in Los Angeles caught on video*, Fox News (Aug. 7, 2025), https://perma.cc/UGG8-2AVC; Matthew Cunningham-Cook, *Led by Fox, Journalists Embed With DHS Amid Media Crackdown*, The American Prospect (Sept. 24, 2025), https://perma.cc/7T43-47D5 (collecting examples of media embedded with DHS agents).

9

**B.    "Operation Pullup" at Cities Church**

**1.    The pre-protest assembly**

In the midst of Operation Metro Surge, and following the Good and Sosa-Celis

shootings, Minnesota community leader and former Minneapolis mayoral candidate

Nekima Levy Armstrong (Defendant No. 1), posted the following flyer to Instagram:



The flyer directed anyone who "want[s] ICE out of Minnesota" to show up on Sunday,

January 18 at 10:00 a.m. at the "Midway Cub foods for an ICE OUT Action in honor of

Dr. Martin Luther King."[30]  The planned action was part of a series of demonstrations

dating back to the murder of George Floyd referred to as "#OPERATIONPULLUP."[31]

The flyer expressly instructed participants to "Dress warm," suggesting that this action

would, like prior ones Fort had covered, be outside.[32]

The events of this particular action were well captured thanks to the journalists

documenting and publishing them in real time.[33]  As seen in the livestream broadcast by

Don Lemon (Defendant No. 4), on January 18, a group of more than 25 individuals

congregated in the Cub Foods parking lot, where Levy Armstrong and Chauntyll Allen

---

[30] RacialJusticeMN, Instagram (Jan. 17, 2026), https://perma.cc/C4JR-3EXN; ECF 144 ¶¶ 7(a), 8(6)-(11).

[31] *Id*.; *see also* Ex. 1 (Lemon's livestream) at 0:45-1:05.  In the past, Operation Pullup had typically engaged in outdoor protests at the homes of public officials, including "staged demonstrations" at "the Police Federation head's home" to protest the murder of George Floyd; at the home of "the head of the U.S. Marshal's for Minnesota after Winston Smith was killed by the U.S. Marshals"; and at the home of the Washington County Attorney "after Daunte Wright was killed" and Minnesota Attorney General Keith Ellison "refused to take the case." *Id*. at 8:02-10:05.  Prior Operation Pullup actions have also regularly been the subject of news coverage.  *See, e.g.*, Ricardo Lopez, *Activists confront Washington County Attorney at his Stillwater home, demanding murder charge for ex-Brooklyn Center cop who shot Daunte Wright*, Minn. Reformer (Apr. 23, 2021), https://minnesotareformer.com/briefs/activists-confront-washington-county-attorney-at-his-stillwater-home-demanding-murder-charge-for-ex-brooklyn-center-cop-who-shot-daunte-wright/.

[32] RacialJusticeMN, *supra* n.30; Ex. 2 at 00000429 (Levy Armstrong explaining Fort had "covered the previous ones we did"); *see also* Ex. 40 at 11:5-7 (grand jury witness noting, despite being inside the Church, "everyone had large . . . winter coats and, and some folks had, you know, headgear" for the cold).

[33] As explained below, the Court can and should consider this footage as required by the First Amendment.  *See* Standards of Review, *infra*.

11

(Defendant No. 2), spoke to the group.  Ex. 1 (Lemon's livestream) at 0:00-8:06.[34]
Fort—who is visible in a red coat with a fur-lined hood—was observing from the side
opposite Lemon while the crowd of protesters practiced various chants.  *Id*.  As shown in
his livestream, Fort did not participate.  *Id*.  Approximately three-and-a-half minutes into
Lemon's coverage of this assembly, Fort walked to her car, where she stayed until the
group left the Cubs Food parking lot.  *Id*. at 3:30-10:10.

About six minutes into the gathering, after Fort was already in her car, Levy
Armstrong and Allen distributed some "information" about the operation.  Ex. 1
(Lemon's livestream) at 7:35-8:01; Ex. 3 at 00000504 (noting that 6+ minutes into
Lemon's livestream "organizers outline[d] the plan" and "ensure[d] everyone has the
address, to the church").  They did not, however, provide the location's name, any
explanation as to their purpose, or what they planned to do after arriving, declining to
answer questions about those details from other protesters.  Ex. 1 (Lemon's livestream) at
6:26-6:38.

### 2. Arrival at Cities Church

About thirty minutes later, the participants in Operation Pullup—and the
journalists covering it—arrived at what turned out to be Cities Church.  *Id*. at 38:56.  At
some point, the Pastor, Jonathan Parnell, noticed those individuals entering the Church
and invited them to sit in any open seats.  Ex. 4 (Church's broadcast) at 24:20-24:30 ("If

---

[34] For the Court's convenience, Fort has provided all video footage referenced herein on
an external drive.  Lemon's livestream also remains available online:
https://perma.cc/YH5G-AD3H.

you need some more seats, we do have some seats available in the sides here . . . some seats up here as well.");[35] Ex. 5 at 00000113 (parishioner recalling the Pastor "inviting them to take a seat").  As the Pastor prepared to begin the gospel reading, Levy Armstrong announced:  "Excuse me, Pastor.  You said that you asked the Lord to chasten your house . . . to get [it] in order."  Ex. 4 (Church's broadcast) at 24:37-24:48.  In response to Levy Armstrong's interruption, Pastor Parnell suspended the service, and Fort then began livestreaming the newsworthy events that followed.  *Id.*; Ex. 8 (Fort's livestream) at 0:00-0:20.[36]  At first, Fort's footage shows numerous protesters shuffling past where she is sitting.  *Id*.  Fort then moved towards the front of the Church to better film where the protesters had gathered.  *Id*. at 0:00-0:53.[37]

As further documented in the various video feeds, a number of parishioners immediately left the Church, while some filed out more slowly during the protest.  *Id*. at 0:52-18:55; Ex. 1 (Lemon's livestream) at 38:07-41:50; Ex. 9 at 0:00-2:16 (footage obtained by Milwaukee Journal Sentinel).  Other parishioners chose to remain in the Church, some staying in their seats, some standing in the aisles, and others standing on the periphery along the walls.  Ex. 8 (Fort's livestream) at 0:52-3:30, 8:40-9:05; Ex. 4

---

[35] Cities Church broadcasts its services live online.  *See, e.g.*, Ex. 6 at 00000201 ("Cities Church has a link on its website that allows people to remotely watch their Sunday service via a live stream."); Ex. 7 at 00000108 ("Cities Church Broadcast Footage"); *see also* Sermons, Cities Church, https://perma.cc/3225-TLDK.

[36] In addition to the external drive submitted herewith, Fort's livestream is also available online: https://perma.cc/4TL2-R8A5.

[37] Similarly, Lemon's footage shows him entering the Church silently, with his videographer remaining outside until Pastor Parnell had suspended the service.  *See* Ex. 1 (Lemon's livestream) at 38:07-41:50.

(Church's broadcast) at 28:47-45:40; *see also* Ex. 40 at 28:4-7 (grand jury testimony that "people were leaving throughout this whole time . . . some members I think felt like they needed to stay as, as just to be a faithful presence and pray.  And eventually they also left").  Some parishioners who had left the Church subsequently returned.  *See* Ex. 10 at 00000110 (parishioner left the Church just before the protest, but upon hearing it start, re-entered the Church and remained in her pew); Ex. 11 at 00000128-29 (parishioner left the Church when the protest began, went home, and returned a short while later).

During the protest, protesters engaged in various chants, such as "ICE out"; "Justice for Renee Good"; and "When our immigrant neighbors come under attack, what do we do? Stand up, fight back."  Ex. 8 (Fort's livestream) at 0:52-23:45; Ex. 4 (Church's broadcast) at 24:40-26:14.  One protester held an anti-ICE sign during the protest.  ECF 144 ¶ 8(31).  Fort did not participate in any of the chanting or other protest activity, as established by real-time video footage of the events and statements from eye-witnesses at the Church, and according to the government itself.  *See generally* Ex. 1 (Lemon's livestream); Ex. 4 (Church's broadcast); ECF 539 at 2-5 (noting any allegation "about Fort chanting" would be "incorrect").[38]

---

[38] Despite this, the government falsely represented in at least fifteen search warrant affidavits submitted to multiple judges in multiple courts and a January 27, 2026 version of the complaint affidavit that Fort engaged in "chanting."  Ex. 42 at 1 (noting the government "submitted admittedly false testimony about Ms. Fort's conduct in connection with at least fifteen search warrant affidavits (and counting)"); Ex. 45 at 00019376 ¶ 40 (Jan. 27, 2026 complaint affidavit containing same).  Although the government contended this pattern was the result of a "cut and paste" error, later affidavits actually expanded on the chanting allegation, falsely alleging that Fort chanted specific statements, even though the government was later forced to concede that never happened.  *See* ECF 542 ¶¶ 7-8.

14

About a minute into the protest, Fort captured and livestreamed Levy Armstrong's statement that she is also a reverend. Ex. 8 (Fort's livestream) at 0:50-0:55. Fort likewise captured and livestreamed Pastor Parnell response in which he loudly proclaims, "Shame. Shame on you. Shame. Shame on you. This is the house of God." *Id.* at 0:55-1:05.

### 3. The journalists conduct interviews

About seven minutes into the protest, when it was clear the service would not resume, Fort interviewed Levy Armstrong inside the Church. Speaking directly to Fort's camera and holding a blue "GF"-branded news microphone (shown in the photos below), Levy Armstrong explained that she chose to organize a protest at Cities Church because

> David Easterwood is a pastor here. He is also the director of the field office for ICE in St. Paul. So someone who claims to worship God, teaching people in this church about God, is out there overseeing ICE agents. Think about what we've experienced. The murder of Renee Good at the hands of ICE. A Venezuelan national shot by ICE. A six month old baby who almost died as a result of ICE unleashing military grade weapons on our community. How dare you claim to be a pastor of God, and you are involved in evil in our community. So we are here, as representatives for justice and righteousness and truth. We will not allow the house of God to perpetuate a farce. This is not the house of God. So we are here demanding justice for Renee Good. David Easterwood ought to be ashamed of himself. He is no man of God, being a field director for ICE and all the havoc they're wreaking on our community.

*Id.* at 6:48-8:04. After Fort finished her own interview with Levy Armstrong, she also livestreamed Lemon's interview of Levy Armstrong. *Id.* at 9:02-9:43.

15

About ten minutes into Fort's livestream, she recorded Lemon approaching Pastor Parnell at the front of the Church to seek his perspective. *Id*. at 10:33-10:34. Fort walked up the center aisle to listen in on Lemon's conversation with the Pastor. *Id*. at 10:34-10:43. As the footage shows, Pastor Parnell willingly participated in Lemon's interview. Indeed, according to at least one parishioner, the Pastor actively "attempt[ed] to speak with the protestors," Ex. 10 at 00000110, but they would not engage him, as the Pastor explained to Lemon during Lemon's interview. Although Fort asked no questions, she reached in with her microphone to capture and livestream Lemon's exchange with the Pastor:

> PASTOR PARNELL: Our church had gathered for worship, which we do every Sunday, and we were interrupted by this group of protesters. We asked them to leave and they, um, obviously have not left.
>
> LEMON: What do you think of this?
>
> PASTOR: I mean, this is unacceptable. It's shameful. It's shameful to interrupt a public gathering of Christians in worship.
>
> LEMON: But there were folks who . . .
>
> PASTOR: I have to take care of my flock and my family.
>
> LEMON: Listen, we live in a . . . there's a Constitution and a First Amendment to freedom of speech and freedom to assemble and protest.
>
> PASTOR: We're here to worship. We're here to worship Jesus because that's the hope of these cities. That's the hope of the world is Jesus Christ.
>
> LEMON: I want to be very respectful. Please don't push me though.
>
> PASTOR: We're, we're here. We're here to worship Jesus. That's why we're here. Okay? That's why we're here. That's what we're about.
>
> LEMON: Don't you think Jesus would be understanding and . . .
>
> PASTOR: We're about . . .

16

LEMON: . . . love these folks?

PASTOR: We're about spreading the love of Jesus.

LEMON: But did you try to talk to them, as a Christian?

PASTOR: No one is willing to talk.

LEMON: Okay.

PASTOR: I have to take care of my church and my family. So I ask that you actually would also leave this building.

LEMON: You don't want us to chronicle?

PASTOR: Unless you're here to worship.  Unless you're here to worship.

LEMON: I'm always worship[ping].  I'm a Christian.

PASTOR: We're here to . . . Well, we're here to worship.  We're here to worship.

LEMON: Okay, thank you very much.  I appreciate you.

*Id*. at 10:35-12:00; Ex. 1 (Lemon's livestream) at 51:16-52:44.  Significantly, in talking

with Lemon, Pastor Parnell refers to "this group of protesters" as "them" (not "you"),

adding that "they . . . have not left," and he takes no issue with Lemon's description of

the journalists' separate role to "chronicle" the events.  *Id*.  Notably, during the interview,

several parishioners also gathered around the Pastor, standing next to him.  *See* Ex. 4

(Church's broadcast) at 35:08-36:41; Ex. 1 (Lemon's livestream) at 51:28-52:42.

At the end of this interview, Fort moved away from Pastor Parnell, and the Pastor

freely walked away:

17







Ex. 1 (Lemon's livestream) at 52:40-52:44; Ex. 4 (Church's broadcast) at 35:40-36:40; *see also* Ex. 12 at 00006990 (███ describing how "Lemon and the others," including Fort, had "moved out of ███ way" so he could pass freely); Ex. 40 at 26:1-2 (grand jury testimony that "after the interview ended," the journalists "kind of disbanded" from standing near the Pastor). Indeed, ████████████████████████████ ████████████████████████████████████ ████████████████████ I did not expect for those people who were interviewing" to engage in "bad behavior because they're videoing." *Id*. at 39:1-14. ██ twice disclaimed feeling "physically threatened by ████████." *Id*. at 40:15-18; *id*. at 39:12-14.

