**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    Plaintiff,<br><br>  v.<br><br>[8] Georgia Ellyse Fort,<br><br>    Defendant. | Case No. 26-cr-00025-LMP-DLM<br><br>**ORAL ARGUMENT REQUESTED** |

**GEORGIA ELLYSE FORT'S MOTION TO DISMISS**
<u>**SUPERSEDING INDICTMENT FOR VINDICTIVE PROSECUTION**</u>
**(FORT MOTION NO. 3)**

**BALLARD SPAHR**
Leita Walker
Matthew S. Ebert
Isabella Salomão Nascimento
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3211
walkerl@ballardspahr.com
ebertm@ballardspahr.com
salomaonascimentoi@ballardspahr.com

Seth D. Berlin (*pro hac vice*)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 508-1122
berlins@ballardspahr.com

**THE LAW FIRM OF KEVIN C. RIACH, PLLC**
Kevin C. Riach
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Tel: (612) 203-8555
kevin@riachdefense.com

*Counsel for Defendant Georgia Ellyse Fort*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ........................................................................................................... 1

FACTS ........................................................................................................................... 4

I.   THE GOVERNMENT HAS RELIED ON REPEATED FALSE
     FACTUAL ASSERTIONS ABOUT FORT'S CONDUCT TO
     PROSECUTE THIS CASE ..................................................................................... 5

II.  THE GOVERNMENT'S SELECTIVE, CONTENT-BASED
     ENFORCEMENT OF THE STATUTES AT ISSUE ............................................. 9

III. THE GOVERNMENT'S BROADER CAMPAIGN OF
     RETRIBUTION AGAINST THE PRESS AND PERCEIVED
     POLITICAL ENEMIES ....................................................................................... 11

     A.   The Government's Attacks on the Press ....................................................... 12

     B.   The Government's Pattern of Political Persecutions ................................. 18

APPLICABLE LAW ..................................................................................................... 25

ARGUMENT ................................................................................................................ 27

I.   THE GOVERNMENT CANNOT PROSECUTE SOMEONE FOR
     ENGAGING IN CONDUCT PROTECTED BY THE FIRST
     AMENDMENT ..................................................................................................... 27

II.  THE CASE AGAINST FORT EASILY QUALIFIES AS AN
     IMPERMISSIBLE VINDICTIVE PROSECUTION ............................................ 33

     A.   Objective Evidence Establishes That This Prosecution Was Brought
          to Punish Fort for Reporting on a Matter of Public Concern ..................... 33

     B.   The Presumption of Vindictiveness Attaches in This Case ........................ 43

     C.   At a Minimum, the Court Should Order Discovery and an
          Evidentiary Hearing .................................................................................... 45

III. DISMISSAL WITH PREJUDICE IS WARRANTED ......................................... 46

CONCLUSION ............................................................................................................. 48

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accountability NOW USA v. Griess et al.*,
No. 26-cv-1385 (D.D.C. June 1, 2026)..............................................................................21, 22

*American Association of University Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. Sept. 30, 2025)......................................................................19

*Associated Press v. Budowich*,
2025 WL 1649265 (D.C. Cir. June 6, 2025).....................................................................29, 41

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).........................................................................................................29, 30

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984)..............................................................................................................25

*Branzburg v. Hayes*,
408 U.S. 665 (1972).......................................................................................................28, 37

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022)..............................................................................................................12

*Federal Education Association v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025)........................................................................................43

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. ---, 146 S. Ct. 1114 (Apr. 29, 2026)......................................................33, 39, 42, 46

*Gonzalez v. Trevino*,
602 U.S. 653 (2024)..............................................................................................................28

*Goyette v. City of Minneapolis*,
338 F.R.D. 109, 115 (D. Minn. 2021)....................................................................................29

*In re Grand Jury Proceedings*,
810 F.2d 580 (6th Cir. 1987) ................................................................................................28

*In re Grand Jury Proceedings* (*Scarce*),
5 F.3d 397 (9th Cir. 1993) ....................................................................................................28

*In re Grand Jury Subpoena to Risen*,
No. 1:10-cr-485, 39 Media L. Rep. 1945, n.6 (E.D. Va. June 28, 2011)................................27

*In re Grand Jury Subpoenas*,
No. 26-MC-43 (PJS) (D. Minn. June 17, 2026)............................................................. *passim*

*Grosjean v. American Press Co.*,
297 U.S. 233 (1936)........................................................................................27, 28

*Jenner & Block LLP v. DOJ*,
784 F. Supp. 3d 76 (D.D.C. 2025) .......................................................................19

*Juan T.R. v. Noem*,
2026 WL 555601 (D. Minn. Feb. 26, 2026) .........................................................44

*Kelly v. Hegseth*,
820 F. Supp. 3d 1 (D.D.C. 2026) .........................................................................22

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) ..............................................................17, 18, 42

*L.A. Press Club v. Noem*,
No. 2:25-cv-05563 (C.D. Cal. June 25, 2026) ......................................................17

*Lewellen v. Raff*,
843 F.2d 1103 (8th Cir. 1988) .........................................................................25, 27

*Media Matters for America v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)..........................................................................28, 29

*Minneapolis Star v. Minnesota Commissioner of Revenue*,
460 U.S. 575 (1983).........................................................................................28, 41

*N.Y. Times Co. v. DOD*,
824 F. Supp. 3d 27 (D.D.C. 2026) .....................................................................15, 41

*National Public Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) .....................................................................14, 41

*In re Natanson*,
2026 WL 1458902 (E.D. Va. May 4, 2026) .......................................................31, 42

*Nieves v. Bartlett*,
587 U.S. 391 (2019).........................................................................................28, 29

*NRA v. Vullo*,
602 U.S. 175 (2024)..........................................................................................30, 31

*Perkins Coie LLP v. Department of Justice*,
No. 25-5241 (D.C. Cir. July 2, 2025) ...................................................................19

*Perkins Coie LLP v. DOJ*,
783 F. Supp. 3d 105 (D.D.C. 2025)........................................................................19

iii

*President & Fellows of Harvard College v. Department of Health & Human Services*,
798 F. Supp. 3d 77 (D. Mass. 2025) ......................................................................19

*Reporters Committee for Freedom of the Press v. AT&T*,
593 F.2d 1030 (D.C. Cir. 1978) ..............................................................................28

*Rossignol, v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003) ........................................................................27, 28, 31

*In re Search of Real Property and Premises of Natanson*,
2026 WL 510727 (E.D. Va. Feb. 24, 2026) ............................................................16

*Susman Godfrey LLP v. Executive Office of President*,
789 F. Supp. 3d 15 (D.D.C. 2025) ..........................................................................19

*United States v. Abrego Garcia*,
No. 3:25-cr-00115 (M.D. Tenn. May 22, 2026) .................................................23, 45

*United States v. Carey*,
816 F. Supp. 3d 129 (D.D.C. 2026) ..............................................................31, 32, 46

*United States v. Carey*,
No. 25-CR-00251 (D.D.C. Mar. 13, 2026) ..............................................................32

*United States v. Chappell*,
779 F.3d 872 (8th Cir. 2015) ........................................................................25, 26, 27

*United States v. Comey*,
No. 25-cr-00272 (E.D. Va. Nov. 17, 2025) .............................................................20

*United States v. Goodwin*,
457 U.S. 368 (1982)...................................................................................................3

*United States v. Hasting*,
461 U.S. 499 (1983)...........................................................................................46, 47

*United States v. Hirsch*,
360 F.3d 860 (8th Cir. 2004) ...................................................................................46

*United States v. Leathers*,
354 F.3d 955 (8th Cir. 2004) .............................................................................25, 26

*United States v. Oregon*,
--- F. Supp. 3d ----, 2026 WL 318402 (D. Or. Feb. 5, 2026)..................................44

*United States v. Perry*,
152 F.3d 900 (8th Cir. 1998) ...................................................................................45

*United States v. Punelli*,
   892 F.2d 1364 (8th Cir. 1990) ........................................................................25, 26, 43

*United States v. Stewart*,
   2025 WL 2754480 (D.D.C. Sept. 29, 2025) .........................................................44

*United States v. Watts*,
   394 U.S. 705 (1969).............................................................................................21

*United States v. Williams*,
   793 F.3d 957 (8th Cir. 2015) .........................................................................26, 43

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977).........................................................................................28, 29

*Virginia v. American Booksellers Association*,
   484 U. S. 383 (1988)............................................................................................31

*Widakuswara et al. v. Lake et al.*,
   Case No. 1:25-cv-01015 (D.D.C. Apr. 22, 2025)..................................................14

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of President*,
   784 F. Supp. 3d 127 (D.D.C. 2025) ......................................................................19

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)..............................................................................................29

**Statutes**

18 U.S.C. § 241 ............................................................................................................1

19 U.S.C. § 1509..........................................................................................................2, 8

42 U.S.C. § 2000aa .......................................................................................................8

**Other Authorities**

United States Constitution, amend. I ......................................................... *passim*

United States Constitution, amend. V...........................................................................1

Federal Rule of Criminal Procedure 12 ....................................................................1, 26

Local Rule 12.1 .............................................................................................................1

Pursuant to Federal Rule of Criminal Procedure 12(b) and Local Rule 12.1, Georgia Ellyse Fort moves this Court to dismiss the superseding indictment against her with prejudice as a vindictive prosecution undertaken in bad faith, in violation of the Fifth Amendment to the United States Constitution. As explained below, the government has gone to extraordinary lengths to prosecute Ms. Fort for engaging in constitutionally protected journalism. It has repeatedly misrepresented the facts averred against her, it has improperly manipulated the law, and it has done so as part of a deliberate pattern of using legal jeopardy—or the threat of it—to silence its perceived opponents and to pressure them to bend the knee. The Constitution simply does not allow this type of vindictive prosecution. Because the government has therefore violated Fort's rights under the Fifth Amendment, dismissal with prejudice is warranted.[1]

## **INTRODUCTION**

In Fort Motion No. 1, Fort conclusively establishes that the only conduct she engaged in on January 18, 2026, is all squarely protected by the First Amendment. In Fort Motion No. 2, Fort demonstrates why, even setting aside the categorical bar to this prosecution under the First Amendment, the allegations against her contained in the superseding indictment do not even amount to violations of 18 U.S.C. §§ 241 or 248.

---

[1] In two concurrently filed motions, Fort has also sought dismissal on the grounds that (1) this prosecution violates Fort's constitutional rights secured by the Speech and Press Clauses of the First Amendment (Fort Motion No. 1), and (2) the government failed to adequately allege facts that, if proven, would establish the elements necessary to proceed under the terms of the statutes she is charged with violating (Fort Motion No. 2).

This Motion turns the focus to the government and the motivations driving its relentless pursuit of Fort, even in the absence of any facts or law to support its case.

Put bluntly, this prosecution is vindictive.  The government has revealed as much in its own words:  That is, without having done any investigation into the case, the government asserted that Fort "should be thrown in jail, or thrown out of the Country," and vowed to pursue the case against her "to the ends of the earth."  Then-Attorney General Pamela Bondi proudly proclaimed, "We are coming after you if you participated in that.  I don't care if you're a . . . journalist."