Although the Pastor asked Lemon to "also leave this building," as Fort's video shows, that is largely drowned out by the background audio, including chanting and the Church's loud music. Ex. 8 (Fort's livestream) at 11:46-11:58; Ex. 40 ("we eventually turned some music on to try to overpower the chanting"); *see also* Ex. 1 (Lemon's livestream) at 52:42-52:47, 53:37-53:43 (noting it was difficult to "hear him" because "they pumped the music up really, really loud" inside the Church). There is no indication that Fort heard the Pastor's request to Lemon, and, in any event, ████████████ it was not directed at her. Ex. 13 at 00007878 (███ "asked LEMON to leave the church"); Ex. 12 at 00006990 (███ "asked both Armstrong and Lemon to leave his church"); Ex. 40 at 35:25-36:1 ("to the interviewer, Don Lemon, ███, 'You may leave.'"). Fort did not separately speak with the Pastor; rather, she simply captured

19

Lemon's interview, providing the Pastor's perspective to her viewers, as she had done with Levy Armstrong.

When the protesters subsequently left the Church, Fort followed and continued documenting them. Ex. 8 (Fort's livestream) at 23:07-24:07. Because the Church had been playing loud music inside, Fort interviewed Levy Armstrong again once outside, asking her to explain "why you held this action here today." *Id*. at 24:08-24:13. Levy Armstrong reiterated that it was because "David Easterwood is a pastor here. He also serves as the field director for ICE in St. Paul. So, in other words, he is the overseer for ICE agents." *Id*. at 24:13-24:30.

### 4.    Outside the Church

The superseding indictment alleges that, in conducting this interview, Fort stood in front of a van that "was preparing to depart." ECF 144 ¶ 8(41). It is unclear, and the superseding indictment does not explain, how conducting an interview outside a church constitutes interference with worship—or even how purportedly standing near the front of a vehicle could block it from backing out. Regardless, Fort's livestreamed footage also demonstrates that any such allegation would be unfounded.

The livestream shows a black van with snow covering its windshield parked behind where Levy Armstrong was standing. Ex. 8 (Fort's livestream) at 24:05-24:40. A few seconds into the interview, the driver of the van turned on the wipers to clear the windshield of the snow. *Id.* The driver neither attempted to drive away nor indicated an intent to do so, whether by turning on a signal or honking the horn, and there is no indication that Fort impeded the van from leaving. *Id.* The livestream shows multiple

20

people walking alongside the van and between the van and where Levy Armstrong was standing while Fort interviewed her. *Id.* A couple of minutes later, after Fort concluded her interviews with Levy Armstrong and Monique Cullars-Doty, Defendant No. 16, Fort panned her camera back in the direction where the van had been parked, and the van was no longer there, indicating that it was able to leave without issue. *Id*. at 24:30-27:03; *see also* Ex. 1 (Lemon's livestream) at 1:05:41-1:06:43 (showing black van which is no longer there about a minute later).

All of the evidence produced by the government uniformly corroborates this, including that the individuals in the van did not attribute any conduct related to it to Fort. Ex. 14 at 00000184 (describing a *man* following a parishioner "and ▮▮▮▮▮▮ to their vehicle" and standing "in front of her vehicle as she attempted to leave."); Ex. 15 at 00000119 (describing a "man" as going "up to a van full of children" and screaming "at them as the van was attempting to drive off"). Indeed, the government's primary percipient witness told the grand jury as much under penalty of perjury, describing conduct he attributed only to a male protester and making clear that the van was subsequently able to leave without issue. Ex. 40 at 33:12-34:12.

### 5.    Local law enforcement response

The Saint Paul Police Department ("SPPD") was on the scene and monitored Fort's public news reporting for real-time updates, but made no arrests. Specifically, records the government obtained from SPPD and produced in discovery reflect that an SPPD sergeant saw the Operation Pullup flyer "advertised" online in advance. Ex. 13 at 00007878. As a result, SPPD dispatched an officer to the pre-protest gathering location,

where the officer advised when the caravan "left the parking lot" of the Cub Foods. *Id*.

Once at the Church, the sergeant observed the events remotely through "News journalist

Georgia Fort's" livestream, which provided him with real-time information on what was

happening inside the Church and if "additional resources would be needed" to respond.

*Id*.  For example, the sergeant used Fort's livestream to apprise the three officers assigned

to the Church "that currently there were no physical altercations inside the church," so

there was no need to enter. *Id*.  "Eventually," "approximately 25 minutes" later, "the

group exited the Church" and "left the area without further incident." *Id*.  No arrests

were made, and SPPD never entered the Church.  *Id*.; *see also* Ex. 40 at 32:15-17 (grand

jury testimony that SPPD "did not come on our property, . . . and didn't engage"); Ex. 16

at 00000146 (parishioner recounting that "no officers entered the church," "the police

officers remained outside during the protest," and "only three (3) police officers

responded").  One of the parishioners present during the protest was actually an off-duty

police officer; although he observed the entirety of the events from inside the Church, he

made no arrests nor asked SPPD to assist.  *See* Ex. 17 at 00000045; Ex. 15 at 00000119

(describing off-duty officer as in "control [of] the situation").

As the broadcast footage from inside the Church clearly shows, Fort captured the

events using a professional-grade camera and microphone:

22



Ex. 4 (Church's broadcast) at 25:55-26:00; Ex. 8 (Fort's livestream) at 9:30-9:40. She used no additional lighting. Ex. 4 (Church's broadcast) at 25:55-26:00. She moved without obstructing the aisles or any parishioners, livestreaming both the protest and the interactions between the protesters and parishioners. *Id*. at 25:55-47:27; Ex. 8 (Fort's livestream) at 1:00-23:00. At no point did Fort engage in chanting or other behavior characteristic of protesting or activism. *See generally* Exs. 8 (Fort's livestream), 1 (Lemon's livestream), 4 (Church's broadcast); *see also supra* n.38. It is also clear from the footage that Fort's presence as a member of the press did not impede or obstruct anyone from leaving the building, or as described above, the areas outside the Church. *Id*.

23

### C.    News Coverage After the Protest

Operation Pullup continued to generate public attention following the protest. Two days after the event, Fort and other local journalists covered a press conference at the Hennepin County Government Center held by the protest's leaders, in which they explained the impetus for the January 18 action.[39]  The national media also picked up and disseminated reports about the protest at the Church.[40]

Levy Armstrong made several more media appearances after the protest, including to answer questions regarding how it had been organized.  She explained to one news organization that, "as the world can see, both Don Lemon and Georgia Fort were there as independent journalists documenting the protest.  They're not organizers, they're not activists, they're not protesters.  . . .  Don and Georgia were there to document [the protest] as journalists should."  Ex. 18.  Levy Armstrong also confirmed that "Georgia had no advanced knowledge."  *Id*.

In response to a similar question from another news outlet—specifically about whether "Georgia Fort was part of the organization or the planning" of the protest—Levy Armstrong answered unequivocally: "No."  Ex. 19 at 2:00-2:10.  She continued,

> [O]n Saturday, I posted a flyer about this action with no details other than "Show up at the Cub foods parking lot, if

---

[39] Georgia Fort (@GeorgiaFort), *Protesters Demand Resignation of MN ICE Director*, YouTube (Jan. 20, 2026), https://perma.cc/2QC8-M8EB; Soyoung Kim and Jeff Wald, *Activists call for Cities Church pastor to resign over ICE leadership conflict*, FOX 9 (Jan. 20, 2026), https://perma.cc/7PV6-UG26.

[40] *See, e.g.*, Jacey Fortin and Lauren McCarthy, *3 People Arrested Over Protest of Minnesota Pastor Linked to ICE*, N.Y. Times (Jan. 22, 2026), https://perma.cc/A8GG-PQYY.

> you want to participate."  So Saturday night, I got a call from
> Don asking about this protest, and I said, "Listen, I can't
> reveal any information about this protest. . . .  I have to treat
> you like everyone else." . . .  Same with Georgia.

*Id*. at 2:18-3:00.  Levy Armstrong also shared that Lemon and others "didn't even know

we were going to a church," and further said that, even at Cub Foods, she gave only the

address of their destination—not the name—and told attendees, "when we get there,

you'll know what the situation is."  *Id*. at 3:15-3:35.

Levy Armstrong repeatedly emphasized that "no one—not a single person other

than my co-organizers—had any idea where we were going, what we were going to do.

They didn't even know what was going to happen once we got inside the location."

Ex. 18.  And specifically with respect to Lemon and Fort, she reiterated that, "neither

Don nor Georgia are activists, protesters or organizers in any way, shape, or form.  . . .

[T]hey did what journalists do, which is to document."  *Id.*

The government concedes that Fort was present for the January 18 protest in her

capacity as a journalist.  *See* Gov't Opp. to Mots. For Disclosure of Grand Jury Trs.

("Grand Jury Opp. (Journalists)") at 1, 2, 8-9 (ECF 479) (asserting, in response to

journalists' motion for grand jury materials, that "Journalists are not above the law," and

"[t]heir occupation as journalists" is "irrelevant").  That concession is wise, as the

evidence it collected as part of its investigation uniformly establishes that Fort was

present as a journalist.  *See, e.g.*, Ex. 20 at 00000187 (███ describes a "light skinned

female, who was holding a microphone with some type of emblem on it," approaching

███with Lemon; he "believed the woman to be some type of reporter or journalist based

on the microphone she held"); Ex. 21 at 00000353 (HSI's characterization: "Fort, a journalist"); Ex. 22 at 00001181 (codefendant describes Fort as a "reporter"); Ex. 13 at 00007878 (SPPD: "I also found a LIVE FEED of this event on the Facebook page of News journalist Georgia Fort").  Nevertheless, the government contends that, despite engaging solely in newsgathering and reporting, Fort violated the FACE Act and conspired with the protesters to do so.

## III.    THE INDICTMENTS

### A.    The Government's Failed Attempts to Charge Fort By Complaint

Immediately following Operation Pullup, in response to Lemon and Fort's viral coverage, the federal government vowed to "come after" anyone they deemed involved.[41] Then-Attorney General Pamela Bondi posted on X, "Listen loud and clear: WE DO NOT TOLERATE ATTACKS ON PLACES OF WORSHIP."[42]

On January 20, the government filed a sealed criminal complaint charging eight individuals, including Fort, with the same two charges at issue here: violations of 18 U.S.C. §§ 241 and 248.  *See* Case No. 26-mj-0040-LMP-DLM, ECF No. 23 (Jan. 20, 2026) (redacted complaint).  That day, the Court found probable cause for conspiracy charges against three defendants, but determined that no probable cause existed to charge Fort, Lemon, and three others under either law.  *See In re United States of America*, Case No. 26-01135, Emergency Pet. for Writ of Mandamus or Issuance of Arrest Warrants

---

[41] Jimmy Kimmel Live (@JimmyKimmelLive), *Jimmy Kimmel Interviews Don Lemon for the First Time Post-Arrest*, YouTube (Feb. 3, 2026), https://perma.cc/DX8N-DMZC.

[42] Att'y Gen. Pamela Bondi (@AGPamBondi), X (Jan. 22, 2026, 2:28 PM), https://perma.cc/2RKN-HAVR.

("Writ Petition" or "Pet.") at 3 (8th Cir. Jan. 22, 2026). According to the government, on January 21, it "offered to submit additional evidence to support the complaint," but the duty magistrate advised (s)he would not be able to review the additional proffer on the expedited basis sought by the government. *Id.* Unsatisfied, the government took the unprecedented step of asking the District Court to review the magistrate's no-probable-cause determination. *Id.*, Pet. at 4.

Chief Judge Patrick Schiltz was randomly assigned to the matter. *Id.*, First Letter from Chief Judge Schiltz to Chief Judge Colloton ("Chief Judge's First Letter") (Jan. 23, 2026). Chief Judge Schiltz surveyed every judge in the District of Minnesota and all Chief Judges within the Eighth Circuit and failed to identify a single instance where a district judge reviewed the decision of a magistrate to deny an arrest warrant. *See id.* at 2; *id.*, Second Letter from Chief Judge Schiltz at 1 ("Chief Judge's Second Letter") (Jan. 23, 2026). Because of the unprecedented nature of the request, Chief Judge Schiltz informed the government that he needed to discuss the issue with his colleagues at their next bench conference, scheduled for a few days later, on January 27. Finding that timeline unacceptable, the government filed its Writ Petition, requesting a ruling by the next day, January 23. *See* Pet. at 2. The Petition contained no additional argument to support the arrest warrants. *Id.* at 11-12. It stated only that the complaint sufficiently established probable cause to charge each of the named defendants and, as support, cited back to the criminal complaint itself. *Id.* at 11-12.

The Chief Judge's First Letter explained that, if the government disagreed with the Court's no-probable-cause decision, it could "improve the affidavit and present it again to

27

the same magistrate judge." Chief Judge's First Letter at 2. The Chief Judge added that the government's argument amounted to little more than "I must accept" what the government puts forward "as true because they said it, and they are the government." *Id*. at 3.

The Chief Judge's Second Letter addressed the government's failure to establish probable cause even more directly:

> The government lumps all eight protestors together and says things that are true of some but not all of them. Two of the five protestors were not protestors at all; instead, they were a journalist and his producer. There is no evidence that those two engaged in any criminal behavior or conspiracy to do so.

Chief Judge's Second Letter at 1. Although Chief Judge Schiltz was apparently referring to the better-known Lemon and his producer, Fort stood in their same shoes. In that regard, the Chief Judge declined to disturb the refusal to issue an arrest warrant for Fort as well.