The government has also demonstrated its vindictive motive through its conduct, the unrelenting pursuit of the case no matter what over the last six months, including:

- Pursuing an indictment even after multiple judges and courts flatly rejected that probable cause existed to charge Fort;

- Incorporating numerous material falsehoods about Fort's conduct into the indictment and superseding indictment, presumably presenting those same falsehoods to the grand jury;

- Falsely accusing Fort of conspiring with someone who had no involvement whatsoever in the events at issue and who was later dismissed from the case with prejudice;

- Submitting no less than fifteen search warrant affidavits to at least four judges in multiple jurisdictions falsely attesting that Fort engaged in "chanting"—and then doubling down to assert that she chanted specific phrases—only to later confess that she did no such thing, but taking no action to correct those falsehoods to the numerous other judges to whom they were made;

- Seeking a warrant for the identities of Fort's subscribers and the names of the individuals who watched her livestream of the protest; and

- Issuing administrative summonses to obtain Fort's phone and YouTube records, asserting authority under 19 U.S.C. § 1509, even though that law

2

deals with customs enforcement and has no bearing on these proceedings and a judge had already rejected the government's search warrant application seeking some of the same information.

Perhaps most significantly, the government is punishing Fort for entering a church open to the public (after being invited in, no less) to document a protest, and then filming and disseminating that footage, something that (a) is not unlawful and (b) numerous others did without fear of facing a federal criminal prosecution, because the government perceived those individuals' viewpoints to be aligned with its own.

Finally, as detailed extensively below, the government's prosecution of Fort cannot be divorced from the now "well-established history" of the government using the criminal legal system "to retaliate against and pressure the President's political and personal adversaries." *In re Grand Jury Subpoenas*, No. 26-MC-43 (PJS), ECF 1 at 14 (D. Minn. June 17, 2026). Such a glaring pattern of misconduct simply cannot reasonably be explained on any basis other than bad faith—a *hallmark* of a vindictive or retaliatory prosecution.

Thus, in spite of the foundational principle that the government may not prosecute an individual to retaliate against her for exercising her legal rights, *see United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("while an individual certainly may be penalized for violating the law, [s]he just as certainly may not be punished for exercising a protected statutory or constitutional right"), all of the evidence in this case points to the government prosecuting Fort precisely *because* she is a journalist, and in particular because she engaged in that constitutionally sacred work to amplify a message with which the government vehemently disagrees.

3

While the existence of any one of these circumstances, on their own, would suffice to demonstrate the wholly unlawful nature of this prosecution, when taken in combination they present an ironclad case of actual vindictiveness that is fatal to this prosecution, or at a minimum, triggers a presumption of vindictiveness that the government cannot overcome. At the very least, Fort has raised sufficient questions about the government's conduct that the Court should order discovery and an evidentiary hearing as to the government's motives.

Fort, therefore, respectfully requests that the Court promptly dismiss the superseding indictment with prejudice, both to punish the government for its bad faith in this case and to deter it from engaging in similar tactics against Fort (or any other member of the press) in the future.

## **FACTS**

Fort incorporates by reference the Facts set forth in Fort Motion Nos. 1 and 2, which describe the events at issue, the superseding indictment, and the government's unconstitutional application of the statutes Fort has been charged with violating. Fort supplements those factual statements by detailing below the government's ongoing pattern of using the threat of prosecution and/or other adverse governmental action to silence its perceived critics and to bring them to heel.

4

## I.  THE GOVERNMENT HAS RELIED ON REPEATED FALSE FACTUAL ASSERTIONS ABOUT FORT'S CONDUCT TO PROSECUTE THIS CASE

It is now well-established that the government made multiple material misrepresentations about Fort's conduct on January 18, including under oath, in order to prosecute her.

In at least fifteen separate search warrant affidavits presented to no fewer than three judges of this District and at least one judge in another District, DHS Special Agent Timothy Gerger falsely attested, among other things, that "Broadcast video obtained from Cities church shows" Fort "chanting with agitators." *See* Appl. For Search Warrant ¶ 43, *In re Search Warrant*, No. 26-MJ-87-SGE (Jan. 27, 2026) (ECF 3). He further claimed that "FORT went into the Cities Church, using her camera as the weapon to intimidate, threaten and scare the congregants." *See* Appl. For Search Warrant ¶ 16, *In re Search Warrant*, 26-MJ-206-JFD (Mar. 6, 2026) (ECF 3). Special Agent Gerber swore that all of his assertions in the various search warrant applications were based on his "personal observations" and "review of documents and other evidence," including portions of multiple livestreams of the events that he personally watched. Appl. For Search Warrant ¶¶ 3, 14, 41, *In re Search Warrant*, No. 26-MJ-87-SGE.

Despite these statements, discovery—including all available video footage of the events and eyewitness statements—disproved those sworn allegations. *See* ECF 528 at 3-7. Accordingly, the government was forced to admit that the statements about Fort's conduct were false and agreed that "two lines" of grand jury testimony needed to be reviewed by the Court *in camera*. *See* ECF 539 at 1-2, 7-8, 16. It refused to address,

however, whether its admitted falsehoods carried forward into its grand jury presentations, and ignored the host of *other* material factual misrepresentations about Fort in the superseding indictment itself, including:

- The allegation that Fort purportedly engaged in "menacing and threatening behavior," ECF 144 ¶ 8(26), which is directly contradicted and disproven by video footage and numerous witness statements, *see* Fort Motion No. 1 at 14-22, 23-25 & Exs. 1, 4, 8, 40 (citing and attaching same);

- The allegation that Fort attempted "to oppress and intimidate" the Pastor, ECF 144 ¶ 8(35), which is contradicted and disproven by video footage, ███ ███████████ statements to law enforcement, and ███ grand jury testimony, *see* Fort Motion No. 1 at 17-22 & Exs. 1, 4, 8, 12, 13, 40 (citing and attaching same); and

- The allegation that Fort purportedly blocked a van while conducting an interview outside the Church, ECF 144 ¶ 8(41), which is contradicted and disproven by video footage, all available witness statements, and ███ ███████ grand jury testimony—all of which refer to a *male* doing so, *see* Fort Motion No. 1 at 22-23 & Exs. 1, 8, 14, 15, 40 (citing and attaching same).

*See also* Ex. 41 (raising these allegations with the government a third time, noting "yet you have provided no further update [about them] since our May 27 discussion"); Ex. 42 at 1 ("The government does not intend to address with the Court the significant misstatements about Ms. Fort's conduct that appear in the superseding indictment."). In fact, not a single witness statement disclosed by the government describes Fort as physically "menacing," "threatening," "oppressing," or "intimidating" anyone; impeding the Pastor; or blocking a van. The substantial video footage of the events likewise establish that these factual averments are false. Exs. 1 (Lemon's livestream), 4 (Church's broadcast), 8 (Fort's livestream); *see* ECF 542 at 2-3 (noting Fort's reply to motion for disclosure that government had not addressed these numerous falsehoods, thereby

conceding the point). Even the subsequently produced testimony of the government's

primary percipient grand jury witness, ▮▮▮▮▮▮▮ disproves the allegations about Fort

in the superseding indictment. For example:

- He referred to Fort only indirectly and cursorily, describing her as a reporter engaged in typical journalistic newsgathering activities (*e.g.*, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮"; "one woman who had a microphone that had an emblem on it like it was, you know, some type of TV or station"). Ex. 40 at 39, 41-42.

- When asked whether he felt "physically threatened" by Fort while she livestreamed ▮▮▮▮▮▮▮, he testified that, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and all the cameras were there I, I did not expect for those people who were interviewing to be, had bad behavior because they're videoing so I did not feel in that moment. . . . The biggest issue with that was not my personal safety." *Id.* at 39:1-14.

- He quickly reiterated that he "didn't feel physically threatened by ▮ ▮▮▮▮▮." *Id.* at 40:15-18.

- In testifying about the incident involving the van (which ▮▮▮▮ was driving and in which ▮▮▮▮▮▮ were passengers), he attributed the only conduct he described to a male. *Id.* at 33:12-34:12. He then testified that the van was able to leave without significant issue. *Id.* at 34:6-12 ("she trepidatiously makes her way out with some help of directing traffic and then she leaves. She was able to, to, you know, ride in the alley, then ride on Snelling and was able to get away.").

*See also* ECF 544. As a result of these falsehoods, and the concerns it raised with the

government's grand jury presentations, the Court ordered the government to provide any

testimony and exhibits presented to the grand jury regarding Fort for review *in camera*.

In addition to these falsehoods, the government necessarily presented additional

false information to the grand jury for it to indict Fort for conspiring with a person the

government has since conceded was completely uninvolved in the events. *See* ECF 412;

ECF 413 at 2. It likewise asserted in its initial indictment that Fort was present for the

7

entire "pre-op" meeting and that she learned "the plan" of the operation, only to walk back those false averments from the superseding indictment, in the face of video and other evidence definitively disproving such an allegation.  *See* Fort Motion No. 1 at 12-14, 36 & n.55; *compare* ECF 39 ¶ 8(4), *with* ECF 144 ¶¶ 8(13), (14); *see* Ex. 1 (Lemon's livestream) at 3:30-10:30 (after three minutes, Fort leaves the "pre-op briefing" for her car, where she remains until the caravan leaves the Cub Foods parking lot); Ex. 3 at 00000504 (case agent noting that 6+ minutes into Lemon's livestream "organizers outline[d] the plan" and "ensure[d] everyone has the address, to the church").

Finally, the government deliberately attempted to circumvent traditional legal avenues to pursue its investigation into Fort.  For example, in applying for search warrants for Fort's devices, media platforms, and subscriber information—*i.e.*, all items related to her newsgathering and reporting—the government failed to alert the signing judges to the Privacy Protection Act ("PPA"), a law specifically designed to protect the press from such intrusion into core First Amendment areas.  *See, e.g.*, Order at 4, *In re Search Warrant*, Case No. 26-mj-206-JFD (D. Minn. Mar. 3, 2026) (ECF 4) (explaining that when "the government presented these warrants, both originally and for re-presentment, it did not direct the Court's attention to the Privacy Protection Act, 42 U.S.C. § 2000aa.  It should have.").

When those attempts failed, the government sought some of that same evidence (as well as other evidence) against Fort through the misuse of administrative summonses purportedly issued pursuant to 19 U.S.C. § 1509, a law pertaining to customs-related investigations.  *See* Ex. 41; *see, e.g.*, Ex. 43.  Of course, this case has nothing to do with

8

any customs-related offense.  But the government's use of this administrative procedure

allowed it to evade any judicial review or notice to Fort of its efforts to obtain discovery

against her.  Ex. 41 at 3.  Notably, when Fort asked the government to explain why it

proceeded through this route rather than the standard procedures prescribed by the

Federal Rules of Criminal Procedure, the government declined to answer.  *Id.*; *see also*

Ex. 42 at 2-3.

## II.    THE GOVERNMENT'S SELECTIVE, CONTENT-BASED ENFORCEMENT OF THE STATUTES AT ISSUE

As explained in greater detail in Fort Motion No. 1 at 37-44, 70-78, the

government's enforcement of Sections 241 and 248 is anything but evenhanded; indeed,

it is undeniably content-based.  The government is aggressively and selectively

prosecuting Fort, even while affirmatively declining to apply the same laws to a number

of others, including:

- The Church and multiple parishioners, who, like Fort, filmed the protest and shared that footage publicly;

- Protesters, who have disrupted other worship services, and the press, who covered those events;

- ICE agents, who have disrupted worship services and other religious events, who were instructed to be "camera ready" during their raids, who invited members of the press to "ride along" with them, and who have now been equipped with body cameras, all generating coverage the government perceives as favorable to it;[2]

---

[2] The government staged and filmed arrests of certain defendants in this case and then disseminated it (and, in the case of Defendant Levy Armstrong, altered it before doing so).  That is yet another example of generating coverage of the protest's aftermath that the government believes is favorable all while punishing Fort for her coverage of the protest itself.