That same day, the government filed its Reply in the Eighth Circuit, acknowledging that Chief Judge Schiltz "ha[d] already considered whether the complaint establishes probable cause, at minimum for two of the five remaining charged individuals" (*i.e.*, Lemon and his producer). *In re United States of America*, Case No. 26-01135, Reply in Support of Emergency Pet. for Writ of Mandamus (8th Cir. Jan. 23, 2026). The government did not explain how the Chief Judge's reasoning would not also apply to Fort.

The Eighth Circuit denied the petition, *id.*, Judg. (Jan. 23, 2026), and the government formally withdrew its request for Chief Judge Schiltz to reconsider the

28

remaining arrest warrants, including Fort's. *See* Case No. 26-mj-00040-LMP-DLM, ECF 33 (Jan. 26, 2026). But that did not end the government's pursuit.

> **B.      Having Struck Out Three Times with Multiple Judges, in Desperation the Government Sought a Grand Jury Indictment**

With the President and senior federal officials publicly demanding charges against Lemon and the other defendants, including Fort, the government engaged in frantic and unprecedented maneuvers to bring this case. On January 20, the day the government initially sought an arrest warrant for Fort, the President twice criticized the *news reporting* on Operation Pullup.[43] The President also posted on social media that he had seen the "footage of the Church Raid in Minnesota" and thought that everyone involved "should be thrown in jail, or thrown out of the Country."[44]

At the same time, then-Attorney General Bondi was publicly pressing for charges against those who were at Cities Church, including the reporters, stating, "We are coming after you if you participated in that. I don't care if you're a failed CNN journalist, you have no right to do that in this country. We don't live in a third world country."[45]

---

[43] *Press Conference: Donald Trump Leads the Press Briefing at the White House*, RollCall.com (Jan. 20, 2026), https://perma.cc/PVH5-HYL6 (contending parishioners were "abused by guys like Don Lemon, who's a, you know, loser, lightweight" and criticizing the way they "walked in that church"); Katie Pavlich of NewsNation Interviews Donald Trump at the White House, RollCall.com (Jan. 20, 2026), https://perma.cc/DS5M-22VE (reiterating claim that Lemon is "a loser" and adding that others involved in protest were professional "agitators" and "anarchists").

[44] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 20, 2026, 1:37 AM), https://truthsocial.com/@realDonaldTrump/posts/115926042315145030.

[45] Derrick Evans (@DerrickEvans4WV), X (Jan. 24, 2026, 1:37 PM), https://perma.cc/24EW-E8YM; *see also id.* (characterizing journalist Don Lemon as an "online agitator").

Similarly, when asked on Fox News, then-Deputy Attorney General Todd Blanche said that "freedom of the press extends to a lot of different areas, but it does not extend to somebody just trespassing and being embedded with a group of rioters."[46]

Perhaps most notably, the President's pick to lead the Department of Justice's Civil Rights Division, Assistant Attorney General Harmeet Dhillon, sat for an extensive interview with Megyn Kelly to discuss the matter, even as the government's Writ Petition was still pending before the Eighth Circuit. Dhillon proclaimed:

> We're gonna pursue this to the ends of the earth. . . . The attorney general herself was there on the ground and managing this process with my principal deputy . . . . And so you know we're not giving up the fight here at all.[47]

In a post to X, Dhillon denounced the livestream coverage of Operation Pullup as "pseudo journalism" unworthy of First Amendment protection.[48]

In yet another interview, Dhillon sought to prioritize certain of the rights secured by the First Amendment, asserting that

> in my opinion, in a private property house of God, church, synagogue, mosque, whatever, there is only one paramount First Amendment right there, and that's the right to freely worship. The right to assemble, the right to protest, freedom of the press . . . you can't just do anything you want

---

[46] *Deputy AG Todd Blanche says authorities are investigating MN church storming 'aggressively'*, Fox News (Jan. 19, 2026), https://perma.cc/V5R9-8CC2, at 3:28-3:37.

[47] *The DOJ WILL Continue Pushing For Criminal Charges Against Don Lemon, Reveals Harmeet Dhillon*, The Megyn Kelly Show (Jan. 23, 2026), https://perma.cc/64QA-UDZG, at 1:54-2:06, 5:06-5:18; *Don Lemon's Outrageous "N Word Treatment" Comment and Promises WAY More Arrests, w/ Harmeet Dhillon*, The Megyn Kelly Show (Jan. 23, 2026), https://perma.cc/49E7-A8LB, at 1:57-2:23.

[48] Asst. Att'y Gen. Harmeet Dhillon (@AAGDhillon), X (Jan. 19, 2026, 12:21 AM), https://perma.cc/82VP-B2PF.

> anywhere, even on public property.  . . .  It's not protected by the law.  *If you wear the badge "journalist" or you claim, "I've got a microphone, I'm a journalist," that is legally irrelevant in the statute.*[49]

As with other politically motivated prosecutions demanded by the President, career prosecutors from the Minnesota U.S. Attorney's Office reportedly refused to participate in this case because the facts and evidence did not support the charges.[50]  As a result, lawyers in Dhillon's Civil Rights Division took over the case.[51]

Bondi, this time joined by Dhillon, returned to the Minnesota U.S. Attorney's Office in late January.  On January 29, the government brought the case before a grand jury.  ECF 39.  The resulting two-count felony indictment, returned that same day, did not bear the name of a single line prosecutor from this District's U.S. Attorney's Office, *id*., representing a stark departure from the many years of collaboration between the office and the Civil Rights Division.[52]

---

[49] @AAGDhillon, X (Feb. 3, 2026), https://perma.cc/VX8C-TP9S, at 0:04-0:42 (emphasis added).  In fact, as discussed herein, the FACE Act incorporates a rule of construction that excludes from its reach "expressive conduct . . . protected [under] the First Amendment to the Constitution."  18 U.S.C. § 248(d)(1).

[50] *See* Katy Tur, *Multiple prosecutors in Minn. and L.A. refused to be involved in Don Lemon charges, sources say*, MS Now (Jan. 30, 2026), https://perma.cc/HHX8-5T5M; Jeffrey Meitrodt and Sarah Nelson, *Inside the upheaval at the Minnesota U.S. Attorney's Office*, The Minn. Star Tribune (Feb. 27, 2026), https://perma.cc/2L7Y-MGU7.

[51] *See, e.g.*, Joe Palazzolo, *This Prosecutor Was Floundering.  Now He's a Go-To Guy at Trump's DOJ.*, Wall Street Journal (Apr. 6, 2026), https://perma.cc/EEJ7-N6XW.

[52] *See, e.g.*, Press Release, *Joint Statement of the United States Attorney for the District of Minnesota Andrew M. Luger, Assistant Attorney General for Civil Rights Vanita Gupta and Special Agent in Charge of the Minneapolis Division of the FBI Richard T. Thornton*, U.S. DOJ (Nov. 17, 2015), https://perma.cc/PV37-YZFU; Press Release, *Three Illinois Men Indicted On Federal Civil Rights And Hate Crime Violations In The Bombing Of Bloomington, Minnesota, Islamic Center*, U.S. DOJ (June 12, 2018),

Further underscoring the political spectacle driving this case, when Levy Armstrong was arrested, the government refused to allow her to turn herself in and even filmed her arrest.[53]  The White House's official social media account later posted a doctored still shot from that footage, darkening the color of Levy Armstrong's skin and making it appear as if she had cried hysterically (when in fact she had not cried at all).[54]

Fort's undersigned counsel contacted the government in advance to advise that she was represented, but the government arrested Fort at her house rather than allowing her to turn herself in.  ECF 138 at 1.  Lemon likewise was not permitted to turn himself in, despite his counsel expressly requesting that he be allowed to do so.  *Id*.  In sum, the government arrested Fort and Lemon for filming and disseminating footage of a protest against a government policy and a government official, while at the same time the government filmed and publicly disseminated its own footage (and altered photos) of

---

https://perma.cc/H9RK-87LM; Press Release, *Justice Department Files Sexual Harassment Lawsuit Against Owners Of Minneapolis Area Rental Properties*, U.S. DOJ (Sept. 16, 2020), https://perma.cc/2KCF-SE2L; Press Release, *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd*, U.S. DOJ (Feb. 24, 2022), https://perma.cc/B4PX-FSZX; Press Release, *Justice Department Finds Civil Rights Violations by the Minneapolis Police Department and the City of Minneapolis*, U.S. DOJ (June 16, 2023), https://perma.cc/DHU6-3R5L; Press Release, *Justice Department Secures Landmark Agreement with City of Anoka, Minnesota, to End Disability Discrimination in "Crime-Free" Housing Program*, U.S. DOJ (May 21, 2024), https://perma.cc/JTU9-AE2C.

[53] Erin Burnett Out Front, *Anti-ICE protest organizer speaks to CNN about arrest: ICE had me 'under surveillance'*, CNN.com (Jan. 23, 2026), https://perma.cc/LQ53-CSH8.

[54] The White House (@WhiteHouse), X (Jan. 22, 2026, 3:54 PM), https://perma.cc/689R-NVWN.

those arrests to amplify its contrary message criticizing the protest as well as the

journalists who covered it.

On February 26, the government obtained a superseding indictment in the case,

adding 30 additional defendants and charging them with the same two offenses set forth

in the initial indictment.  *See* ECF 144.

Since then, the flawed nature of the prosecution—brought with little, if any,

investigation beforehand—has come into even sharper focus.  As just a few examples:

- The government revealed, in seeking additional time to produce discovery, that it began investigating the facts of the case *after* it had already indicted Fort.  ECF 391; ECF 406 at 4, 6.

- In the rush to bring charges, after the highest federal authorities so demanded and several personally flew to Minnesota to see to it, the government indicted someone who was not even at the Church or involved in the protest in any way.  *See* Gov't Mot. to Dismiss (ECF 412); Joint Mot. for Disclosure of Brady Materials at 2 (ECF 413).

- The government necessarily presented inaccurate information to the grand jury to obtain an indictment against an innocent person, *id*. at 5, including to allege that she had conspired with Fort.

- The government refused to say whether it instructed either grand jury about how the FACE Act must be construed under the statute's own terms or the limitations on either charge it sought against Fort under the U.S. Constitution.  Grand Jury Opp. (Journalists) at 10-12.

- The government tried to obtain multiple search warrants in connection with this case, including for Fort's YouTube channel and the personally identifying information of her subscribers and livestream viewers, *see* Application for Search Warrant – Denied, *In re Search Warrant*, Case No. 26-mj-00206 (D. Minn. Feb. 24, 2026) (ECF 1), but was denied (multiple times) for lack of probable cause, Order Denying Search Warrant Applications, *Id*. (D. Minn. Feb. 24, 2026) (ECF 2); Order Keeping Under Advisement Three Search Warrant Applications, *Id.* (D. Minn. Mar. 6, 2026) (ECF 3)—a fact only discovered after the Court *sua sponte* unsealed

33

the rejected warrant applications, *see* Order to Unseal, *Id.* (D. Minn. May 22, 2026) (ECF 8).

- The government concedes that, in at least fifteen sworn search warrant affidavits, the lead case agent falsely claimed, among other things, that Fort participated in chanting inside the Church, despite also claiming to have reviewed the video footage of the events, footage that affirmatively disproves that sworn averment. *See* ECF 539 at 1-2, 7-8; ECF 528 at 4-6 (listing some MJ case numbers); Ex. 42 (noting the number is fifteen "and counting"); *see also* Ex. 45 (Jan. 27, 2026 complaint affidavit containing same).

## C.    **The Bald Allegations Against Fort**

The superseding indictment is remarkable in two respects. First, it advances only three meager allegations specifically against Fort. Specifically, the government claims that:

- Fort purportedly was present at a meeting at a shopping center for a pre-protest briefing, during which "other co-conspirators," though notably not Fort, were advised "about the target of the[] operation (*i.e.*, Cities Church) and provided instruction on how the operation would be conducted once they arrived," *id.* ¶¶ 8(13), (14);[55]

- inside the Church, Fort, along with Lemon and his producer, "approached the pastor and largely surrounded him (to his front and both sides), stood in close proximity to the pastor in an attempt to oppress and intimidate him, and physically obstructed his freedom of movement while Lemon peppered him with question to promote the operation's message," *id.* ¶ 8(35); and

---

[55] As explained above, video footage from this gathering confirms that none of the people present for the "pre-meeting" were told that the protest would be at the Church or "how the operation would be conducted." Notably, with respect to Fort, the government dropped its prior allegation from the initial indictment that she was present during the portion of the pre-meeting in which participants were supposedly briefed on the details of the protest. *Compare* ECF 144 ¶¶ 8(13), (14), *with* ECF 39 ¶ 8(4).

34

- outside the Church, Fort interviewed Armstrong in front of a minivan that was preparing to leave, but had not yet done so, *id.* ¶ 8(41).[56]

Second, the superseding indictment's limited allegations against Fort are flatly contradicted by the extensive documentary evidence of the events, including the real-time video footage available to the government.

Despite the limited nature of the allegations against Fort and the substantial documentary evidence contradicting them, the government contends that these actions amount to violations of (1) 18 U.S.C. § 241 by participating in a conspiracy to interfere with "the First Amendment right of religious freedom at a place of religious worship, as secured by Title 18, United States Code, Section 248(c)" (Count I), and (2) the FACE Act, 18 U.S.C. § 248(a)(2), (b) (Count II).