- Individuals lawfully convicted of violating the "clinics" provision of the FACE Act, but who were pardoned by the President;

- Individuals who have been effectively encouraged to violate that "clinics" provision in light of the government's announcement that it will no longer prosecute violators under that section, unless they are protesting at so-called "pregnancy crisis" centers; and

- Journalists who have covered immigration enforcement actions or protests in ways that the government believes is more favorable.

This is hardly surprising. According to at least one former attorney from the Minnesota U.S. Attorney's Office, the government's recent approach to charging decisions is "the ultimate example of selective prosecution."[3] Even more recently, Chief Judge Patrick Schiltz called out the now "well-established" pattern of prosecutors bringing deeply flawed cases to appease administration officials. *In re Grand Jury Subpoenas* at 14, No. 26-MC-43 (PJS) (ECF 1). As a result, the government has had to repeatedly dismiss prosecutions arising out of Operation Metro Surge because the evidence flatly contradicts the government's allegations. *See* R. & R. at 7 n.15, 15 n.11, *United States v. Adbebe*, No. 26-MJ-77 (SRN/ECW) (D. Minn. June 3, 2026) (ECF 64) (cataloguing Operation Metro Surge cases that have either been dismissed or downgraded). Indeed, more than half of the cases in which people were charged for assaulting or impeding federal officers have been dismissed. *See id.*[4] The same serious

---

[3] Jeffrey Meitrodt, Sarah Nelson, and Deena Winter, *Another wave of departures in Minnesota's U.S. Attorney's Office*, The Minnesota Star Tribune (Feb. 2, 2026), https://perma.cc/2M3E-HE7A; Jeffrey Meitrodt and Sarah Nelson, *Inside the upheaval at the Minnesota U.S. Attorney's Office*, The Minnesota Star Tribune (Feb. 27, 2026), https://perma.cc/2L7Y-MGU7.

[4] *See also* Sarah Nelson, *Federal Prosecutors ask to dismiss charge against woman accused of assaulting agents*, The Minnesota Star Tribune (May 14, 2026),

evidentiary defects predominate here too. *See* Part I, *supra*; *see also* ECF 550 (cataloguing the growing list of falsehoods, improper conduct, and violations of law committed by the government in this case).

## III.   THE GOVERNMENT'S BROADER CAMPAIGN OF RETRIBUTION AGAINST THE PRESS AND PERCEIVED POLITICAL ENEMIES

Below, Fort details an unmistakable pattern of government retaliation against the press and the government's perceived political enemies. This prosecution fits comfortably within that "well-established history." Mot. to Quash at 14, *In re Grand Jury Subpoenas*, No. 26-MC-43 (PJS) (Feb. 2, 2026) (ECF 1). Thus, although the evidence laid out in Parts I and II, *supra*, is, alone, enough to prove that this prosecution is vindictive and being pursued in bad faith, when placed within this broader context, the conclusion is undeniable and inexplicable on any other basis: The government is prosecuting Fort to punish her for engaging in constitutionally protected conduct—her reporting.

---

https://perma.cc/4T4X-QEKB; Sarah Nelson, *DOJ moves to drop charges against men arrested after ICE shooting in north Minneapolis*, The Minnesota Star Tribune (Feb. 12, 2026), https://perma.cc/M9BA-BWYJ (Minnesota U.S. Attorney's Office describing its own charges as "materially inconsistent" with the evidence in the case); Susan Du, *Charges dropped against three Minnesotans accused of assaulting federal agents*, The Minnesota Star Tribune (Feb. 25, 2026), https://perma.cc/FJ69-R9GD (highlighting one case in which Minnesota U.S. Attorney's Office filed a motion under a line attorney's name, who had "no knowledge of, or involvement with the case," then dropped the case down to a misdemeanor, before dismissing the case entirely for lack of evidence; discussing another case in which court dismissed the charges with prejudice because of the government's "weak evidence" and "vague and contradictory" allegations); Nathan O'Neal, *Federal charges for assaulting, impeding DHS agents keep getting dismissed*, FOX 9 (May 28, 2026), https://perma.cc/2FHF-JFV2.

### A.    The Government's Attacks on the Press

During his first term, the President:

- urged former FBI Director Comey (before the government targeted him with repeated prosecutions) to "consider putting reporters in prison" for publishing content he disliked;[5]

- revoked CNN reporter Jim Acosta's White House press credentials after lashing out at Acosta during a press conference;[6]

- repeatedly spied on the press, including surreptitiously obtaining reporters' email and phone records;[7]

- repeatedly called for POLITICO's employees to be jailed for reporting on a near final draft of the ultimate opinion in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), suggesting that the prospect of being raped in prison would get them to reveal their source;[8] and

---

[5] Michael S. Schmidt, *Comey Memo Says Trump Asked Him to End Flynn Investigation*, N.Y. Times (May 16, 2017), https://perma.cc/4UMW-TCMG.

[6] Brent D. Griffiths and Jason Schwartz, *White House pulls pass from CNN reporter*, POLITICO (Nov. 7, 2018), https://www.politico.com/story/2018/11/07/white-house-jim-acosta-credential-973702.

[7] Bess Levin, *Report: Trump's Justice Department Spied on at Least Five Reporters from Outlets Trump Despised*, Vanity Fair (May 21, 2021), https://www.vanityfair.com/news/2021/05/trump-doj-reporter-surveillance?srsltid=AfmBOoouDVwHkLvEW5xo4nhup5LxS7m75aV79XF2ACLIiN7OWRUY3r7f.

[8] Donald Trump, C-SPAN (Oct. 22, 2022), https://www.c-span.org/clip/campaign-2022/user-clip-trump-threatens-journalist-with-prison-bride-for-leaks/5111702; Donald Trump, C-SPAN (Nov. 7, 2022), https://www.c-span.org/clip/campaign-2022/user-clip-trump-on-jailing-journalists/5137042.  Trump acknowledged that he had been advised not to say such things because the threat of jailing reporters "is treasonous."  *Id*. ("they don't want [me] to mention this because they think it's so terrible").

- "solicit[ed] ideas from conservative allies . . . for how the U.S. government and Justice Department could go about turning his desires—for brutally imprisoning significant numbers of reporters—into reality."[9]

Even before retaking office, then-candidate Trump and his associates billboarded their intent, if returned to office, to once again target the press for retribution:

- About a year before the 2024 election, the President threatened that, "when I WIN the Presidency of the United States," the "LameStream Media will . . . pay a big price for" coverage that he dislikes.[10]

- In late 2023, future FBI Director Kash Patel admitted that, once re-elected, the President would weaponize the Justice Department "to come after the people in the media."[11]

- At the 2024 Conservative Political Action Conference, Patel said the President would bring to heel "the most powerful enemy that the United States has ever seen," the media.[12]

As promised, since President Trump and his cronies took office for his second term, these attacks have only intensified exponentially:

---

[9] Ryan Bort and Asawin Suebsaeng, *Trump Keeps Musing About Journalists Being Raped In Prison—He's Not Joking*, Rolling Stone (Nov. 8, 2022), https://perma.cc/ZN2L-S3T2.

[10] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 24, 2023 6:53 PM), https://truthsocial.com/@realDonaldTrump/posts/111122815628828712.

[11] Kate Sullivan and Alayna Treene, *New Trump admin would try to prosecute journalists, former Trump adviser says*, CNN (Dec. 6, 2023), https://perma.cc/6Q6Q-W9E9.

[12] Right Side Broadcasting Network, *FULL SPEECH: Kash Patel Addresses CPAC in DC 2024 – 2/23/24*, YouTube (Feb. 23, 2024), https://perma.cc/48T6-RD6Y (9:47-10:04).

- In January 2025, FCC Chairman Brendan Carr revived previously dismissed complaints against ABC, CBS, and NBC, for their coverage of the 2024 presidential election.[13]

- In February 2025, after unilaterally renaming the Gulf of Mexico as the "Gulf of America," the government expelled the Associated Press from the White House press pool and barred its reporters from events because it continued to refer to it as the "Gulf of Mexico."[14]

- In March 2025, the government attempted to dismantle the Voice of America, and other statutorily established broadcasters, based on a dislike of their coverage.[15]

- In June 2025, the government threatened to sue both CNN and *The New York Times* over their respective reports about a leaked preliminary Defense Intelligence Agency assessment concluding that the U.S. air strikes had not eliminated Iran's nuclear infrastructure.[16]

---

[13] Liam Scott, *FCC launches media investigations, reinstates complaints*, VOA (Feb. 5, 2025), https://perma.cc/69ZG-WDTD.  Notably, Carr declined to reinstate a similar complaint against Fox News over its coverage of the 2020 election.  *Id.*

[14] Ben Johansen, *Associated Press blocked from Oval Office for not using 'Gulf of America'*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/associated-press-gulf-of-mexico-oval-office-016418.

[15] *See* Mem. Op. at 2-7, *Widakuswara et al. v. Lake et al.*, Case No. 1:25-cv-01015 (D.D.C. Apr. 22, 2025) (ECF 98) (preliminarily enjoining executive orders targeting VOA); Mem. Op., *id.*, (Mar. 7, 2026) ECF 219 (concluding Kari Lake was unlawfully serving as American Global Media's CEO and voiding all actions taken by her); *see also Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 91-92 (D.D.C. 2026) (ruling that government improperly withdrew funding from public media based antipathy to the perceived viewpoint of its coverage).

[16] Brian Stelter, *Trump threatens CNN and New York Times with lawsuits over Iran reports*, CNN (June 26, 2025), https://perma.cc/KS72-N33L.  This reporting is particularly relevant now given that, despite the President's earlier representation that Iran's nuclear capability had been "obliterated," he initiated the current war to eliminate the country's nuclear threat.

14

- In July 2025, the government threatened to prosecute CNN over its *reporting* about apps, developed by third parties, that warn users of nearby immigration enforcement actions.[17]

- In September 2025, the Department of Defense revoked the credentials of nearly *all* members of the Pentagon press pool, for refusing to sign onto a new policy that would prohibit journalists from asking questions about confidential information or reporting information they receive without official government approval.[18]

- Also in September 2025, ABC temporarily pulled Jimmy Kimmel off air, after FCC Chair Carr objected to Kimmel's remarks on Charlie Kirk's death.  Carr threatened the company that "[w]e can do this the easy way or the hard way.  These companies can find ways to take action on Kimmel or there is going to be additional work for the FCC ahead."[19]

---

[17] Giselle Ruhiyyih Ewing, *Trump administration threats CNN with prosecution*, POLITICO (July 1, 2025), https://www.politico.com/news/2025/07/01/kristi-noem-cnn-prosecution-00435445.  Apple removed the apps from its App Store, after DOJ "demanded" it do so.  Clare Duffy, *Apple removes ICE tracking apps after Trump administration says they threaten officers*, CNN (Oct. 3, 2025), https://perma.cc/C3AW-ZG6N; *see also* Mem. Op. at 1, *Rosado et al. v. Bondi et al.*, No. 26 C 1532 (N.D. Ill. Apr. 17, 2026) (ECF 34) (granting preliminary injunction, finding plaintiffs—app creators—were likely to succeed on merits of First Amendment claim against government for pressuring Apple to remove apps from its app store).