## IV.    THIS PROSECUTION IS IMPACTING FORT'S ONGOING REPORTING

The government's prosecution of Fort, for engaging in protected newsgathering and reporting on an indisputable matter of public concern, has interfered and is continuing to interfere with her ongoing reporting.[57]  For example, although Fort has publicly criticized her prosecution, since her arrest on January 30, she has refrained from reporting on the Cities Church protest or its aftermath precisely because she is facing

---

[56] In a meet-and-confer between the parties on July 1, 2026, the government repeatedly represented that its "case against Ms. Fort [i]s limited to only the paragraphs of the superseding indictment in which she is expressly named and that it otherwise does not consider general references to 'defendants' to include Ms. Fort." *See* Ex. 42 at 3 (unanswered letter memorializing parties' discussion and inviting clarification if letter did not "accurately capture" government's representations).

[57] Scott Nover, *The Trump administration arrested this journalist. She says the censorship is ongoing*, The Wash. Post (May 17, 2026), https://perma.cc/9E8R-7JPT.

criminal prosecution for supposedly participating in it. She did not report on the government's Herculean efforts to bring charges against the defendants here—indeed, she expressly chose *not* to report on it while facing the *threat* of prosecution[58]—and she declined to cover the subsequent protests outside the Church for fear of accruing new charges.[59]

Because of the pending charges, Fort also has not, since her arrest, attempted to interview any sources (parishioners, protesters, or others involved) about how the experience impacted them. It is not clear that they would talk to her if she tried, given her status as a defendant facing conspiracy charges predicated on her interacting with the protesters through her newsgathering and reporting. Thus, even though Fort is one of the few journalists with firsthand knowledge of the events on that day—a topic of significant public interest—she is hamstrung in being able to report on the subject and events surrounding the Church.

This chill has also impacted Fort's other reporting.[60] For example, prior to her arrest, Fort had been actively covering the ongoing national boycott of Target.[61] Two of

---

[58] Georgia Fort (ByGeorgiaFort), *Agents are at my door*, Facebook (Jan. 30, 2026), https://perma.cc/R2WX-N78P (I "knew that I was on a defendants list. I did not publish it because it was under seal.").

[59] Nicole Ki, *St. Paul police arrest protester on Easter Sunday outside Cities Church*, MPR (Apr. 5, 2026), https://perma.cc/GE3V-6BRC.

[60] Nover, *The Trump administration arrested this journalist. She says the censorship is ongoing*, *supra* n.57.

[61] *Id.*; *compare* Georgia Fort (@GeorgiaFort), *Target Boycott Continues on Black Friday*, YouTube (Nov. 28, 2025), https://perma.cc/425W-AWLP (previous coverage of press conference featuring Levy Armstrong and Cullars-Doty about Target boycott), *with* @bygeorgiafort, *The National Target Boycott that started in Minneapolis continues*,

the boycott's co-founders, however, are co-defendants (and alleged co-conspirators) in this case.[62]  As a result, Fort has refrained from interviewing them as part of her reporting on the Target boycott, which she otherwise would do but for the criminal prosecution against her.  Furthermore, like all other criminal defendants, Fort is also now highly conscious of everything she puts out into the public domain, realizing it could be used against her in this case.  Unlike most other defendants who are not journalists, however, this has a disproportionately heavy impact on Fort's ability to perform her constitutionally protected work.

## V.    THE GOVERNMENT'S CONTENT-BASED ENFORCEMENT OF SECTIONS 241 AND 248

The government is selectively enforcing Sections 241 and 248 to allow expression it favors while punishing speech it openly disfavors.  First, the government is enforcing these laws against journalists who covered the protests, but not the parishioners or the Church, both of whom also captured and disseminated footage of the protest.  Second, the government routinely allows federal law enforcement agents to interrupt church services and other church functions, and to have those raids covered by journalists, while prosecuting the journalists who covered the protest here.  Third, the government is prosecuting journalists for supposedly amplifying the anti-ICE protesters' message through their news reporting, while using their arrests and prosecution both to suppress

---

Threads (Mar. 11, 2026), https://perma.cc/8YSY-G9SC (covering Target boycott but relying on other journalists' clips of statements from Levy Armstrong and Cullars-Doty).
[62] *Id.*

that message and, through their own footage, to advance a pro-ICE viewpoint.  Finally, the government is enforcing the section of the FACE Act protecting church services while expressly refusing to enforce the section protecting reproductive health facilities (except "crisis pregnancy centers"), or to punish journalists who cover conduct at such facilities.

*First*, the government has not charged any of the parishioners from Cities Church under the FACE Act, despite several deliberately deciding to remain in the Church during the protest, standing in the aisleways, and recording the protest.  *See* Part II.B.2, *supra*; @CristieD, *Full video 1/18/26*, YouTube (Jan. 20, 2026), https://perma.cc/3QXM-BXEJ; Ex. 24 at 00001384 ("cell phone video" of the protest "by parishioners"); Ex. 25 at 00001379 (protest "footage provided by parishioners").  The Church itself also recorded the entirety of the protest for broadcast.  Ex. 7 at 00000108 ("Cities Church Broadcast Footage"); Ex. 26 at 00000231 ("the [Church's] live stream captured the whole incident").  Prosecuting journalists for recording and disseminating footage, while not prosecuting either the parishioners or the Church, both of whom did the same thing, impermissibly treats those two respective groups of "speakers" on the same topic differently.

*Second*, although DHS long had a policy against immigration enforcement at "place[s] of worship" and other sensitive locations, Ex. 27 (citing similar policies dating back to 2011), the government rescinded that limitation on the day of President Trump's second inauguration, Ex. 28.  Since then, ICE has deliberately targeted churches and other houses of worship to conduct immigration raids.  According to three DOJ attorneys

38

briefed on the government's strategy, ICE specifically "plan[ed] to target Spanish-speaking churches across the country." Ex. 29.

These were not just rumored plans. In June 2025, one Bishop in Los Angeles, California reported that his congregation "experienced at least one case of ICE agents entering a parish property and seizing several people." Ex. 30.

In Georgia, an individual was attending worship services with his wife and children, when ICE seemingly set off his "immigration GPS ankle monitor." Ex. 31. When he stepped outside to check on the issue, "ICE officers were waiting to take him into custody" in the middle of observing mass. *Id*.

The Christian Broadcasting Network reported that, during Operation Charlotte's Web in North Carolina, ICE arrested a man at his church "during a service project" held "after a Saturday service." Ex. 32. Video of the raid showed some parishioners fleeing into the nearby woods, others scrambling to get inside the church, one woman openly sobbing, and children huddling together.[63]

In North Hills, California, ICE arrested a parishioner on the grounds of the North Hills United Methodist Church during a church-sponsored event.[64] The pastor of the church reported that the arrest was so "terrorizing"—disrupting its food ministry, childcare services, and after-school programs—that it moved its services fully online

---

[63] Christian Broad. Network (@ChristianBroadcastingNetwork), *Ice Arrest at Church Sparks Outrage in Charlotte*, YouTube (Dec. 22, 2025), https://perma.cc/94Z7-24SN.

[64] KTLA 5 (@KTLA), *Community devastated after congregant arrested during immigration raid on L.A. church grounds*, YouTube (Feb. 2, 2026), https://perma.cc/L45B-FHQ4.

39

going forward as a result.[65]  As was the case here, journalists were on scene when the raid

occurred.[66]

Meanwhile, here in Minnesota, ICE has staked out churches during Spanish mass

hours, which one pastor characterized as "a real interference with our parishioners' right

to worship," adding that it cut attendance at services "by half."  Ex. 33.

Even assuming that the government could plausibly distinguish between

disruptions at houses of worship by ICE agents (which it embraces) and disruptions by

protesters (which it seeks to criminalize), it has no basis to treat the *journalists* covering

each type of action differently.  In that regard, the government has not charged the

individual who recorded and published footage of the North Carolina raid, or the

individual(s) who captured and published the North Hills raid, including the reporter who

was on scene at the time and covered it.  Similarly, as noted above, the government has

directed its agents to be "camera-ready," and invited journalists to "ride along" for some

of the agency's most high-profile raids.  *See* Part II.A, *supra*.  And the government has

outfitted agents with body cameras to enable them to capture events from their own

perspectives, but now seeks to criminalize journalists for obtaining their independently-

captured footage.[67]

---

[65] *Id.*

[66] NBCLA (@NBCLA), *Church leaders to denounce ICE raids on property*, YouTube (Feb. 2, 2026), https://perma.cc/9NT5-7MGY.

[67] Preston Mizell, *DHS Secretary Noem stands by body camera requirement for federal agents following Trump comments*, Fox News (Feb. 3, 2026), https://perma.cc/A7N4-H7JL ("DHS announced that federal law enforcement officers would be required to wear body cameras.").

***Third***, while openly protecting speech it favors, the government has continued to lash out against speech about the January 18 protest it dislikes. For example, immediately after Fort was released from custody following her initial appearance, she was met in the lobby of the Minneapolis federal courthouse by a crowd of media and community members. Even though the courthouse is open to the public during regular business hours, DHS flooded the public entryway outside of the security zone, ejected everyone, and shut down access for the rest of the afternoon. As seen below, DHS unleashed no fewer than two dozen agents on the otherwise peaceful gathering inside a public courthouse (ejecting, among others, Fort's counsel, who is pictured in the foreground):



*See also* Ex. 34 at 00000934 (targeting protest organizer's viewpoint by noting in investigative report that she "continued talking about President Trump and ICE negatively").

*Finally*, despite Bondi's later commitment at her confirmation hearing to enforce the FACE Act "evenhandedly,"[68] just days into his second term, the President pardoned over twenty people convicted of violating the FACE Act and/or engaging in a conspiracy to prevent access to reproductive health clinics providing abortions. Ex. 35 at 2-5. The next day, the Administration announced that it would no longer enforce the abortion-clinic-access portion of the law, except at pregnancy crisis centers. Ex. 36. It claimed that *those* "prosecutions and civil actions . . . have been the prototypical example" of "the weaponization of the federal government." *Id*. A week later, Bondi formed the "Weaponization Working Group" to examine, among other things, "[c]riminal prosecutions under the [FACE Act] for non-violent protest activity." Ex. 37. Notably, in at least one of the pardoned FACE Act cases, local journalists covered the protest and arrests, including inside the clinics, but were never charged with anything.[69] Again, even if the government could plausibly distinguish between protests at abortion clinics (which it embraces) and protests at churches (which it seeks to criminalize), it has no basis to treat the journalists covering each type of action differently based on the topic and message of the underlying protest.

---

[68] CNBC Television (@CNBCtelevision), *Pam Bondi faces questions at Senate confirmation hearing for attorney general*, YouTube (Jan. 15, 2025), https://perma.cc/HFC9-JS8D.

[69] *See* Alexandra Koehn, *8 adults, 4 children charged after refusing to leave abortion clinic*, NewsChannel 5 Nashville (Mar. 5, 2021), https://perma.cc/6BKL-F7PH (reporting that station reporter and a freelance photographer were both on site); *United States v. Gallagher et al.*, Case No. 3:22-cr-00327 (M.D. Tenn.), *appeal filed*, Nos. 24-5615/5640/5643/5647/5913/5928 (6th Cir. Jul. 8, 2024) (remanded and convictions vacated upon full and unconditional pardon from President Trump).

42

\*    \*    \*

Against this backdrop, the prosecution of Fort suffers from a cascade of First Amendment infirmities.  It punishes a journalist for covering a protest on matters of significant public concern.  It improperly tries to lump her into a conspiracy with those she was covering.  It results in an unconstitutional restraint on her ongoing news coverage.  It targets a journalist for the topic of her reporting and perceived viewpoint, including her decision to cover this protest at all, and therefore applies the statutes in a content-discriminatory fashion without satisfying strict scrutiny.  And, while the statutes expressly exclude such First Amendment-protected activities from their scope, if the government's strained interpretation somehow applied, they would be unconstitutionally vague.

The superseding indictment should promptly be dismissed with prejudice.

## STANDARD OF REVIEW

Because this case targets a journalist engaged in reporting on a newsworthy event, it directly implicates the First Amendment.  As such, the applicable standard differs from a typical prosecution in multiple respects.

*First*, for more than 100 years, the U.S. Supreme Court has required courts applying the First Amendment to consider the full circumstances in which otherwise protected conduct arises before it can be proscribed.  *See Schenck v. United States*, 249 U.S. 47, 52 (1919) (on challenge to an indictment, "the character" and constitutionality "of every act depends *on the circumstances* in which it is done" (emphasis added)); *see also Miller v. California*, 413 U.S. 15, 24-25, 34 (1973) (when captured by a criminal

43

statute, the context and content of the expressive conduct must be "taken as a whole," including assessing "contemporary community standards," even though they were not addressed in the indictment); *Cohen v. California*, 403 U.S. 15, 18-22 (1971) (including fulsome discussion of the circumstances in which the expressive conduct at issue did and did not arise).  As the Supreme Court has "repeatedly" explained, "in cases raising First Amendment issues" courts have "an obligation to make an independent examination of the whole record in order" to avoid "forbidden intrusion on the field of free expression." *Bose Corp.*, 466 U.S. at 499.

These procedural protections exist because First Amendment freedoms "are delicate and vulnerable, as well as supremely precious in our society," *NAACP v. Button¸* 371 U.S. 415, 433 (1963), or as the Court recently put it, "jealous[ly] protect[ed]," *Chiles v. Salazar*, 607 U.S. ---, 2026 WL 872307, at *7 (Mar. 31, 2026).  Accordingly, the Court has often emphasized—in a variety of settings—that "First Amendment freedoms" in particular "need breathing space to survive."  *Button¸* 371 U.S. at 433; *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964) (even erroneous statements "must be protected if the freedoms of expression are to have the 'breathing space' that they' need to survive'" (quoting *Button*, 371 U.S. at 433)); *Phila. Newspaper, Inc. v. Hepps*, 475 U.S. 767, 772 (1986) ("Freedoms of expression require breathing space." (cleaned up)).