[18] Jack Detsch, *Pentagon to limit journalists' access unless they agree not to publish certain information*, POLITICO (Sept. 19, 2025), https://www.politico.com/news/2025/09/19/pentagon-limits-access-journalists-00574227; Cheyanne M. Daniels, *Major media outlets, including Hegseth's former employer Fox News, decline to sign new Pentagon reporting rules*, POLITICO (Oct. 14, 2025), https://www.politico.com/news/2025/10/14/fox-news-pentagon-press-restrictions-00608019.  This policy was subsequently ruled unconstitutional.  *N.Y. Times Co. v. DOD*, 824 F. Supp. 3d 27, 53-54 (D.D.C. 2026), *appeal filed,* No. 26-5113 (D.C. Cir. Apr. 10, 2026), *stay granted*, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026).

[19] Brett Bachman and Amelia Benavides-Colon, *ABC Pulls Jimmy Kimmel Off the Air Indefinitely After FCC Chair's Threats*, NOTUS (Sept. 17, 2025), https://perma.cc/5EZW-L662; *see* Dell Cameron, *The FCC Has a Fast Lane for Complaints About Trump's Media Critics*, WIRED (Apr. 14, 2026), https://perma.cc/TXC7-WQFZ (outlining how FCC complaints against disfavored media are intentionally fast-tracked under the current administration).

- In December 2025, the President once again threatened to pull the broadcast licenses of networks whose coverage is critical of him.[20]

- In January 2026, the FBI raided the home of a *Washington Post* reporter, seizing multiple devices.[21]  The government failed to alert the judge who issued the warrant about the PPA.[22]

- In April 2026, the FCC launched an early review of ABC's broadcast licenses immediately following the President's and First Lady's criticism of a joke by Kimmel.[23]

- In or around May 2026, the government subpoenaed reporters for *The Washington Post* and the *Wall Street Journal* to testify before a federal grand jury over reporting the administration deemed unfavorable to it, under the guise of national security concerns.  The government also

---

[20] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 24, 2025 11:36 PM), https://truthsocial.com/@realDonaldTrump/posts/115772922954148853.

[21] Richard Luscombe and Jeremy Barr, *FBI raids home of Washington Post reporter in 'highly unusual and aggressive' move*, The Guardian (Jan. 14, 2026), https://perma.cc/WR9T-BLVC.

[22] Charlie Savage, *U.S. Failed to Alert Judge to Press Law in Application to Search Reporter's Home*, NY Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/doj-press-law-warrant-application-washington-post-journalist.html.  As a result of the government's failure to advise the Court about this directly applicable statute, the judge rescinded the part of the warrant authorizing access to the devices or review of the seized data, and ordered the government to return of all information "outside the limited information authorized by the search warrant."  He reasoned that the government had abused the presumption of regularity by failing to alert him to the PPA, the government's seizure of the devices constituted a prior restraint under the First Amendment, and the government could not be trusted—even with the use of a filter team—to review the materials on the devices it seized.  Instead, "the Court will conduct the review itself," the judge wrote.  *In re Search of Real Prop. and Premises of Natanson*, 2026 WL 510727 (E.D. Va. Feb. 24, 2026), *R. & R. adopted*, No. 26-SW-54, ECF 122 (E.D. Va. May 4, 2026), *available at* https://perma.cc/95W2-7S6X.

[23] https://perma.cc/WR5Y-VQ3K; *see* Mary Cunningham, *Could the FCC yank ABC's TV licenses amid Trump spat with Kimmel?*, CBS News (May 1, 2026), https://perma.cc/GV6E-WTS3; Brian Stelter, *Trump administration challenges ABC station licenses amid Kimmel controversy*, CNN (Apr. 28, 2026), https://perma.cc/9LZV-KW94.

16

subpoenaed the *Wall Street Journal* for documents related to its coverage of the Iran war.[24]

- In July 2026, the government subpoenaed reporters for *The New York Times* to testify before a federal grand jury over reporting about the President's new Qatari-donated Air Force One jet.  The government deliberately served some of the reporters at home.[25]  The government also subpoenaed the reporters' (and some of their spouses' and parents') phone records.[26]

The Ninth Circuit addressed the precise context of news coverage of protests, in April 2026, finding "extensive evidence that" the federal government "repeatedly targeted journalists," who were out covering anti-ICE protests and who were separate from the "protesters."  *L.A. Press Club v. Noem*, 171 F.4th 1179, 1189 (9th Cir. 2026), *vacating in part and affirming in relevant part*, 799 F. Supp. 3d 1036, 1068 (C.D. Cal. 2025) (finding "Defendants lack[ed] any valid justification for targeting journalists," because they are neither part of the protest nor perpetrators of any violence); Order at 16, *L.A. Press Club v. Noem*, No. 2:25-cv-05563 (C.D. Cal. June 25, 2026) (ECF 120) (reaffirming "the existence of a policy within DHS" that improperly "treats mere public recording of its agents as a threat that" is "criminal in nature").  Both the appellate and

---

[24] Perry Stein, *DOJ issued subpoenas to force Post, WSJ reporters to testify before grand jury*, The Washington Post (June 23, 2026), https://perma.cc/5C56-5PAX.

[25] Michael M. Grynbaum, *Times Journalists Subpoenaed as Trump Escalates Pressure on Media*, N.Y. Times (July 11, 2026), https://perma.cc/YA5M-FZPU.

[26] Michael M. Grynbaum and Jonah E. Bromwich, *U.S. Withdraws Subpoenas Issued to New York Times Journalists*, N.Y. Times (July 23, 2026), https://perma.cc/Q6FE-KS45. The government subsequently withdrew the subpoenas, after conceding that its filings contained multiple factual errors, it had failed to disclose to the Times and the Court related subpoena requests issued to third-party providers, it skirted regular procedures to obtain the subpoenas, and, in seeking a non-disclosure order from another judge, it had omitted relevant details to the court's consideration from its application.  *Id.*

17

district courts credited the "'avalanche' of circumstantial evidence" that the journalists' reporting was a 'substantial motivating factor' for" the actions taken against them—*i.e.*, that the government had acted in retaliation for squarely protected First Amendment conduct. *L.A. Press Club*, 171 F.4th at 1189.

Although this list is not exhaustive, it demonstrates how this prosecution is emblematic of the government's ongoing assault on news coverage that it dislikes. Indeed, so strong is the government's use of its police and prosecutorial power to target disfavored expression that the agents involved in this case have seen fit (a) to note in their investigative reports when a defendant publicly "talk[ed] about President Trump and ICE negatively," *see, e.g.*, Ex. 34 at 00000934, and (b) to shut down a public courthouse in the middle of the day when Fort was met with a simple, peaceful show of support after a hearing in this case, *see* Fort Motion No. 1 at 43.

### B.    The Government's Pattern of Political Persecutions

The charges against Fort also form part of an escalating series of retaliatory prosecutions and investigations by the government, including without limitation former FBI Director Comey (now twice), New York Attorney General Letitia James, Chair of the Federal Reserve Jerome Powell, six federal Democratic lawmakers, and various Minnesota elected officials and municipal governments. In addition, the government has

18

also targeted law firms,[27] universities,[28] non-profits,[29] and more, all in a naked attempt to punish dissent and cow the entities into "bending the knee."

The deeply flawed nature of the government's prosecution of Fort are strikingly similar to those that infected the 2025 prosecutions of Comey and James, both of which were ultimately dismissed.  Following a public Truth Social post by the President directed to "Pam" (then-Attorney General Bondi) asking why there had been no attempt to prosecute Comey and "Leticia," who are "guilty as hell," the two found themselves

---

[27] *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 26 (D.D.C. 2025) (enjoining viewpoint-discriminatory executive order targeting law firm); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 155 (D.D.C. 2025) (holding that executive order which "suppresses [] disfavored speech by imposing severe sanctions on WilmerHale both directly and indirectly" "is 'an egregious' violation of the First Amendment!"); *Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 93, 108 (D.D.C. 2025) (enjoining executive order targeting law firm as "offensive[] to the freedoms the First Amendment guarantees" for "viewpoint discrimination"); *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 165 (D.D.C. 2025) (executive order targeting law firm "express[ed] President Trump's disapproval of plaintiff's First Amendment activity" amounting to "viewpoint discrimination, plain and simple").  The government's consolidated appeal of these rulings is currently pending.  *Perkins Coie LLP v. Dep't of Justice*, No. 25-5241 (D.C. Cir. July 2, 2025).

[28] *See, e.g.*, *See President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 119 (D. Mass. 2025) (ruling for Harvard on First Amendment challenge to government efforts to make university "overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint"), *appeal filed*, No. 25-2231 (1st Cir. Dec. 31, 2025); *Am. Assoc. of Univ. Profs. et al. v. Rubio et al.*, 802 F. Supp. 3d 120, 189 (D. Mass. Sept. 30, 2025) (ruling that government engaged in intentional viewpoint discrimination in seeking to deport students who participated in pro-Palestinian protests), *judgment entered*, 2025 WL 524753 (D. Mass. Jan. 22, 2026), *appeal filed*, No. 26-1195 (1st Cir. Feb. 24, 2026).

[29] Press Release, *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering*, U.S. Dep't of Justice (Apr. 21, 2026), https://perma.cc/JQZ4-M2K3.

19

under federal indictment.[30]  The post came one day after the U.S. Attorney for the

Eastern District of Virginia resigned abruptly after telling senior DOJ officials that there

was not sufficient evidence to bring charges against either Comey or James.[31]

The President then installed his former personal defense lawyer, Lindsey Halligan,

as head of the office,[32] who, like here, rushed to indict in response to direct political

pressure; personally directed the presentation of the case to the grand jury; signed the

charging document herself; and was, at first, the only prosecutor listed on the case.[33]  As

here, prosecutors from other U.S. Attorney's Offices parachuted in to handle the case,

---

[30] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 20, 2025 5:44 PM), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727.  *See Attorney General Bondi, Director Patel Statements Regarding Indictment of Former FBI Director James Comey*, U.S. Dep't of Justice (Sept. 25, 2025), https://perma.cc/EP8Y-2ME3; *New York State Attorney General Indicted*, U.S. Dep't of Justice (Oct. 9, 2025), https://perma.cc/T7ZK-PKNX.

[31] Glenn Thrush, et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. Times (Sept. 19, 2025), https://perma.cc/Y4QZ-45YG.

[32] Kyle Cheney, *Bondi taps Trump's former personal attorney as a top federal prosecutor*, POLITICO (Sept. 22, 2025), https://www.politico.com/news/2025/09/22/bondi-taps-lindsey-halligan-federal-prosecutor-00575547.