***Second***, the First Amendment imposes various limitations on the government's ability to punish speech.  The Constitution does not allow a person to "be subject to prosecution for" squarely protected conduct.  *Miller*, 413 U.S. at 27.  Relatedly, it does not permit imposing on the speaker the burden of proving that her expressive conduct

44

"should be protected from criminal prosecution" in the first place. *United States v. Alvarez*, 617 F.3d 1198, 1204 (9th Cir. 2010) (citing *Hepps*, 475 U.S. at 778), *aff'd*, 567 U.S. 709 (2012). Rather, that burden falls squarely and solely on the government. As a result, the Constitution does not permit deference to the government or assume that even standard criminal legal processes operate as a sufficient check on the government to secure citizens' First Amendment's freedoms. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 480 (2010) (The "First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *Miller*, 413 U.S. at 25 ("First Amendment values" are "protected by the ultimate power of [the] courts to conduct an independent review of constitutional claims").

The First Amendment similarly does not tolerate "the existence of a penal statute susceptible of sweeping and improper *application*." *Button*, 371 U.S. at 433 (emphasis added) (invalidating statute as applied). In other words, the Constitution permits government intrusion into "the area" of the First Amendment "only with narrow specificity" and extreme vigilance. *Id*.; *see also Miller*, 413 U.S. at 22-23 (In "the area of freedom of speech and press the courts must always remain sensitive to any infringement . . . . This is an area in which there are few eternal verities.").

*Third*, courts have routinely "emphasized the importance of resolving First Amendment cases at the earliest possible junction." *Green v. Miss USA, LLC*, 52 F.4th 773, 800 (9th Cir. 2022); *McBride v. Merrell Dow & Pharm. Inc.*, 717 F.2d 1460, 1467 (D.C. Cir. 1983) ("In the First Amendment area, summary procedures are even more

45

essential.  For the stake here . . . is free debate."); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation").  As the Supreme Court explained in *Dombrowski*, 380 U.S. at 487, "vindication of freedom of expression" should not "await the outcome of protracted litigation."  Thus, even where a case involves "the improbability of successful prosecution," the "chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure."  *Id.* (citing numerous cases); *see also Lewellen v. Raff*, 843 F.2d 1103, 1110 (8th Cir. 1988) (enjoining prosecution at early stage due to First Amendment violation).

This early disposition is proper for the additional reason that First Amendment issues typically present questions of law for the Court alone to resolve.  *See, e.g.*, Order, *United States v. Handy* ("*Handy*"), Case No. 22-cr-096 (D.D.C. Aug. 15, 2023) (in FACE Act case, "any argument that Defendant's conduct was constitutionally-protected is a legal argument solely for the Court, and not for the jury"), *appeal filed*, Nos. 23-3143, 24-3064 (D.C. Cir.) (convictions vacated and appeal dismissed as moot upon presidential pardon); *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 685 (1989) ("whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law"); *Barnard v. Jackson Cnty.*, 43 F.3d 1218, 1225 (8th Cir. 1995) (whether government employee's speech is "protected by the First Amendment" is a "question of law for the court"); *Shands v. City of Kennett*, 993 F.2d 1337, 1342 (8th Cir. 1993) (whether speech is "on a matter of public concern" is a question of law "for

46

the court"); *Lundell Mfg. Co. v. Am. Broad. Co.*, 98 F.3d 351 (8th Cir. 1996) (plaintiff's status as a private or public figure is a question of law).

*Fourth*, because the First Amendment requires courts to analyze the full context of challenged activities, courts routinely and properly consider facts beyond a pleading, whether an indictment or complaint. *See, e.g.*, *Schenck*, 249 U.S. at 52 (requiring courts to undertake a searching inquiry into the full context in a criminal case given the liberty interests at stake); *Nunes v. Lizza*, 12 F.4th 890, 897-98 (8th Cir. 2021) (explaining that whether a statement is protected opinion under the First Amendment depends on, among other factors, "the literary context" and "the public context" in which the statement was made (citing approvingly *Michel*, 816 F.3d 686)); *Michel*, 816 F.3d at 696 (directing courts to consider the "totality of the circumstances" including "the specific language in issue," "the full context of the communication," and "the broader social context and surrounding circumstances" of the statement); *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020) (even on motion to dismiss, under "federal First Amendment law, the public figure question is given a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation," even when not pled in the complaint).

*Finally*, although required by settled First Amendment doctrine, this approach aligns with the traditional standards under Rule 12 of the Federal Rules of Criminal Procedure for deciding motions "alleging a defect in instituting the prosecution." That rule contemplates that courts may properly "consider evidence beyond the pleadings to

47

make" any necessary "factual findings," *United States v. Baxter*, 127 F.4th 1087, 1091 (8th Cir. 2025) (considering as-applied constitutional challenge to criminal statute prohibiting marijuana user from possessing firearm), and that early disposition is particularly appropriate where the case involves questions "of law" for the court, *United States v. Covington*, 395 U.S. 57, 60 (1969); *see also United States v. Pope*, 613 F.3d 1255, 1260-61 (10th Cir. 2010) (Gorsuch, J.) (holding that pretrial dispositive motions are particularly appropriate where they "require [the court] to answer only pure questions of law" or where the "undisputed evidence shows that, as a matter of law, the Defendant could not have committed the offense for which he was indicted") (cited with approval in *Baxter*, 127 F.3d at 1091); *see* Order, *Handy*, Case No. 22-cr-096 (Aug. 15, 2023) (First Amendment's limitation on FACE Act prosecution "is a legal argument solely for the Court, and not for the jury").

## **ARGUMENT**

### I.   THE STATUTES AT ISSUE EXPRESSLY INCORPORATE THE CONSTITUTION'S LIMITS ON PROSECUTING FORT FOR ENGAGING IN PROTECTED FIRST AMENDMENT ACTIVITIES

Although the First Amendment limits the ability of the government to prosecute a journalist like Fort for engaging in constitutionally protected newsgathering and reporting under *any* law, the statutes under which she has been charged contain express language making clear that such First Amendment-protected activities simply do not fall within the statutory prohibition and therefore are not subject to prosecution in the first place. Specifically, Subsection (d)(1) of 18 U.S.C. § 248—the "Rules of Construction" of the FACE Act—provides that nothing in the statute "shall be construed" to "prohibit any

48

expressive conduct . . . protected from legal prohibition by the First Amendment to the Constitution."

As Fort demonstrates herein, this constitutional limitation, expressly imported into the statutory language, captures the *entirety* of Fort's conduct in observing, reporting, and livestreaming these events. *See* Argument, Part II, *infra*. Indeed, the language of the statute's rule of construction is not limited to Fort's *expression*, but includes all of her "expressive *conduct*," which, as explained below, *see* Argument, Parts II.A & II.B, *infra*, squarely includes her newsgathering—and, if it did not, any ambiguity on that score would render the statute unconstitutionally vague, *see* Argument, Part IV, *infra*.

As a result, Count II, directly alleging a FACE Act violation, necessarily fails against her. And, because Count I is predicated on a conspiracy to violate the FACE Act, *see* ECF 144 ¶ 6 (alleging conspiracy against "exercise of the First Amendment right of religious freedom at a place of religious worship, as secured by" 18 U.S.C. § 248(c)), it too must be dismissed.[70]

---

[70] In addition, as explained in Fort Motion No. 2, both provisions have also been construed to require proof of "specific intent," including to satisfy the First Amendment. *See also, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (First Amendment demands "a subjective mental-state requirement" before criminal liability can be imposed because prohibitions "on speech have the potential to chill, or deter, speech outside their boundaries."). She respectfully refers the Court to the discussion of that issue in Fort Motion No. 2. *Id*. at 7, 11-12, 15, 19-20.

## II.  FORT ATTENDED THE PROTEST SOLELY AS A JOURNALIST, AND HER CONDUCT IS SQUARELY PROTECTED BY THE FIRST AMENDMENT

At all relevant times, Fort was functioning as a journalist and engaged in conduct that lies at the core of the First Amendment's protections.  As a result, both governing law and the uncontested facts—those alleged in the superseding indictment, those reflected on video footage, those presented to the grand jury, and those in eye-witness statements produced by the government—lead to the inescapable conclusion that prosecuting Fort for performing this constitutionally protected role violates both the Speech and Press Clauses of the First Amendment.

### A.  Fort Was Functioning as a Journalist at the Protest

Where federal law attempts to define who qualifies as a journalist, it does so in a way that clearly includes Fort.  For example, the Privacy Protection Act, a law specifically intended to protect the press,[71] applies to an individual "reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication."  42 U.S.C. § 2000aa.  That formulation of who is

---

[71] The government twice failed to disclose this law to Magistrate Judge Docherty when submitting the failed search warrant applications related to this case.  *See* Order at 4, *In re Search Warrant*, Case No. 26-mj-206-JFD (D. Minn. Mar. 3, 2026) (ECF 4) (noting that when "the government presented these warrants, both originally and for re-presentment, it did not direct the Court's attention to the Privacy Protection Act, 42 U.S.C. § 2000aa. It should have.").  The government likewise failed to disclose the law, to an Eastern District of Virginia judge in seeking a search warrant of a *Washington Post* reporter, causing that court to strip the government's presumption of regularity.  *See In re Search of Real Prop. and Premises of Natanson*, 2026 WL 510727, at *8 (E.D. Va. Feb. 24, 2026), *aff'd*, 2026 WL 1458902 (E.D. Va. May 4, 2026); *see also* Fort Motion No. 3 at 7-13, 35-41, 45-47 (addressing pattern of vindictive prosecution and inapplicability of presumption of regularity).

a "journalist" is consistent with the approach of many jurisdictions, including this one, that have analyzed who is eligible to assert a reporter's testimonial privilege. *See, e.g.*, *von Bulow v. von Bulow*, 811 F.2d 136, 143 (2d Cir. 1987) (privilege available to those who, "at the inception of the investigatory process, had the intent to disseminate to the public the information obtained through" newsgathering); *Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir.1993) (adopting *von Bulow* standard); *J.J.C. v. Fridell*, 165 F.R.D. 513, 515-16 (D. Minn. 1995) (citing *von Bulow* and *Shoen* approvingly); Minn. Stat. § 595.023 (journalist's privilege available to a "person who is or has been directly engaged in the gathering, procuring, compiling, editing, or publishing of information for the purpose of transmission, dissemination or publication to the public").

Given her conduct, Fort was indisputably operating in her capacity as a journalist during Operation Pullup. The evidence, including that produced by the government in discovery, conclusively establishes this undisputed point. *See* Facts, Part II.B, *supra*. Fort documented what the protesters and parishioners were saying and doing throughout the protest, conducted an interview with Levy Armstrong inside the Church, and livestreamed Lemon's interviews with both Levy Armstrong and Pastor Parnell, including to convey his countervailing perspective to her online audience. *See id.* Fort stayed in the Church only as long as necessary to cover this indisputably newsworthy event, then followed the protesters outside, where she conducted a second interview with Levy Armstong. *Id.* Once the protest ended, Fort stopped livestreaming. *Id.*

Fort was equipped with a professional-grade camera and microphone. *See* Facts, Part II.B.4, *supra*. She used only the equipment that was necessary for her to operate as a

51

journalist—gathering and publishing the news—without additional equipment that might be intrusive. *See id.* (no additional lighting used). At no point did Fort engage in chanting or other behavior characteristic of protesting or activism. *Id.* The protest organizers repeatedly confirmed that Fort was there not as a protester, but as a journalist reporting on the events. *See* Facts, Part II.C, *supra*. Even Pastor Parnell differentiated between "this group of protesters" and journalist Don Lemon and did not take any issue with Lemon's description of his purpose in "chronicling" the protest. *See* Facts, Part II.B.3, *supra*.

In fact, even the government agrees that Fort is a journalist, as demonstrated in its filings in this very case (though it wrongly contends that this status is immaterial). *See* Grand Jury Opp. (Journalists) at 1, 2, 8-9 (responding to journalists' motion for grand jury records by asserting, "Journalists are not above the law" and "[t]heir occupation as journalists" is "irrelevant"); ECF 561 at 8-9 (anticipating that Fort "may also seek to raise" a "Free Press Clause" challenge, but her status "as a 'journalist'" is immaterial). Outside of its filings, the government has also publicly conceded that certain individuals attended the protest as journalists, specifically through repeated statements made by senior federal officials between the failed attempts to charge the case by complaint and the January 29 original indictment. For example, Dhillon openly admitted that some of the individuals present at the protest were "wear[ing] the badge 'journalist.'" *See* Facts, Part III.B, *supra*.[72] In another statement, Dhillon recognized that Fort (and Lemon) are

---

[72] To be sure, she followed up that admission with an assertion that it was "legally irrelevant" because the "freedom of the press" was, in her view, subordinate to the

journalists. *Id*. Blanche likewise conceded to Fox News that Fort (and Lemon) are journalists. *Id*. Thus, though these officials wrongly contended that Fort's status as a journalist does not insulate her from this prosecution, they each admitted that she is, in fact, a journalist and was operating in that capacity on January 18.

The superseding indictment itself unmistakably establishes that Fort was, at all relevant times, engaged in journalism. It expressly alleges that Fort observed the protesters before they arrived, participated in Lemon's interview with Pastor Parnell, and interviewed Levy Armstrong, conveying her reporting via livestream to her audience. *See* ECF 144 ¶¶ 8(13), (14), (35), (41). Fort's journalistic endeavors in observing, reporting, interviewing, and informing her viewers are all confirmed by real-time footage of the events, including her own livestream. *See* Facts, Part II.B, *supra*. Although the lead agent falsely swore out affidavits alleging otherwise, the superseding indictment does not allege that Fort engaged in any chanting or other behavior that could be characterized as protesting or activism. *See generally* ECF 144.