[33] Kyle Cheney & Josh Gerstein, *'Let's have a trial': Comey proclaims innocence as Trump revels in grand jury indictment he demanded*, POLITICO (Sept. 25, 2025), https://www.politico.com/news/2025/09/25/james-comey-charges-indictment-00581501; Kyle Cheney, Erica Orden, & Hassan Ali Kanu, *How Trump's message to 'Pam' got exactly the results he wanted*, POLITICO (Oct. 10, 2025), https://www.politico.com/news/2025/10/10/trump-doj-prosecutions-comey-james-00601838; *see also* ECF No. 191 at 14, *United States v. Comey*, No. 25-cr-00272 (E.D. Va. Nov. 17, 2025) ("only one prosecutor appeared" before the grand jury "on behalf of the government").

after local career prosecutors refused.[34]  Due to the numerous irregularities that led to the

government's indictment of Comey, a magistrate judge in the Eastern District of Virginia

ordered prosecutors to produce "all grand jury materials" to the defense.[35]  That

prosecution was ultimately dismissed, with the Court finding that Halligan (who, as

described above, had been hastily installed to pursue prosecution) had been appointed in

violation of the law.[36]  Undeterred, on April 28, 2026, the government again indicted

Comey—this time, characterizing a career law enforcement official's *speech* critical of

the President (a social media post depicting sea shells on the beach in formation of

"8647") as somehow a credible *threat* on the President's life.[37]

---

[34] Josh Gerstein & Kyle Cheney, *James Comey pleads not guilty to criminal charges following Trump pressure to prosecute*, POLITICO (Oct. 8, 2025), https://www.politico.com/news/2025/10/08/james-comey-pleads-not-guilty-trial-date-00597839.

[35] Kyle Cheney & Josh Gerstein, *Judge says possible errors by Lindsey Halligan could imperil Comey case*, POLITICO (Nov. 17, 2025), https://www.politico.com/news/2025/11/17/lindsey-halligan-indictment-james-comey-00654224.

[36] Ryan Lucas, *Judge tosses Comey, James cases after finding prosecutor unlawfully appointed*, NPR (Nov. 24, 2025), https://perma.cc/X8TS-C992.

[37] Indictment, *United States v. Comey*, No. 26-cr-00016 (E.D.N.C. Apr. 28, 2026) (ECF 1).  Such a prosecution is foreclosed by a long line of Supreme Court authority cabining what qualifies as a "true threat," dating back to *United States v. Watts*, 394 U.S. 705 (1969).  In *Watts*, the Court held that a statement by a Viet Nam draft protester—that, if forced to carry a rifle, "the first man I want to get in my sights is L.B.J."—was political hyperbole protected by the First Amendment, not a true threat.  *Id.*  In that regard, a D.D.C. judge recently enjoined the government from taking any enforcement action against members of an organization for displaying "a flag with the legend '8647'" on it.  *See Accountability NOW USA v. Griess et al.*, No. 26-cv-1385 (D.D.C. June 1, 2026) (ECF 20).  The court reasoned that there was "no plausible basis to conclude that a reasonable person . . . would regard the flag [with 8647] to represent" a true threat to the

21

The government also tried—and failed—to indict six Democratic lawmakers over constitutionally protected speech addressing whether military personnel are required to follow what the lawmakers contended were illegal orders.[38]  Outraged, the President posted a spate of social media posts calling for the target lawmakers to be jailed, charged, and even executed,[39] despite obvious First Amendment concerns.[40]

The recent dismissals of several federal prosecutions further underscore the government's ongoing pattern of using prosecutions to target individuals perceived to be on the opposite side of the President's immigration agenda.  In one, the U.S. Attorney for the Northern District of Illinois personally appeared before the Court to dismiss charges against the four remaining defendants in *United States v. Rabbitt et al.* with prejudice.[41] The case arose from allegations that, during an anti-ICE protest, defendants surrounded

---

President's life, and that the government's "criminal incitement" theory "would fare no better (and, if anything, worse)."  *Id.* at 11, 17.

[38] Josh Gerstein and Kyle Cheney, *Prosecutors fail to secure indictment against 6 Dem lawmakers*, POLITICO (Feb. 10, 2026), https://www.politico.com/news/2026/02/10/lawmakers-military-orders-grand-jury-indictment-00775504; *see also Kelly v. Hegseth*, 820 F. Supp. 3d 1, 13 (D.D.C. 2026) (granting Senator Kelly's motion for a preliminary injunction enjoining the Defense Department's efforts to censure and demote him as improper retaliation for his protected expression), *appeal filed*, No. 26-5070 (D.C. Cir. Feb. 27, 2026).

[39] Gerstein and Cheney, *Prosecutors fail to secure indictment against 6 Dem lawmakers*, *supra* n.38.

[40] David L. Axelrod and Isabella S. Nascimento, *Threat to Prosecute Lawmakers for Speech Is Scary (and Probably Unconstitutional)*, The Philadelphia Inquirer (Nov. 26, 2025), https://perma.cc/W6VX-YT8M.

[41] No. 25-CR-693, May 21, 2026 Hr'g Tr. at 49:20-50:5 (N.D. Ill.), https://perma.cc/8WLR-XQUU.

an ICE vehicle, blocked it from entering a federal facility, and damaged the car.[42]

Despite these allegations of serious misconduct, the charges were dismissed following a

hearing at which the Court recited a litany of infirmities with the government's grand jury

presentation, including:  vouching; communicating with jurors outside of the grand jury

room; and excusing from deliberations grand jurors who disagreed with the government's

case.[43]

In another, a Middle District of Tennessee judge dismissed charges against Kilmar

Abrego Garcia—who the government mistakenly deported to El Salvador based on

"administrative error," and then, after being ordered to facilitate his return to the United

States, did so only after obtaining an indictment against him—for vindictive

prosecution.[44]  The Court determined that record supported a presumption that the

prosecution was vindictively motivated, which the government failed to rebut, even after

fulsome discovery and an evidentiary hearing on that issue.[45]

---

[42] Jon Seidel and Tina Sfondeles, *'We will win': Six Broadview protesters plead not guilty to conspiracy, decry attack on First Amendment*, Chicago Sun Times (Nov. 12, 2025), https://perma.cc/5B94-9GQV.

[43] No. 25-CR-693, May 21, 2026 Hr'g Tr. at 22:7-23:25.  The Court also noted that the government's misconduct before the grand jury and with the Court both vitiated any entitlement to the presumption of regularity and raised concerns that the prosecution was vindictive.  *Id*. at 23:23-25:18.

[44] *United States v. Abrego Garcia*, No. 3:25-cr-00115, ECF 312 at 12-13 (M.D. Tenn. May 22, 2026).

[45] *Id*. at 2; *see also id*., ECF 138 at 1 (Oct. 3, 2025) (finding Abrego was, at a minimum, entitled to discovery and a hearing, having "carried his burden of demonstrating some evidence that the prosecution against him may be vindictive").

In yet two others, Judges John Tunheim and Elizabeth Cowan Wright dismissed the cases with prejudice to deter future prosecutorial harassment of the defendants by the government. *See United States v. Ahmed*, No. 26-MJ-24 (JRT/ECW), ECF 73 (D. Minn. June 12, 2026); *Adbebe*, No. 26-MJ-77, ECF 64. They determined that various social media posts by senior administration officials and federal agencies announcing the defendants' arrests and posting their booking photos "violated a Court order" sealing the cases, "likely violated the Department of Justice's own policies, and undermined the presumption of innocence that lies at the heart of our criminal justice system." *Ahmed*, ECF 73 at 11-12.[46]

Finally, Chief Judge Schiltz quashed six grand jury subpoenas issued by the government, ruling they were "part of an unconstitutional effort to coerce Minnesota officials . . . and to harass and retaliate against them." *In re Grand Jury Subpoenas*, No. 26-MC-43, ECF 1 at 14. Relying on the repeated public threats of the President and senior administration officials, and the administration's "well-established" pattern of using the criminal legal system against perceived adversaries, he deemed the subpoenas "a blatantly unlawful and unethical use of the grand-jury process." *Id*. at 3-11, 15-16.

*        *        *

The government's prosecution of Fort, for engaging in constitutionally sacred conduct and based on repeated misstatements of central facts, is a glaring example of yet

---

[46] *See* ECF 550 at 11-12 (detailing same violations in this case).

24

another vindictive prosecution.  The superseding indictment should be promptly dismissed with prejudice.

## **APPLICABLE LAW**

To demonstrate vindictive prosecution, a defendant must "show that the prosecution was brought in order to punish" her "for the exercise of a legal right." *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004).  A prosecution brought "in retaliation for" engaging in statutorily or constitutionally protected conduct is unlawful. *United States v. Punelli*, 892 F.2d 1364, 1371 (8th Cir. 1990).  Thus, a vindictive prosecution claim requires that the Court probe the government's motives for the prosecution—such as whether the government is singling out Fort because of who she is, the content of her speech, or its viewpoint, or if the prosecution is intended to punish or chill her from continuing to gather and report the news.[47]  A finding of "bad faith" or retaliatory motive is fatal to a prosecution, "*regardless* of whether valid convictions conceivably could be obtained."  *Lewellen v. Raff*, 843 F.2d 1103, 1110 (8th Cir. 1988) (quoting *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981)).

A defendant can prove "impermissible prosecutorial vindictiveness with objective evidence of the prosecutor's 'vindictive or improper motive.'"  *United States v. Chappell*,

---

[47] In that regard, the legal framework governing Fort's First Amendment arguments articulated in Fort Motion No. 1 overlap to a significant degree with the questions raised by the vindictive prosecution claim.  Fort thus incorporates by reference the discussion of the applicable legal standards set forth in Fort Motion No. 1, including without limitation, the substantial authority under the First Amendment mandating a searching review of the full context and circumstances to ensure that there is no "forbidden intrusion on the field of free expression."  *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984); *see* Fort Motion No. 1 at 45-50.

25

779 F.3d 872, 879 (8th Cir. 2015). "A vindictive or improper motive may," in turn, "be proved by either direct or circumstantial evidence." *Leathers*, 354 F.3d at 961. Alternatively, a defendant may "rely on a presumption of vindictiveness," where "sufficient evidence to show a reasonable likelihood of vindictiveness exists." *United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015). "In determining whether the presumption of vindictiveness applies," courts "examine the prosecutor's actions in the context of the entire proceedings." *Id.* To overcome the presumption, the government must identify an "objective event or combination of events" that indicate(s) that its charging decision "was motivated by some purpose other than a vindictive desire to deter or punish" the defendant for exercising their rights. *Punelli*, 892 F.2d at 1371.

Rule 12 of the Federal Rules of Criminal Procedure requires that "a motion alleging a defect in instituting the prosecution," such as vindictive prosecution, be raised by pretrial motion. Such a claim, by definition, requires the Court to consider evidence beyond the indictment itself, *see Williams*, 793 F.3d at 963, and make "findings of fact," *Chappell*, 779 F.3d at 879. The standard also contemplates that the Court will consider whether discovery or an evidentiary hearing are warranted based on the strength of Fort's proffered evidence. *Id.*[48]

---

[48] The Court's factual findings about "the prosecutor's motives" are reviewed only "for clear error." *Chappell*, 779 F.3d at 879. The decision to permit discovery and/or to hold an evidentiary hearing are committed to the sound discretion of the Court and, thus, are reviewed for abuse of discretion. *Id.* (citing *Wayte v. United States*, 470 U.S. 598, 624 (1985)).