Thus, as the unassailable video footage, the government's own evidence, its charging document, its other filings in this case, and its many public statements confirm, Fort was acting as a journalist throughout the events on January 18. Indeed, multiple judges declined to issue arrest and search warrants in this case, including due to Fort's

---

"paramount First Amendment right" at issue there, namely, "the right to freely worship." *Id*.

presence at the protest in her capacity as a journalist. *See* Facts, Part III, *supra*.[73] One

judge even put a stop to the government's clandestine attempt to use this prosecution as a

vehicle to improperly invade Fort's constitutionally protected newsgathering materials,

unpublished work product, and viewership and subscriber information, *id.*—all

constituting even more evidence of Fort's status as a journalist and, worse, representing

further injury to her First Amendment rights. *See, e.g.*, *First Choice Women's Res. Ctrs.,

Inc. v. Davenport*, 608 U.S. ---, 146 S. Ct. 1114, 1120, 1126 (Apr. 29, 2026) (subpoena

demanding the "names, phone numbers, addresses, and places of employment" of an

organization's donors constitutes its own First Amendment injury).[74]

**B.      Settled Law Establishes That Fort's Activities as a Journalist Are Protected By the First Amendment**

Despite all this, the government contends that Fort can be prosecuted for her

journalism. Multiple strands of controlling First Amendment authority say otherwise.

***First***, the First Amendment guarantees the right of the press to publish and disseminate

information, especially on matters of public concern. *See Fla. Star v. B.J.F.*, 491 U.S.

524 (1989). The First Amendment "rests on the assumption that the widest possible

dissemination of information from diverse and antagonistic sources is essential to the

welfare of the public" and "that a free press is a condition of a free society." *Associated*

---

[73] This Court has also determined that Fort qualifies as a journalist more broadly based on having issued her credentials as a journalist.

[74] The government nevertheless attempted to circumvent the judge's rulings by subsequently issuing various administrative summonses for some of the same information. *See* Ex. 42 at 2-3.

*Press v. United States*, 326 U.S. 1, 20 (1945). As the Eighth Circuit succinctly put it in *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 838 (8th Cir. 2021): "Reporting is a First Amendment activity."

Indeed, in the First Amendment "lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). The right of the press to *disseminate* "information and education with respect to the issues of the times," *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940), does not exist in a vacuum, but rather serves the public's right to *receive* that information, including to foster participation in our democratic society. *See, e.g.*, *Bd. of Educ., Island Trees Sch. Dist. v. Pico*, 457 U.S. 853 (1982); *Estes v. Texas*, 381 U.S. 532, 539 (1965) (a "free press has been a mighty catalyst in . . . generally informing the citizenry of public events and occurrences"); *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("the press's "constitutional guarantees" were "not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of the press assures the maintenance of our political system and an open society.").

**Second**, the law has long recognized that, as an antecedent to reporting the news, the First Amendment also protects the right to *gather* the news. *See Branzburg v. Hayes*, 408 U.S. 665, 707 (1972) ("news gathering is not without its First Amendment protections"); *id*. at 681 ("without some protection for seeking out the news, freedom of the press could be eviscerated"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586 (1980) (Brennan, J., concurring) (recognizing "the special nature of a claim of a First Amendment right to gather information"). The Supreme Court has protected journalists'

55

various newsgathering activities, whether receiving information from someone else who obtained it illegally, *see Bartnicki v. Vopper*, 532 U.S. 514 (2001), or the right to ask questions and interview witnesses to gather even confidential information, *see Smith v. Daily Mail Co.*, 443 U.S. 97 (1979).

Tolerating government efforts to criminalize routine reporting practices—thereby suppressing "the right of the press" to report on those "praising or criticizing governmental agents" or "clamoring and contending for or against change"—threatens to "muzzle one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (cleaned up). Consistent with these precedents, this Court had no difficulty concluding that "photographing, filming, or otherwise documenting" at arguably unlawful "protest scenes" are nevertheless "constitutionally protected news-gathering activities." *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 116 (D. Minn. 2021) (citing *Am. Civ. Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595, 597 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording" because these newsgathering methods "enable speech.")); *see also Project Veritas v. Schmidt*, 125 F.4th 929, 943 (9th Cir. 2025) (making a recording in the course of "newsgathering activities is protected" by the First Amendment); *Quraishi*, 986 F.3d at 839 (collecting cases); *Welch v. Dempsey*, 51 F.4th 809, 811 (8th Cir. 2022) (affirming finding that plaintiff engaged in constitutionally protected activity by livestreaming a protest); *Animal Legal Defense Fund v. Wasden*,

56

878 F.3d 1184, 1196-97 (9th Cir. 2018) (invalidating under First Amendment so-called

"ag-gag" statute that criminalized making audio/video recordings on premises of

agricultural facility without consent because law "quash[es] investigative reporting").[75]

To be sure, the First Amendment does not immunize the press from "the

application of general laws" that do not directly implicate their role as the press.  *See*

*Associated Press v. NLRB*, 301 U.S. 103, 133 (1937) (labor laws); *Associated Press v.*

*United States*, 326 U.S. at 20 (antitrust laws); *Cohen v. Cowles Media Co.*, 501 U.S. 663

(1991) (laws enforcing contracts and other promises); *Branzburg*, 408 U.S. at 709

(testifying in response to a grand jury subpoena provided it is issued in good faith).  And

the Supreme Court has likewise made clear that the press does not have broader *speech*

rights than other speakers.  *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 352 (2010)

(striking down media exemption in election law as unconstitutional because media had no

greater First Amendment right to engage in speech).  But the Speech and Press Clauses

---

[75] The Eighth Circuit has not yet had an opportunity to confront "ag-gag" laws as applied against the press.  *See, e.g.*, *Animal Legal Def. Fund v. Reynolds* ("*Reynolds I*"), 89 F.4th 1071, 1082 (8th Cir. 2024) (upholding Iowa surveillance-trespass law against facial challenge); *PETA, Inc. v. Reynolds* ("*Reynolds II*"), 173 F.4th 959, 967 (8th Cir. 2026) (upholding same as applied and reaching the unremarkable conclusion that protesters did not have the right to trespass and then record themselves solely because the First Amendment protects recording).  These cases continue to amplify the distinction between persons who themselves engage in illegal conduct (*Reynolds I* and *II*) and the press who report on that misconduct (*Wasden* and *Bartnicki*, 532 U.S. at 518), the latter of which protects the receipt and dissemination of information even where someone else violated the law in obtaining it.  As noted, *Reynolds* left open whether the Iowa ag-gag law at issue would be unconstitutional if applied in cases where the government's "interests" are "less robust" and the topic "important enough to outweigh these interests," which would certainly include reporting, in a place open to the public, on a newsworthy event. *Reynolds II*, 173 F.4th at 967 n.5.

do operate to insulate the press from intentional and directed targeting under such laws simply for *gathering* and *reporting* the news to the *public*.  In other words, the government cannot put the press in a *worse* position than the general public, in order to effectively preclude its ability to gather information and report on newsworthy events. *See, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582, 585 (1983) (special tax targeting ink and paper products ruled unconstitutional because it effectively targeted press).  Consistent with this authority, this Court has recognized the press's special role in documenting and reporting on protests despite dispersal or curfew orders.  *See*, *e.g.*, *Goyette*, 338 F.R.D. at 116-17, 121.  It rightly recognized that, just by being near (or even enmeshed with) an unlawful assembly for purposes of reporting on it, a journalist has not joined the unlawful assembly, such that an otherwise lawful dispersal order issued to the members of the assembly does not apply to the journalist.  *Id.*; *see Quraishi*, 986 F.3d at 837-38 (despite "that police had asked *protestors* to stop their activities" did "not mean the reporters could not report from" the location of the unlawful assembly).

Based on its prior submissions in this case, the government appears to contend that there is no First Amendment right to stage a protest in a church, and hangs its hat on *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971).  *See* Gov't Opp. to Mots. For Disclosure of Grand Jury Trs. ("Grand Jury Opp. (Protesters)") at 1-2, ECF 510.  But, even assuming the *Action* decision applies to the *protesters* and that the government could establish the various elements of the statutes with respect to them, *Action* says

nothing about whether members of the *press* are free to *cover* such a protest, and substantial intervening law confirms that they are.

Courts enforce that distinction because, at base, the press serves as "surrogates for the public" when the public cannot otherwise bear witness to an event themselves. *Goyette*, 338 F.R.D. at 116; *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe [events] at first hand . . . , he relies necessarily upon the press to bring to him in convenient form the facts of those operations," or else "most of us . . . would be unable to vote intelligently or to register opinions on the administration of government generally."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (press "often are provided special seating and priority entry so that they may report what" occurred because "[i]nstead of acquiring information about trials by firsthand observation . . . , people now acquire it chiefly through the print and electronic media").[76]  Indeed, as the Supreme Court explained in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), the "predominant purpose" of the First Amendment is "to preserve an untrammeled press as a vital source of information.  . . .  A free press stands as one of the great interpreters between the government and the people.  To allow it to be fettered is to fetter ourselves." *See also Minneapolis Star*, 460 U.S. at 582, 585 (emphasizing the "basic assumption of

---

[76] Consistent with that approach, members of the press are often granted preferential access to facilitate their reporting to the public.  *See, e.g.*, 8 C.F.R. § 1003.27 (conferring preferred access to press to immigration proceedings); 28 C.F.R. Part 26, § 26.4(c)(4)(ii) (separately delineating ten representatives of the press as among those authorized to attend a federal execution).

our political system that the press will often serve as an important restraint on government").

*Third*, for that reason, the First Amendment affords speech on matters of public concern "special protection" under the law. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); *Sullivan*, 376 U.S. at 270 ("debate on public issues should be uninhibited, robust, and wide-open"). As the Supreme Court has explained, a key function of the First Amendment is to "invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Obviously, reporting on this protest certainly invited a wide range of strongly held views, about both the propriety of staging a protest during a worship service and the asserted tension between religious principles and the government's current immigration policies. But the fact that Fort's (and Lemon's) coverage sparked such diverse reactions actually underscores the protection such coverage enjoys in our constitutional landscape. Indeed, as politicians debate these issues, and the government seeks to prosecute protesters, it is imperative to have independent news coverage of the events to inform the public (just as that coverage informed local police in real time in this case).

*Snyder* itself reflects these lessons. The case involved a highly controversial protest targeting a fallen soldier's funeral service at a church. 562 U.S. at 447. The Supreme Court firmly held that the speech at issue—including chants and signs asserting that "God kills American soldiers as punishment" for the United States being "overly tolerant" of homosexuality, *id*. at 447-48—despite being offensive, spoke "to broader

60

public issues" and therefore constituted speech on a matter of public concern.  *Id*. at 454.

The Court emphasized that the setting—adjacent to a place of religious worship during a

deeply personal, somber event—"does not alter that conclusion."  *Id*. at 455.  Indeed,

there was "no doubt" that the choice of venue was deliberate "to increase publicity for

[the protest's] views" and "reach as broad a public audience as possible."  *Id*. at 454-55.

It was undisputed that the media extensively covered the protest.[77]  Neither the courts nor

the parties questioned the bedrock principle that the journalists who were there to

document the event were not subject to any legal liability, whether criminal or civil.[78]

    *Branzburg* is likewise instructive on this point.  In that case, three journalists were

subpoenaed to testify before a grand jury.  Each had reported on unlawful conduct they

had personally observed: in one case, accompanying Black Panthers as they stockpiled

weapons for transport following the conviction of leader Huey P. Newton for the death of

---

[77] *See id*. at 468 (Alito, J., dissenting) (characterizing the protest as "a raucous media event"); *Snyder v. Phelps*, 580 F.3d 206, 212 (4th Cir. 2009); *see also* Respondent's Br., *Snyder v. Phelps*, 2010 WL 2826988, at \*1 (July 7, 2010) (noting "a large presence of public media who published details about the funeral and deceased soldier before and after the funeral"); *see also* Exs. 38 (photojournalist for the *Baltimore Sun* recounting on-the-ground experience photographing the protest), 39 (photographers from *Associated Press*, *York Daily Record*, and *Carroll County Times* present).

[78] Although the *Snyder* decision notes several times that the picketing occurred "at a public place," 562 U.S. at 458, the Court did not rule on whether the outcome would have been different had the protesters entered a church or done so following an invitation from the pastor, as was the case here.  In any event, nothing in the opinion suggests that, even if the *protesters* could have been punished in such hypothetical circumstances, members of the press merely *reporting* on the events could have been punished as well.  The same is true of the Eighth Circuit's decision in *Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012), which involved the constitutionality of a creating a buffer zone in response to repeated protests and simply did not address the right of a journalist to cover such a protest.

a policeman; in a second, being embedded with Black Panthers waiting at their headquarters for a police raid after being tipped off in advance; in a third, documenting and reporting on the operation of an illegal drug lab. 408 U.S. at 667-78. As one of the journalist's editors later admitted, "We knew he was going to witness illegal activity. He was going to witness a crime, but he wasn't going to participate. We didn't have any concern about that."[79] Although they were subpoenaed, none of them was charged as a conspirator simply for reporting the conduct they observed, even though that conduct was ostensibly illegal. Under that same reasoning, this Court exempted journalists from otherwise lawful dispersal orders, ruling that just because a journalist is reporting on an unlawful assembly does not equate "to *participating* in an unlawful assembly." *See Goyette v. City of Minneapolis*, 2021 WL 5003065, at *5 (D. Minn. Oct. 28, 2021). The same is true here.