26

## **ARGUMENT**

**I.    THE GOVERNMENT CANNOT PROSECUTE SOMEONE FOR ENGAGING IN CONDUCT PROTECTED BY THE FIRST AMENDMENT**

A substantial body of case law establishes what constitutes government retaliation or "bad faith" for a person's exercise of their First Amendment rights. *See* ECF 452 at 3 (government setting out standard for vindictive prosecution as requiring a showing of "bad faith"). In its vindictive prosecution cases, the Eighth Circuit has frequently relied on non-criminal cases involving retaliation or bad faith, treating the standards for what constitutes retaliation and vindictiveness as largely interchangeable. *See Chappell*, 779 F.3d at 879 (citing *Thompson v. Armontrout*, 808 F.2d 28, 31 (8th Cir. 1986); *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, (1985)); *see also Lewellen*, 843 F.2d at 1110 (affirming injunction enjoining state criminal prosecution under First Amendment retaliation framework).[49]

Under that intertwined body of criminal and civil jurisprudence, evidence of retaliatory, vindictive, or other improper motive includes, but is not limited to, the following:

- The targeted individual gathered or disseminated information critical of or otherwise objected to by the government.[50]

---

[49] For a more complete discussion of the case law setting out the contours of bad-faith government conduct in the First Amendment realm, and in particular when directed toward the press, *see* Lee Levine & Isabella Salomão Nascimento, *The Subpoenas Are Coming! The Subpoenas Are Coming!*, ABA Communications Lawyer (Aug. 28, 2025), https://www.americanbar.org/content/dam/aba/publications/communications_lawyer/communications-lawyer-41-1-winter-2026.pdf.

[50] *See, e.g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936); *Rossignol, v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003) (Wilkinson, J.); *In re Grand Jury Subpoena*

- The government admitted—through, for example, contemporaneous statements—that it took action, at least in part, for a retaliatory purpose.[51]

- There was a temporal or causal link between the targeted person's exercise of their right(s) and the governmental action taken against them.[52]

- The process surrounding the prosecution, including the events leading up to it, was unusual, irregular, or subjected the targeted individual to unnecessarily onerous procedures.[53]

- The prosecution was based on information the government knew or should have known was materially false.[54]

- The areas of the government's investigation serve no legitimate law enforcement need or bear only a remote or tenuous relationship to the issues of the case.[55]

- The relevant government decisionmakers have a history of taking retaliatory action against those who disseminate information they deem objectionable.[56]

---

[51] *See Grosjean*, 297 U.S. at 250; *Minneapolis Star v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 579-80 (1983); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977); *Rossignol*, 316 F.3d at 521.

[52] *See Nieves v. Bartlett*, 587 U.S. 391, 403 (2019); *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025).

[53] *See Grosjean*, 297 U.S. at 250; *Minneapolis Star*, 460 U.S. at 579-80; *Arlington Heights*, 429 U.S. at 267 ("[d]epartures from the normal procedural sequence" may show "that improper purposes are playing a role"); *Gonzalez*, 602 U.S. at 676 (Jackson, J., concurring).

[54] *See Arlington Heights*, 429 U.S. at 267; *Gonzalez*, 602 U.S. at 676 (Jackson, J., concurring).

[55] *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972); *id.* at 710 (Powell, J., concurring); *see In re Grand Jury Proceedings*, 810 F.2d 580, 585 (6th Cir. 1987); *In re Grand Jury Proceedings* (*Scarce*), 5 F.3d 397, 400 (9th Cir. 1993); *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1061 n.107 (D.C. Cir. 1978).

[56] *See Grosjean*, 297 U.S. at 250; *Minneapolis Star*, 460 U.S. at 579-80; *Arlington Heights*, 429 U.S. at 267.

28

- The government engaged in a pattern of conduct that cannot reasonably be explained on any basis other than bad faith.[57]

- The impact of the prosecution on its target, while "alone [] not determinative," suggested a retaliatory or otherwise improper motive.[58]

- The prosecution was likely to deter similarly situated individuals from engaging in the same or similar protected conduct deemed objectionable by the government.[59]

- The government has not prosecuted similarly situated individuals who have engaged in expression that the government favors.[60]

Moreover, the Supreme Court long ago ruled that even the mere *threat* of legal sanctions to dissuade disfavored First Amendment protected activities is flatly unconstitutional. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 & n.8 (1963). In that seminal decision, the Court struck down a law empowering a government commission to identify books deemed to contain "obscene, indecent or impure language" and to "investigate and recommend the prosecution of" anyone distributing them. *Id*. at 59-61. The commission would send a notice, on official stationary, to any distributor of such a publication, thanking the distributor in advance for its cooperation and reminding it of the commission's "duty to recommend to the Attorney General prosecution of purveyors of obscenity." *Id*. at 61-63. Local law enforcement would then visit the

---

[57] *See Arlington Heights*, 429 U.S. at 266-67; *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

[58] *See Arlington Heights*, 429 U.S. at 266.

[59] *See Arlington Heights*, 429 U.S. at 266; *Media Matters for Am.*, 138 F.4th at 580; *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 115 (D. Minn. 2021).

[60] *See Nieves*, 587 U.S. at 403; *Associated Press v. Budowich*, 2025 WL 1649265, at *17 (D.C. Cir. June 6, 2025) (Pillard, J., dissenting), *appeal ongoing*, No. 25-5109 (D.C. Cir. Apr. 10, 2025).

distributor. *Id*. at 62-63. As a result, many publishers elected to stop distributing the books in question. *Id*. at 64.

Even though no books were actually seized or banned and no one was prosecuted, *id*. at 66-67, the *specter* of these "informal sanctions" was enough to "amount to a scheme of governmental censorship," which arrived at the Supreme Court "bearing a heavy presumption against its constitutional validity." *Id*. at 64, 67, 70. The Court rejected the commission's claim that its lack of "power to apply formal legal sanctions" saved the scheme because its operation "obviat[ed] the need to employ" formal penalties at all. *Id*. at 66, 69. It explained that, at the heart of the issue, was the commission's intent "to achieve the suppression of publications deemed 'objectionable,'" *id*. at 67, and underscored the need for courts to closely examine both the government's motivations *and* the practical effects of its conduct. *Id*. at 67 & n.8 ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant" judicial intervention.) (collecting cases).

The Supreme Court recently reaffirmed *Bantam Books* in *NRA v. Vullo*, where the Court concluded that a New York regulator had likewise "constructed a 'system of informal censorship,'" 602 U.S. 175, 201 (2024) (Jackson, J., concurring), designed to "punish or suppress" the NRA's protected gun-promotion advocacy, *id*. at 180. The Court in *Vullo* was not moved by the fact that the government was investigating *legitimate* violations of state insurance law. *Id*. at 196; *see also id*. at 202 (Jackson, J., concurring) (noting that NRA even *conceded* that its insurance products were "unlawful"). To the contrary, the Court explained, that "does not excuse" the

government "from allegedly employing coercive threats to stifle" protected speech. *Id*. The regulator's actions—taken under the pretext of enforcing valid laws—therefore still amounted to a First Amendment violation under *Bantam Books*. *Id.*; *see also Virginia v. American Booksellers Ass'n*, 484 U. S. 383, 393 (1988) (self-censorship in response to a "well-founded fear that the law will be enforced against them" is an injury in fact "that can be realized even without an actual prosecution"); *Rossignol*, 316 F.3d at 522-23, 525 (where action under color of law was "driven by a desire to retaliate against [journalist's] past criticism of their fitness for office and to censor future criticism along the same lines," officials' conduct amounted to an unconstitutional "scheme" that was "a classic example of the kind of suppression of" speech that "the First Amendment was intended to prohibit"); *In re Natanson*, 2026 WL 1458902, at *6 (E.D. Va. May 4, 2026) (even where there was no law or court order blocking journalist from continuing to report, "the Court cannot ignore the seizure's effect on Natanson's ability to function as a journalist," including the "chilling effects" of "such a seizure").

While *Bantam Books* and *Vullo* found First Amendment violations based on the mere *threat* of prosecution, here we have an *actual* prosecution designed to punish and deter core First Amendment activities, further underscoring its vindictive nature. For example, in *United States v. Carey*, 816 F. Supp. 3d 129 (D.D.C. 2026), the court considered whether a veteran had been vindictively prosecuted for flag burning, in light of an executive order issued by the President directing the Department of Justice to prosecute anyone who "desecrat[ed] this symbol of our country." *Id*. at 142. The court concluded that, once officers arrested Carey and brought the case to the prosecutors to

31

charge, "it is hard to believe that they would feel free to defy the President by declining to charge" the defendant. *Id.*

The issuance of the executive order and a couple statements from arresting officers referencing it led the court to conclude that Carey had "easily" cleared the bar of showing "some evidence" of vindictive prosecution. *Id.* at 144. Because Carey had "create[d] a colorable claim that the Government is punishing [him] for exercising his First Amendment rights," he was, at minimum, entitled to discovery into the government's motives. *Id*;[61] *see also* Part Facts, III.B, *supra* (recounting M.D. Tenn. dismissal of indictment for vindictive prosecution).[62]

This overwhelming body of law limiting both actual and threatened prosecutions, and the extensive pattern of this government's retaliation against Fort and its other perceived critics, is more than sufficient to conclude that the government has engaged in vindictive prosecution against Fort by charging her in this case.

---

[61] Notably, as soon as the court ordered discovery into the claim, the government moved to dismiss the case with prejudice. *See* Mot. to Dismiss, *United States v. Carey*, No. 25-CR-00251 (D.D.C. Mar. 13, 2026) (ECF 26).

[62] The Northern District of Illinois suggested that the government's indictment against several anti-ICE protesters charged with conspiracy could have been the result of vindictive prosecution, given the nature of the prosecutorial misconduct before the grand jury. *See* Facts, Part III.B, *supra*. That issue was never litigated, however, because prosecutors quickly dismissed the case with prejudice after the Court's decision to turn the transcripts over to the defense and to allow motion practice on the issue of vindictiveness. *Id.*

32

## II.    THE CASE AGAINST FORT EASILY QUALIFIES AS AN IMPERMISSIBLE VINDICTIVE PROSECUTION

### A.    Objective Evidence Establishes That This Prosecution Was Brought to Punish Fort for Reporting on a Matter of Public Concern

As set out in Fort Motion No. 1, the law and the facts establish that Fort attended the January 18 protest in her capacity as a journalist and engaged solely in conduct protected by the First Amendment, including newsgathering, observing, interviewing, and reporting.  As such, the question for the Court is whether the government is prosecuting Fort to punish her based on that protected conduct.  The circumstances of this case lead to only one conclusion:  It is.

*First*, prior to being charged, Fort was actively covering Operation Metro Surge and the Twin Cities community's response thereto, including the two ICE shootings in Minneapolis that precipitated the protest at issue.  *See* Fort Motion No. 1 at 8-11. Though Fort learned of it only at the Church after the protest began, the purpose of this Operation Pullup action was to protest one of the pastors also serving "as the director of the field office for ICE in St. Paul," *i.e.*, criticism pointed directly at that government official and more broadly at the government's immigration policy, which Fort disseminated through her reporting.  *See id*.  This is precisely the type of negative coverage the President himself bemoaned as giving "too much media attention [to] ICE," rather than more flattering issues of his choosing.  *Id*.  It is thus without question that Fort's newsgathering and reporting qualifies as First Amendment protected conduct that the government either perceived as critical or otherwise found objectionable.