Nevertheless, in a prior filing, the government attempted to distinguish *Branzburg* by wresting selected quotations from their context. *See* ECF 561 at 8 (citing case for proposition that "it would be frivolous to assert that the First Amendment, in the interest of securing news . . . confers a license on" reporters "to violate valid criminal laws"). The government's argument shows that it fundamentally misapprehends Fort's point. She does not claim a right to violate the law because she is a journalist. Rather, she

---

[79] *See* Lee Levine & Stephen Wermiel, *A Tale of Three Reporters: Reflecting on Branzburg v. Hayes at 50*, ABA Commc'ns Lawyer (Oct. 14, 2022), https://www.americanbar.org/groups/communications_law/publications/communications _lawyer/2022-fall/a-tale-three-reporters-reflecting-branzburg-v-hayes-50/; *see also* Earl Caldwell, *Angry Panthers Talk of War and Unwrap Weapons*, N.Y. Times (Sept. 10, 1968), https://perma.cc/44KE-5Z89.

claims a right to observe and report on others without that being criminalized simply

because those she is reporting on are accused of breaking the law.  That distinction is all

the more important where, as here, the FACE Act itself expressly excludes from its reach

"expressive conduct" protected by the First Amendment.[80]

*Finally*, the First Amendment guarantees the right to not to be deterred from

ongoing reporting on matters of public concern.  It expressly prohibits the government

from trying to stop the press from reporting or continuing to report on a subject.  *See,*

*e.g.*, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (striking down

government's attempt to enjoin *The New York Times* and *The Washington Post* from

publishing the contents of a classified Department of Defense study) (citing *Bantam*

*Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)); *Bantam Books*, 372 U.S. at 67 & n.8

(1963) (mere threat of prosecution violated the First Amendment); *Rossignol v.*

*Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (attempt to restrict ongoing critical

reporting by buying up entire print run of newspaper violated the First Amendment); *see*

*In re Search of Real Prop. and Premises of Natanson*, 2026 WL 1458902, at *6 (even

where there was no law or court order blocking journalist from continuing to report, "the

---

[80] Nor does Fort claim an unfettered right to record where recording is otherwise
prohibited.  As such, these circumstances are markedly different from those in *Rice v.*
*Kempker*, 374 F.3d 675 (8th Cir. 2004), a case previously invoked by the government in
which the Court rejected a First Amendment right to videorecord an execution, *see* ECF
561 at 8-9.  Because both the Church and other parishioners videorecorded and
disseminated the same events, *Rice* has no application here.  For the same reason *Zemel v.*
*Rusk*, 381 U.S. 1 (1965), which the government relied on in the same pleading, is of no
help, given that it stands for the unremarkable proposition that a citizen had no First
Amendment right to have his passport validated for travel to Cuba where such travel is
otherwise prohibited.

Court cannot ignore the seizure's effect on Natanson's ability to function as a journalist," including the "chilling effects" of "such a seizure"). So strong is this right that the First Amendment erects a "virtually insurmountable barrier" to such government restraints on ongoing reporting. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring). This is because such restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Yet, as demonstrated above, that has been precisely the impact of this prosecution on Fort's reporting. *See* Facts, Part IV, *supra*.

In sum, there is no question that the government's aggressive approach in immigration enforcement has garnered substantial public attention and resulted in immense public debate. A protest at a church—particularly to protest a pastor's service doubling as an ICE official—is, however one might feel about it, unquestionably newsworthy and addresses a matter of public concern. Fort's activities *reporting* on such a protest from the scene therefore falls squarely within the protections of the First Amendment, and she cannot lawfully be prosecuted for it. Notably, the government has not alleged—nor could it—that simply being invited into and entering the Church, without more, was a crime. Rather, it points to what happened next: the participants of Operation Pullup started speaking, chanting, and otherwise protesting during the service. But the government does not contend Fort engaged in any of this conduct. Instead, as the footage clearly shows, Fort stayed silent and started *documenting*. *See* Facts, Part II.B, *supra*; *see also supra* n.38 (detailing lead agent's repeated allegation that Fort engaged in chanting, followed by government's concession those sworn statements were in fact

64

false).  Nor can the government point to Fort's decision to move about the Church, once the service had already been suspended, as any different from the Pastor's or the parishioners' conduct at that time.  *See* Facts, Part II.B.2, *supra*; *see also* Ex. 4 (Church's broadcast) at 25:30-35:00.  Indeed, the *only* thing Fort did that was materially different than the parishioners who remained in the Church and passively recorded via smartphone—or, for that matter, the Church, which likewise captured the entirety of the events for broadcast—was to proactively interview Levy Armstrong (twice) and to document Lemon's interview of Pastor Parnell.  *See* Facts, Part II.B.3, *supra*.  *But that is what journalists do*.  To prosecute Fort for these actions, and particularly to treat her differently than others engaged in the same protected conduct at the same event, eviscerates the foundational protections of the First Amendment.

> **C.    The First Amendment Likewise Precludes Prosecuting Fort for Conspiracy**

Perhaps recognizing the thinness of its charges against Fort for her individual conduct, the government attempts to paint her as participating in a broad conspiracy, including to falsely represent, under penalty of perjury, that Fort was chanting during the protest, despite video evidence directly to the contrary.  But the government's strategy of asserting that Fort was somehow part of a criminal conspiracy runs head-long into the First Amendment in multiple respects.

*First*, it is black letter law that even concerted action, when premised purely on First Amendment-protected conduct, cannot amount to conspiracy.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982); *Citizens Against Rent Control*

*Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 296 (1981) (There are "some activities, legal if engaged in by one, yet illegal if performed in concert with others, but [protected] expression is not one of them.").

**Second**, even assuming *arguendo* that the government could somehow deem Fort as affiliated with the protesters (and that it could establish that the protesters violated the FACE Act), the First Amendment precludes criminalizing Fort's conduct where, as here, she engaged only in "constitutionally protected activity." *Claiborne Hardware*, 458 U.S. at 916-20. The Supreme Court has repeatedly held that liability "may not be imposed merely because an individual [is said to have associated with] a group, some members of which committed [unlawful] acts," when that specific individual otherwise engaged only in constitutionally protected conduct. *Id.*; *see also Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 700 (7th Cir. 2001) ("All parties acknowledge that the defendants engaged in a substantial amount of protected speech during the protest missions . . . . We entirely agree with the defendants that liability cannot constitutionally be imposed on them for this portion of their conduct."), *rev'd on other grounds*, 537 U.S. 393 (2003).

Rather, "where an organization engages in both protected speech and unprotected, illegal conduct," *id.*, the First Amendment demands "'precision of regulation.'" *Claiborne Hardware*, 458 U.S. at 916; *id.* at 916-17 ("the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to" liability). That is, there must be evidence "that the organization itself . . . possessed unlawful goals" *and* "the individual [defendant] held a specific intent to further those

66

illegal aims." *Id*.; *see also id.* at 919 (government must allege "clear proof that a defendant 'specifically intend[ed] to accomplish the aims of the organization.'" (cleaned up) (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)).  Thus, in *Claiborne Hardware*, individuals who supported a boycott and who engaged only in protected conduct could not be held liable for the violent conduct purportedly committed by their fellow boycotters because there was no adequate "evidentiary basis for concluding that [those] parties agreed" to engaging in that unlawful conduct.  458 U.S. at 920, 933.

Applying these principles, there is no basis to prosecute Fort for participating in a criminal conspiracy for reporting and for interacting with news sources.  To hold otherwise would render "traditionally-recognized relationships between sources and reporters . . . actionable as conspiracies on a substantial scale."  *Dowd v. Calabrese*, 589 F. Supp. 1206, 1214 (D.D.C. 1984).  "The inevitable result would be the 'chilling' of such relationships and collaborations, to the detriment of the values inherent in the First Amendment."  *Id*.  Even where there is actual "[c]ollaboration between individuals with an axe to grind and reporters eager for a story," that is "the way the news media frequently operate" and "such collaboration does not, without more, a conspiracy make."  *Id.* at 1213 (finding no conspiracy where reporter used source "for what to him was an important story" and source used reporter "to secure a sympathetic account of his criminal past and his present confinement"); *see also Bell Atl. Corp. v. Twombly*, 550 US 544, 556-57 (2007) (concluding that "parallel conduct" arising from each parties' self-interest, without more, "does not suggest conspiracy").

67

So too here.  Not only does the superseding indictment fail to allege facts that, if proven, would establish that Fort was part of the protest (and the government's own evidence, including video footage from numerous sources, conclusively demonstrates the opposite), but the superseding indictment's attempt to hold her responsible for the group's protest under a conspiracy theory must fail because its allegations against *her* all involve *protected* activities.  Although the government claims that the defendants entered the Church "in a coordinated" fashion, ECF 144 ¶ 3, even if this allegation were directed at Fort (which the government has expressly disclaimed, *see* Ex. 42 at 3), supposedly "coordinating" with the protesters could not, without more, form the basis of a conspiracy without violating the First Amendment.  *See Claiborne Hardware*, 458 U.S. at 915; *Berkeley*, 454 U.S. at 294; *Scheidler*, 267 F.3d at 700.  Nor do the allegations in the superseding indictment overcome the government's "heavy" burden to show that Fort agreed to anyone's unlawful conduct, if any, in the course of the protest.  *See Claiborne Hardware*, 458 U.S. at 934.  As a result, the First Amendment halts the government's conspiracy case against Fort in its tracks, and Count I alleging Fort participated in a criminal conspiracy, and the related allegations of both counts that she somehow aided and abetted others, must be dismissed.

III.   **AS APPLIED TO FORT, THE STATUTES ARE NOT CONTENT NEUTRAL AND CANNOT SURVIVE STRICT SCRUTINY**

While prosecuting Fort, the government has steadfastly refused to prosecute a host of others who, at least under the government's theory of this case, also violated the law. They include:  the parishioners in the Church and the Church itself, both of whom, like

68

Fort, recorded and disseminated the event in question; ICE agents who have conduced immigration raids in churches and are now equipped with their own cameras to record events; and others who have accompanied them, sometimes by invitation, to record and report on those raids. *See* Facts, Parts II, V, *supra*. Meanwhile, the government is both continuing to silence speech over the January 18 protest that it disfavors, while full-throatedly advancing its own narrative of the events. Thus, as applied, the government is using these statutes to target Fort for protected speech, based on its topic and its perceived viewpoint. Because the government is applying the statutes against her in a content-based manner, and cannot come even close to surviving strict scrutiny, its application of these statutes is unconstitutional.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023) ("The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands."). "In this Nation, no official—'high or petty'—may command our tongues or silence our voices." *Chiles*, 2026 WL 872307, at *6; *id*. at *13 ("[T]he First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country."). "If there is any fixed star in our constitutional constellation, it is that no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). As the Court explained in overturning a conviction under the

69

Stolen Valor Act, enacted with the noble purpose of protecting the integrity of military

honors:

> Permitting the government to decree this speech to be a criminal offense would endorse government authority to compile a list of subjects [that] are punishable. That governmental power has no clear limiting principle. Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth.

*Alvarez*, 567 U.S. at 723.

"When the government seeks to favor or disfavor certain" speech, "it compromises

the integrity of our national discourse and risks bringing about a form of soft censorship."

*Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019). Targeting speech

based on the "particular views taken by speakers on a subject" is an especially "blatant"

and "egregious" violation of the First Amendment. *Rosenberger v. Rector and Visitors of*

*Univ. of Va.*, 515 U.S. 819, 829 (1995). "But it is well established that the First

Amendment's hostility to content-based regulation extends not only to restrictions on

particular *viewpoints*, but also to prohibition of public discussion of an entire *topic*."

*Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) (emphases added) (invalidating

regulations that treated signs differently based on their topic); *id.* at 169 (A "law banning

the use of sound trucks for political speech—and only political speech—would be a

content-based regulation, even if it imposed no limits on the political viewpoints that

could be expressed."). "Prohibited, too, are restrictions distinguishing among different

*speakers*, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340

(emphasis added); *see also Minneapolis Star*, 460 U.S. at 582, 585 (special tax targeting

ink and paper products ruled unconstitutional because it effectively targeted press); *Grosjean*, 297 U.S. at 250 (tax targeting only large newspapers held unconstitutional under First Amendment because it "limit[s] the circulation of information to which the public is entitled").

A statute that targets speech based on the speaker, its topic, or the viewpoint expressed constitutes classic content-based discrimination. As such, unless it can clear the incredibly demanding hurdle of strict scrutiny, it is unconstitutional and cannot stand. *See Alvarez*, 567 U.S. at 716-17 (government bears the burden of proving constitutionality). That is true for "a law regulating the content of speech" even where it "mostly regulates non-expressive conduct." *Chiles*, 2026 WL 872307, at *7.

## A. As Applied, the Statutes Are Content-Based

The prosecution of Fort is based on a content-based application of the statutes under which she is charged. Indeed, the government's superseding indictment repeatedly acknowledges that it targeted the defendants for engaging in "an anti-ICE action" that objected to a pastor at Cities Church serving as "the local ICE overseer." ECF 144 ¶¶ 8(1), (6); *id.* ¶ 8(24) (averring that protesters condemned church for "harboring a 'Director of ICE'"); *see also, e.g.*, Ex. 34 at 00000934 (noting protest organizer "talking about President Trump and ICE negatively"). The superseding indictment targets that viewpoint even more directly than the original. *Compare* ECF 39 ¶ 8, *with* ECF 144 ¶¶ 8(1), (6), (24) (adding allegations that Levy Armstrong found it "outrageous" that "the local ICE overseer" is "a pastor at" the Church, conducted "various internet searches regarding the ICE officer," and advertised an "anti-ICE action").

71

Emphasizing the government's efforts to target that viewpoint, the President complained that "there is too much media attention on ICE . . . and not enough attention paid to" issues he prefers. *See* Facts, Part II.A, *supra*. While government officials are of course free to express their own views, using prosecutions to silence disfavored views is patently unconstitutional. *See, e.g.*, *Frederick Douglass Found. Inc. v. District of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) (government may not "permit one side to have a monopoly in expressing its views" by cutting off those who dissent, which would be the "antithesis of constitutional guarantees" (cleaned up) (quoting *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Relations Comm'n*, 429 U.S. 167, 175-76 (1976)).