33

***Second***, the government has brazenly admitted that its purpose in prosecuting Fort is to punish her for covering the events, both for being present at the protest and for purportedly amplifying its aims. In the days immediately following the protest, and without awaiting the outcome of any investigation into the merits of its case, the government vowed to "come after" anyone present that day and to pursue the case "to the ends of the earth," even though multiple judges on multiple courts refused to bless the charges against Fort. *See* Fort Motion No. 1 at 28-33. In fact, without any information beyond the livestream footage of the protest, the President declared that everyone involved "should be thrown in jail, or thrown out of the Country." *Id*. at 31. At the same time, Bondi announced that she did not care if an individual was present on January 18 only as a journalist because "you have no right to do that in this country." *Id*. Dhillon, whose division is driving this prosecution because every long-standing career prosecutor from Minnesota's U.S. Attorney's Office either refused or quit, said outright that she would charge even the journalists present at the protest because the "right to freely worship" is "paramount" over other First Amendment rights. *Id*. at 32-33. The government has thus proudly admitted that this prosecution is fatally laced with retaliatory and censorial—and therefore vindictive—motives tied directly to Fort's journalistic activities. The Court need only take the government at its word.

***Third***, the timing of the prosecution, the wholly irregular maneuvers the government took to charge the case, and the government's decision to bring charges without conducting any sort of meaningful investigation first are all further proof of the improper motives driving this prosecution. That history has been detailed extensively in

34

this case, which Fort incorporates by reference here.  *See* Facts, Part I, *supra*; Fort Motion No. 1 at 28-36; *see also* ECF 125 at 3-9; ECF 138 at 1-5; ECF 528, 542, 544; ECF 550.  Yet, despite conducting itself in a manner never before seen in this or any other court within the Eighth Circuit, the government continues to vigorously resist any scrutiny into the process it used to secure its indictments in this case, *see* Gov't Opp. to Journalist Defendants Mots. For Disclosure of Grand Jury Trs. ("Grand Jury Opp. (Journalists)"), ECF 479 at 12-20; *see also* Gov't Opp. to Protester Defendants Mots. For Disclosure of Grand Jury Trs. ("Grand Jury Opp. (Protesters)"), ECF 510.  What is more, while prosecuting Fort for recording and disseminating footage it disliked, the government generated its own footage of defendants' arrests to produce a political spectacle and to create a one-sided narrative, all the while having investigative agents flag statements by defendants perceived to be "talking about President Trump and ICE negatively."  *See* Fort Motion No. 1 at 34-35, 43; Facts, Part II, *supra*.

Since indicting Fort, moreover, the government has dragged the case out, delayed compliance with its constitutional, statutory, and court-ordered obligations, and even produced discovery—particularly those documents containing information directly undermining the government's case—in a redacted form in violation of the Court's directives.  *See* ECF 511, 514; *see also* ECF 525 at 1 ("the Court has concluded the government did not meet its disclosure deadline").  Indeed, to date, the government has refused to produce all but one transcript from the grand jury proceedings, even those plainly containing exculpatory evidence, such as those containing the misstatements that led the grand jury to indict an entirely uninvolved individual and the false accusation that

35

Fort conspired with this person. The government has also admitted that it did not begin investigating the case in earnest until after securing the first indictment, *see* ECF 131, 391, despite the Justice Department's own policies that require the government to thoroughly assess evidence and discovery obligations *before* charges are filed, not afterward, *see* ECF 138 at 9. Thus, the government rushed to place Fort in legal jeopardy only to drag out the proceedings, thereby keeping them hanging over her head and delaying when she can again report freely. All of this led the Court to, at one point, call out the government's gamesmanship, writing: "So, here we are, months into a case that the government had an intense appetite to initiate, but cannot seem to keep up the pace when it comes to discovery obligations. This is unacceptable." ECF 411 at 3. In short, these are precisely the irregular, unusual, unnecessarily onerous procedures and close temporal links that the case law treats as weighty evidence of a retaliatory and censorial—*i.e.*, vindictive—motive.

*Fourth*, the government cannot dispute that its case was based on information it either knew or should have known was materially false. It absolutely was.

Despite falsely accusing Fort of conspiring with her, the government has already dismissed one defendant with prejudice because it discovered she was never at the Church or involved in the protest in any way. *See* Facts, Part I, *supra*. It has had to walk back the allegation that Fort was present for the entire "pre-op" meeting and that she learned "the plan" of the operation in the face of video and other evidence definitively disproving such an allegation. *Id*. It has admitted to making multiple false statements, including under oath, in order to obtain search warrants related to this case. *Id*. And the

36

testimony of its own grand jury witness wholly rebuts the superseding indictment's

principal averments about Fort's conduct—something the government's own evidence

produced in discovery corroborates. *Id.* And it has steadfastly refused to address

whether the material falsehoods that appear in the superseding indictment were presented

to the grand jury. *Id.*

***Fifth***, the government then attempted to use this prosecution as cover to obtain

protected journalistic materials—including unpublished work product, newsgathering

information, and the personal details of Fort's subscribers—which have no legitimate

connection to the charged offenses and which the government would otherwise have no

legal avenue to obtain. *See Branzburg*, 408 U.S. at 707-08 ("Official harassment of the

press undertaken not for purposes of law enforcement but to disrupt a reporter's" work

has "no justification" under the First Amendment.); *id.* at 710 (where the government

seeks information from a journalist "bearing only a remote and tenuous relationship to

the subject of the investigation, or . . . without a legitimate need of law enforcement," the

"courts will be available to newsmen") (Powell, J. concurring). Specifically, the

government *twice* improperly sought a search warrant for Fort's YouTube account. *See*

Appl. For Search Warrant, *In re Search Warrant*, No. 26-MJ-206-JFD, ECF 1; *id.*, ECF 3

(Mar. 6, 2026). The Court properly rejected the warrants for lack of probable cause,

reasoning that the portion that sought "subscriber information," including names,

addresses, emails, telephone numbers, and IP addresses, for Fort's YouTube page, was

particularly "concerning" because "subscriber information is not needed to prove or

disprove the commission of a crime." *Id.* at 4-5; *id.*, ECF 4 at 2-3 (Mar. 6, 2026) ("The

Court was concerned, when these three search warrant applications were originally submitted, that the request for search and seizure of 'subscriber' information meant the government was seeking to compile a list of people who had viewed the videos produced by" Fort.).

With respect to other information sought, the Court also expressed concern that allowing it would "transgress the" PPA, to which the government had failed to "direct the Court's attention." *Id*. at 4-5 (citing *In re Natanson*). The Court thus ordered the government to notify Fort of the pending search warrants, so that she could be heard on the matter. *Id*. at 1; *id*. at 7 (The "Court cannot foresee any harm that will come from advising [Fort] that these three warrants have been applied for."). Rather than comply, the government withdrew the applications, keeping their existence a secret from Fort and subsequently failing to produce them to Fort in discovery. *See* ECF 528 (Fort's Motion for Disclosure/*Brady* Motion). In fact, Fort only learned of these significant developments when Magistrate Judge Docherty *sua sponte* ordered their disclosure. *See* ECF 8. Only then did the government produce them in discovery.

Compounding this injury, the government then sought some of the same information through the misuse of administrative customs summonses, despite Judge Docherty's determination that there was no relation between the requested information and the charges, despite the PPA, and despite that the case does not involve any customs investigation.

The government's clandestine attempts to use this prosecution as a vehicle to obtain Fort's journalistic materials and personal information about her audience, when

38

none of that information bore a relationship to the issues in the case (as the Court itself determined), is highly probative evidence of the government's bad-faith motive. Indeed, the Supreme Court recently reiterated that a government demanding the "names, phone numbers, addresses, and places of employment" of an organization's donors was in and of itself a First Amendment injury. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ---, 146 S. Ct. 1114, 1120, 1126 (Apr. 29, 2026) (citing, among others, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), for the proposition that "compelled disclosure of affiliation with groups engaged in [speech]" can "constitute a[n] effective . . . restraint on" First Amendment freedoms). So too here.

**Sixth**, as Fort explained in seeking the grand jury materials, the repeated public assertions about this case by senior federal government officials—including those leading this prosecution—contained such fundamental misstatements of law that, if conveyed to the grand jurors, would undermine the integrity of those proceedings. *See* ECF 125 at 15; ECF 550 at 3-8. There is every reason to believe that is exactly what happened: as they publicly admitted, Bondi and Dhillon, from whom came the most problematic pronouncements, personally returned to the District to direct the presentation of this case to the grand jury, which ultimately resulted in Fort's indictment on January 29. *See* ECF 129 at 5-9. Their names are the first ones listed on the indictments. ECF 550 at 5. The grand jury testimony so far disclosed reflects that only Civil Rights Division attorneys— *i.e.*, attorneys who directly report to, at a minimum, Dhillon—presented the case. *Id.* Bondi then bragged on social media that she had Fort arrested "[a]t my direction." *Id.* at 5 & n.3.

39

The government has refused to state whether it instructed either grand jury on how the text of the FACE Act specifies that it cannot be construed to "prohibit any expressive conduct . . . protected from legal prohibition by the First Amendment to the Constitution."  *See* Grand Jury Opp. (Journalists) at 10-12; ECF 550 at 5-8.[63]  Thus, even if the government were correct that a protest inside a church falls within the statute, the government had a separate obligation to advise the grand jury that, where a *journalist* covering that protest is engaged in activities that are protected under the First Amendment, the FACE Act expressly provides that such conduct fall outside its scope. Yet, to this day, the government forcefully defends as "correct" Assistant Attorney General Dhillon's statement that Section 248(a)(2) applies to "anyone" from interfering "with those exercising the right of religious freedom at a house of worship, for any reason," *id*. at 6, despite both the FACE Act and the First Amendment saying otherwise.

**Seventh**, current federal government officials—and in particular, the decisionmakers who have spearheaded this prosecution, including the President, Bondi, and Dhillon—have a demonstrated history of retaliating against those whose conduct they deem objectionable, the Constitution be damned.  *See In re Grand Jury Subpoenas*, ECF 1 at 17-18 (detailing "the Trump administration's well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries."); *see* Facts, Part III, *supra* (extensively detailing numerous attacks

---

[63] The government attempted to wave away this glaring defect in its grand jury presentations by claiming that this language is an affirmative defense.  But as Fort explained in her objections to the Court's June 10, 2026 Order, that is incorrect as a matter of law.  *See* ECF 550 at 5-8.

on the press and on other institutions for exercising their First Amendment rights); Fort

Motion No. 1 at 33 n.51 ("Under recently ousted attorney general Pam Bondi, the Justice

Department transformed from an agency that stood apart from the White House to one

dedicated to the president's agenda, including the prosecution of his perceived

enemies."); *see also N.Y. Times Co. v. DOD*, 824 F. Supp. 3d at 48 (describing

administration "whose leadership has been and continues to be openly hostile to the

'mainstream media' whose reporting it views as unfavorable").  This case is no

exception.  Indeed, not only is this history of retaliation so widely known, in several cases

the government did not even contest it.  *See, e.g.*, *Budowich*, 2025 WL 1649265, at *13

(Pillard, C.J. dissenting) (White House conceded it "ousted the AP from the Press Pool

based on" viewpoint discrimination); *Nat'l Pub. Radio*, 827 F. Supp. 3d at 83

(government conceded that Executive Order to defund NPR and PBS was "viewpoint

based"); *see also Minneapolis Star*, 460 U.S. at 582 (when government "single[s] out the

press for special treatment," it violates the First Amendment).