The government targeted Fort and her journalist co-defendants aggressively for arrest and prosecution while refusing to prosecute others who engaged in substantially similar conduct. *See* Facts, Parts II, V, *supra*. The government has not prosecuted any of the parishioners who deliberately remained in the Church or the Church itself, both of whom recorded and disseminated the protest. Despite repeatedly interfering with worship by conducting ICE raids at churches, the government has not prosecuted its own agents, which it has directed to be "camera ready" and equipped with body cameras to capture officials' own footage while punishing journalists for recording independent footage of such events. Nor has it prosecuted the journalists the government has invited to accompany its agents on its raids, or those who were present for various immigration raids in churches, recorded the events, and subsequently disseminated that footage. *Id*. And its prosecution is having the inevitable effect of silencing Fort's news coverage of

72

immigration enforcement, this prosecution, and even the boycott of Target, all while trumpeting government officials' views.

Because the government targeted Fort while allowing other coverage that it deems more favorable, it is discriminating on the basis of topic, viewpoint, *and* speaker.[81]  That conclusion is fortified by the government's repeated efforts to punish certain disfavored speakers, including, as detailed in Fort Motion No. 3 addressing the vindictive nature of this prosecution, by:  reviving complaints against major broadcast networks except the one the President watches; calling for specific late-night hosts to be pulled from the air; barring one news organization from access to White House spaces; wresting control over the White House Press Pool and then prioritizing hand-picked media outlets for spots; and so on.  *See* Fort Motion No. 3 at 7-26.  Indeed, the government's approach is a classic case of "free speech for me, but not for thee," a practice the First Amendment staunchly prohibits.  *See Chiles*, 2026 WL 872307, at *9 ("The Constitution does not protect the right of some to speak freely; it protects the right of all."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (government simply may not favor "some speakers over others"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992) (Although "the government

---

[81] Moreover, the government has essentially *admitted* its intent to selectively enforce the FACE Act, and by extension the conspiracy statute, in a content- and viewpoint-discriminatory manner, effectively giving a pass to anti-abortion protesters—and journalists who covered those protests—but punishing the protesters and journalists here. *See* Facts, Part V, *supra*.  Even assuming *arguendo* that the government could somehow justify its transparently content-based enforcement of companion provisions of the same statute when applied to *protesters*, there is simply no compelling governmental interest whatsoever that would justify aggressively prosecuting *journalists* who covered this protest while imposing no consequence on those who report on anti-abortion protests.  *Id*.

73

may proscribe libel," it "may not make the further content discrimination of proscribing *only* libel critical of the government.").  Against this backdrop, the government's application of the statutes against Fort is content-based and flatly unconstitutional unless the government can satisfy strict scrutiny.  *See, e.g.*, *Rosenberger*, 515 U.S. at 828.[82]

### B.   The Government Cannot Satisfy Strict Scrutiny

To survive strict scrutiny, the government must demonstrate that the law is necessary to serve a compelling governmental interest, that the law is narrowly tailored, and there is no less restrictive means of achieving the asserted government interest. *Citizens United*, 558 U.S. at 340; *Alvarez*, 567 U.S. at 729.  The government's burden of satisfying strict scrutiny is demanding and typically case-dispositive.  *See Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (typically, a "finding of viewpoint bias end[s] the matter"); *Reed*, 576 U.S. at 163, 171 (imposing same standard); *McManus*, 944 F.3d at 520 ("strict scrutiny, in practice, is virtually impossible to satisfy").  The government cannot satisfy that daunting burden here.

Even conceding that protecting individuals "exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship" is a

---

[82] Against this backdrop, there is little question that the government's misuse of Sections 241 and 248 is content-based and the government must therefore overcome strict scrutiny to avoid dismissal.  But even if the question were limited to the language of the two statutes themselves, rather than the government's application of them, they still impose a burden on speech and would, at a minimum, be subject to intermediate scrutiny, which requires a substantial government interest unrelated to the suppression of free expression and limitations "no greater than" what "is essential" to further that interest, *United States v. Dinwiddie*, 76 F.3d 913, 923-24 (8th Cir. 1996), a test that the government also cannot meet.

compelling government interest,[83] charging a journalist for *reporting on* a protest where the protesters are alleged to have interfered with that interest is in no way the least restrictive means to achieve that end.  For example, to the extent the government's interest is deterring additional protests in churches, its focus on prosecuting the journalists reporting on those protests is misplaced.  As the Supreme Court explained in *Bartnicki*, the "normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it. . . .  [I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding" actor.  532 U.S. at 529-30.  So too here.

The scope of the conduct the government seeks to criminalize also undermines any claim that it is applying the statutes in the least restrictive manner possible.  For example, the superseding indictment charges Fort with interfering with worship and therefore violating the FACE Act, based in significant part on constitutionally protected conduct that *did not even take place inside of the Church or have any effect on the ability to worship*:  for example, observing and newsgathering during the pre-protest briefing and interviewing Levy Armstrong outside the Church.  ECF 144 ¶¶ 8(13), (41); *id.* ¶ 9 (incorporating prior paragraphs by reference).  An interview that takes place outside,

---

[83] For purposes of this argument, Fort assumes that protecting the exercise of "the First Amendment right of religious freedom" under the FACE Act extends to conduct by private parties, even though the statute is limited to "the First Amendment right of religious freedom," 18 U.S.C. § 248(a)(2), and the First Amendment restrains only the government.  *See Loe v. Jett*, 796 F. Supp. 3d 541, 567 (D. Minn. 2025) (citing *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022)) ("The Free Exercise Clause is triggered [only] if a plaintiff's free exercise of religion is burdened by a governmental action.").

75

across an alley from the Church—near a location from which a van freely left minutes later, *see* Facts, Part II.B, *supra*—long after the service was concluded, does not interfere with the right to worship. *Id*.

In sum, the government is prosecuting Fort under Sections 241 and 248 in a way that is content-based as applied and cannot overcome strict scrutiny. As a result, the prosecution cannot stand, and the superseding indictment must be dismissed. *See, e.g.*, *United States v. Cook*, 472 F. Supp. 3d 326, 339-40 (N.D. Miss. 2020) (ruling that dismissal of indictment was required where application of statute to defendant was content-based and failed to survive strict scrutiny); *United States v. Cassidy*, 814 F. Supp. 2d 574, 583-85, 588 (D. Md. 2011) (same).

## IV.   IF THE GOVERNMENT CONTENDS THE STATUTES NEVERTHELESS APPLY TO FORT, THEY WOULD BE UNCONSTITUTIONALLY VAGUE

As explained above, *see* Part I, *supra*, Section 248(d)(1) of the FACE Act includes a rule of construction that expressly excludes First Amendment-protected activities from its scope. To the extent that the government contends that Fort's journalistic activities covering and reporting on the protests do not fall within Section 248(d)(1), despite its plain text, then the statute would be unconstitutionally vague. The superseding indictment must therefore be dismissed, including the government's conspiracy charge which is expressly predicated on the FACE Act charge, for multiple reasons.

***First***, a criminal statute is unconstitutionally vague "if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox TV*

76

*Stations, Inc.*, 567 U.S. 239, 253 (2012); *see United States v. Turner*, 842 F.3d 602, 604 (8th Cir. 2016) (same).  If the government were correct that, despite its text, Section 248(d)(1) does not apply to core newsgathering and reporting, then the statute would "fail[] to give . . . fair notice of the conduct it punishes," *Turner*, 842 F.3d at 604, and would be rendered unconstitutionally vague.

Analyzing the charges set forth in the superseding indictment illustrates this point. For example:

- How can a journalist like Fort observe a meeting in a way that clearly differentiates that she is engaged in constitutionally protected newsgathering, not an overt act evincing an unlawful conspiracy?  ECF 144 ¶¶ 7(b), 8(13).

- How can a journalist like Fort enter a church (invited in by the pastor, no less) to report on a demonstration without being charged with "positioning [herself] among the congregants" to engage in a "disruptive takeover"?  *Id.* ¶ 8(23).

- How can a journalist like Fort conduct or capture an in-person interview with a source like Pastor Parnell without standing "in close proximity to" him?  *Id.* ¶ 8(35).

- How can a journalist like Fort exercise her constitutionally protected right to observe events, to report on them, to interview sources, and to ask questions, when the government contends Fort cannot conduct an interview inside a church, but also faults her for conducting an interview in a public area outside of a church?  *Id.* ¶ 8(41).

These examples illustrate that, if the government contends that such activities are nevertheless subject to criminal prosecution despite the language of Section 248(d)(1), someone in Fort's shoes faces the impossible task of guessing what is prohibited by the law and in complying with it, thereby underscoring its vagueness.  *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the

possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). For avoidance of doubt, *all* of this conduct is protected by the First Amendment under long-established law, *see* Part II, *supra*, and as such, Fort's conduct from January 18 falls outside of the FACE Act entirely, *see* Part I, *supra*. But to the extent the government contends that any of it does not, and as a result does not fall within the limitation afforded by Section 248(d)(1), then the statute is impermissibly vague and the indictment must be dismissed.

**Second**, vagueness problems also arise where a law invites arbitrary enforcement. Here, the government's interpretation of the FACE Act invites arbitrary enforcement, as demonstrated by this very prosecution. *See, e.g.*, *Turner*, 842 F.3d at 604; *Stevens*, 559 U.S. at 480 (noting that "this prosecution is itself evidence of the danger in putting faith in government representations of prosecutorial restraint. When this legislation was enacted, the Executive Branch announced that it would interpret" the statute in a limited fashion and "[n]o one suggests that the videos in this case fit that description"). Both other parishioners and the Church itself filmed and disseminated footage of this protest, but to date have not been charged. *See* Facts, Part V, *supra*. The journalists or bystanders who recorded and reported on ICE raids at places of worship also have not been charged. *Id*. Nor have ICE agents conducting raids at churches. *Id*. Not even the journalists present at the Nashville abortion clinic protest—which led to multiple FACE Act convictions—were charged alongside the protester defendants. *Id*.; *see also Gonzalez v. Trevino*, 602 U.S. 653, 657-58 (2024) (plaintiff's showing that statute under

78

which she was charged had never been used in the same manner at any point in the last decade was objective evidence of First Amendment violation). Thus, to the extent the government contends that the statutes apply to Fort, but none of these others, the law quite plainly invites arbitrary enforcement. The superseding indictment must therefore be dismissed for this reason as well.

*Finally*, at a minimum, the rule of lenity requires dismissal. "The rule of lenity is a junior version of the vagueness doctrine that ensures fair warning by resolving ambiguity in a criminal statute as to apply it only to conduct *clearly* covered." *United States v. Wendt*, 168 F.4th 1068, 1077 (8th Cir. 2026) (internal marks omitted) (emphasis added). Fort's conduct is anything but clearly covered. As demonstrated above, both the law and the facts uniformly support that Fort's conduct does not trigger the FACE Act and cannot serve as the basis for a conspiracy charge. *See* Part II, *supra*. No one in Fort's shoes would have understood otherwise. Allowing this prosecution to proceed would be to hold Fort to an application of Sections 241 and 248 never before seen. That is precisely the situation for which the rule of lenity was created. As such, at a minimum, the superseding indictment must be dismissed on this basis.

## V.    DISMISSAL WITH PREJUDICE IS WARRANTED

Where, as here, a prosecution violates the Constitution in multiple respects that cannot be cured by a subsequent indictment (here, following multiple attempts to charge by complaint, followed by two indictments), dismissal with prejudice is required. Dismissal with prejudice is also the only remedy that will vindicate the multiple constitutional harms this prosecution has imposed on Fort, as detailed above, and that

79

will deter the government from similarly infringing on journalists' First Amendment rights in the future. Federal courts inherently possess "supervisory powers" to "implement a remedy for violation of recognized rights," to ensure that any conviction would rest only "on appropriate considerations validly before the jury," or to "deter illegal [government] conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983). Use of the power is appropriate where, as here, a defendant has been so prejudiced. *Id*. at 506.

All three grounds are present in this case. *First*, the government's constitutional violations in pursuing this prosecution have been plentiful, intentional, and in plain view. *See* Parts I-IV, *supra*; *see also* Fort Motion No. 3 (demonstrating that government has pursued a vindictive prosecution against her). *Second*, a conviction against Fort could *only* rest on conduct squarely protected by the First Amendment Speech and Press Clauses, in a case designed to retaliate and censor Fort for her reporting. *Id*. As a result, it is self-evident that any conviction would not rest on "appropriate considerations" that were "validly before the jury." *Hasting*, 461 U.S. at 505. *Third*, only dismissal with prejudice will sufficiently deter further illegal conduct by the government, particularly where the Fort has been indisputably prejudiced by that conduct, not least of all in chilling her ongoing reporting. *See* Parts II-IV, *supra*.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the charges against Georgia Fort in the superseding indictment under the First Amendment with prejudice.

Dated:  August 6, 2026                 Respectfully submitted,

By:  *s/ Isabella Salomão Nascimento*

**BALLARD SPAHR LLP**
Leita Walker
Matthew S. Ebert
Isabella Salomão Nascimento
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3211
walkerl@ballardspahr.com
ebertm@ballardspahr.com
salomaonascimentoi@ballardspahr.com

Seth D. Berlin (*pro hac vice*)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 508-1122
berlins@ballardspahr.com

**THE LAW FIRM OF KEVIN C. RIACH, PLLC**
Kevin C. Riach
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Tel: (612) 203-8555
kevin@riachdefense.com

*Counsel for Georgia Ellyse Fort*

81