 ***Eighth***, the prosecution has had precisely the impact on Fort and other members of

the press that the government desired.  As detailed in Fort Motion No. 1, although she has

publicly criticized her prosecution, since her arrest on January 30 she has not continued

reporting on the Cities Church protest or its aftermath precisely because she is facing

criminal prosecution, including a charge of conspiring with the protesters.  *See* Fort

Motion No. 1 at 37-39.  She deliberately elected not to cover the subsequent protest

outside of Cities Church for fear of facing new, additional charges.  *Id*.  She has similarly

been forced to limit her other, ongoing coverage, including by refraining from

interviewing the national Target boycott's leaders, two of whom are alleged co-conspirators in this case. *Id.* As such, this prosecution is having a direct impact on her work as a journalist. *See, e.g.*, *L.A. Press Club*, 171 F.4th at 1188 ("Government conduct that induces reporters to modify their coverage . . . chills First Amendment expression when based on a reasonable fear that government reprisals are likely to occur."); *In re Natanson*, 2026 WL 1458902, at *6 (even where there was no law or court order blocking journalist from continuing to report, "the Court cannot ignore the seizure's effect on Natanson's ability to function as a journalist," including the "chilling effects such a seizure could have"); *see also First Choice Women's Res. Ctrs.*, 608 U.S. ---, 146 S. Ct. at 1127 ("Objectively reasonable people" would not "'lightly disregard'" even the threat of enforcement of a subpoena infringing on First Amendment rights and would therefore "be induced . . . to trim [their] protected advocacy knowing it now stands in the government's crosshairs" (quoting *Bantam Books*, 372 U.S. at 68, with approval)).

This prosecution and high-ranking officials' statements about it were also intended to send a message to other journalists to deter them from covering the government in ways that its officials dislike. The government's message to the press—and numerous others, including lawyers, universities, and so on—has not been subtle: bend the knee or else. *See* Facts, Part III, *supra*. Fort and the other journalists who covered this protest are just the government's latest targets in sending this message. By contrast, when the parishioners at the Church and the Church itself engaged in the same conduct as Fort (observing, filming, and disseminating that footage), they were not prosecuted. *See* Fort Motion No. 1 at 39-44. When journalists have engaged in the very same conduct as

42

Fort—newsgathering, observing, interviewing, and reporting—but the government approved of what that coverage would show, it invited them to come along, directed agents to be "camera-ready," and gave the journalists a front-row seat to the action. *Id*.

As the Chief Judge of this District put it, this is "a blatantly unlawful and unethical use" of the criminal legal system, one that is overtly retaliatory, censorial, and therefore vindictive. As such, the case against Fort must be dismissed.

### B.     The Presumption of Vindictiveness Attaches in This Case

Although Fort has firmly established the vindictive nature of the prosecution against her, at a minimum, the evidence above—considered in the "context of the entire proceedings" of this case—suffices to trigger the presumption of vindictiveness. *Williams*, 793 F.3d at 963. The burden thus shifts to the government to point to an "objective event or combination of events" that proves its decision to charge Fort "was motivated by some purpose other than a vindictive desire to deter or punish" her for engaging in protected First Amendment activities. *Punelli*, 892 F.2d at 1371. It cannot.

The hallmark of this case is how stunningly and unremittingly irregular it has been. *See* Facts, Part I, *supra*; *see also* ECF 550 at 1-3, 11-14 (detailing just some of the irregularities revealed in this case). It represents yet another example, in this District and across the country, of the government vitiating any claim it once had to a presumption of regularity. *Id*. at 9-13. As one court put it, while "[g]enerations of presidential administrations and public officials have validated this underlying premise of the presumption of regularity," current officials "may have forfeited the right to such a presumption" entirely. *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90-92 (D.D.C.

43

2025), *appeal docketed*, No. 25-5303 (D.C. Cir. Aug. 20, 2025); *United States v. Oregon*, --- F. Supp. 3d ----, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."), *appeal filed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Stewart*, 2025 WL 2754480, at *1 (D.D.C. Sept. 29, 2025) (describing federal prosecutors' conduct as "[a]t a minimum, . . . unseemly; more than likely it is unlawful.  Not to mention, this only deepens the growing mistrust of the actions of prosecutors.  That is a sentiment that was once unthinkable, but the irregular is now the regular."); *Rabbitt*, No. 25-CR-693, May 21, 2026 Hr'g Tr. at 23:14-25 ("I relied on all of you and your personal representations in this case . . . .  And I do that because . . . I put even more reliance on Department of Justice attorneys.  Your sole goal is to do justice.  Your client is justice itself.  I do believe deeply in the presumption of regularity and that most government attorneys are doing the best they can to do the right thing.  That trust has been broken."); *Juan T.R. v. Noem*, 2026 WL 555601, at *2 (D. Minn. Feb. 26, 2026) ("The Court is not aware of another occasion in the history of the United States in which a federal court has had to threaten contempt—again and again and again—to force the *United States government* to comply with court orders."); *see also* ECF 125 at 21-25 (collecting nearly three dozen cases in which courts have determined that this government is not entitled to the presumption of regularity) (excerpt reattached hereto as Ex. 44 for the Court's convenience).

44

This prosecution also reflects many of the same infirmities present in the prosecution of Abrego Garcia, which the Court there found gave rise to, at the very least, a presumption of vindictiveness that the government failed to rebut. *See* Facts, Part III.B, *supra*. Specifically, in dismissing the indictment, the Court relied on a number of facts that are also present here, including: (1) the suspicious timing of the government's decision to investigate and charge him; (2) the public statements issued by senior administration officials, including now-Acting Attorney General Blanche, demanding prosecution and prejudging the case; (3) the record of extensive contact between the local prosecutors and Main Justice up "until the indictment was returned"; and (4) the attorneys who presented to the grand jury report directly to those officials. *Abrego Garcia*, ECF 312 at 14-27. According to the Court, all of this tainted both the investigation and indictment and "confirmed what motivated it." *Id*. The Court therefore granted discovery and held an evidentiary hearing. When the government attempted to rebut the presumption of vindictiveness, the Court dismissed the case. *Abrego Garcia*, ECF 312 at 2.

Dismissal is likewise required here on this basis.

## C.    At a Minimum, the Court Should Order Discovery and an Evidentiary Hearing

The government has conceded that, to be entitled to discovery, Fort need only present "some evidence that tends to show the existence of" the elements of her claim of vindictive prosecution. ECF 452 at 3; *see also United States v. Perry*, 152 F.3d 900, 903 (8th Cir. 1998) (applying same standard to vindictive prosecution claim) (citing *United*

*States v. Armstrong*, 517 U.S. 456, 468-69 (1996)); *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). As in *Carey*, Fort has "easily" met that threshold here. 816 F. Supp. 3d at 144 ("Carey must offer some evidence tending to show that he would not have been prosecuted but for his protected speech. Carey easily clears that bar."); *see also* Parts II.A & II.B, *supra*. As such, the Court should permit Fort to take discovery on her vindictive prosecution claim after which it should set the case for an evidentiary hearing regarding the government's motivations.

## III.    DISMISSAL WITH PREJUDICE IS WARRANTED

As explained in Fort Motion No. 1, *see* Argument, Part V, federal courts inherently possess "supervisory powers" to "implement a remedy for violation of recognized rights," to ensure that any conviction would rest only "on appropriate considerations validly before the jury," or to "deter illegal [government] conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983). Use of the power is appropriate where a defendant has been prejudiced by any of these three concerns. *Id*. at 506. Here, all three grounds are present.

***First***, the government's constitutional violations in pursuing this prosecution have been plentiful, intentional, and in plain view. *See* Fort Motion No. 1 & Facts, Parts I-III, *supra*.

***Second***, a conviction against Fort could only rest on conduct squarely protected by the First Amendment Speech and Press Clauses, in a case designed to retaliate and censor Fort for her reporting. *See* Fort Motion No. 1; *Hasting*, 461 U.S. at 505. As a result, it is

self-evident that any conviction would not rest on "appropriate considerations" that were "validly before the jury." *Id*.

**Third**, only dismissal with prejudice will sufficiently deter the government from further illegal conduct. Of this we can be certain because, despite being denied charges not once, not twice, but three times, the government aggressively sought to indict and to prosecute Fort anyway. *See* Fort Motion No. 1 at 28-36. And despite being denied search warrants multiple times, the government refused to relent and then sought the information surreptitiously through the use of administrative summonses without judicial oversight. *See* Facts, Part I, *supra*.

None of the unbiased and evenhanded career prosecutors from the Minnesota U.S. Attorney's Office would participate in this case, making even future prosecutions extremely likely to carry the same vindictive, retaliatory, and bad faith concerns underlying this case. *Id*. at 33. The government's trail of political prosecutions— including its recent effort to re-indict Comey after its first prosecution failed, its repeated targeting of ABC, and its failed attempt to subpoena various Minnesota officials and members of the press—also confirms that it is highly unlikely to let this go, absent a court order compelling that it do so. *See* Facts, Part III, *supra*.

The consequences of the government's vindictive prosecution are far from academic. Rather, Fort has been indisputably prejudiced by the government's flagrant prosecutorial misconduct, not least of all in the ways she has been silenced and her reporting chilled—effects which the government has, in its officials' many statements,

47

confirmed was the basis of its decision to prosecute her.  *See* Facts, Part I-II, *supra*; Fort Motion No. 1 at 31-36, 37-39.

Dismissal with prejudice is the only remedy that will suitably correct the government's unconstitutional retaliation against Fort and deter it from engaging in similarly flagrant misconduct in the future.

## **CONCLUSION**

For the foregoing reasons, the Court should rule that the government has engaged in a vindictive prosecution of Fort, dismissing the superseding indictment against her with prejudice, or should, at the very least, order discovery and conduct an evidentiary hearing on the government's conduct and purposes in pursuing this prosecution against Fort.

Dated:  August 6, 2026                    Respectfully submitted,

                                          By:  *s/ Isabella Salomão Nascimento*

                                          **BALLARD SPAHR LLP**
                                          Leita Walker
                                          Matthew S. Ebert
                                          Isabella Salomão Nascimento
                                          2000 IDS Center
                                          80 South 8th Street
                                          Minneapolis, MN 55402
                                          Tel: (612) 371-3211
                                          walkerl@ballardspahr.com
                                          ebertm@ballardspahr.com
                                          salomaonascimentoi@ballardspahr.com

                                          Seth D. Berlin (*pro hac vice*)
                                          1909 K Street NW, 12th Floor
                                          Washington, DC 20006
                                          Tel: (202) 508-1122
                                          berlins@ballardspahr.com

                                          **THE LAW FIRM OF KEVIN C. RIACH, PLLC**
                                          Kevin C. Riach
                                          125 Main St. SE, Suite 339
                                          Minneapolis, MN 55412
                                          Tel: (612) 203-8555
                                          kevin@riachdefense.com

                                          *Counsel for Georgia Ellyse Fort*

49