**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NEKIMA VALDEZ LEVY ARMSTRONG, *et al.*,<br><br>Defendants. | No. 0:26-cr-025-LMP-DLM<br><br>**OPPOSITION TO DEFENDANT FORT'S EXPEDITED MOTION FOR RETURN OR IMPOUNDMENT OF CALL AND TEXT LOGS AND REQUEST FOR HEARING (Dkt. 641)** |

The United States of America hereby submits this brief in response to defendant Georgia Fort's motion to return or impoundment of call and text logs (Dkt. 641).

## INTRODUCTION

Defendant Fort's motion is an impermissible effort to leverage the Privacy Protection Act (PPA) and moot orders from Magistrate Judge Docherty denying unrelated search warrant applications into a fictional allegation of government misconduct. Fort's motion seeks to impound or return of Fort's telephone subscriber and toll logs from T-Mobile which were obtained via administrative summonses under 19 U.S.C. § 1509. It also accuses the government of violating that Privacy Protection Act, which Fort asserts somehow became the controlling "law of the case" when Judge

Docherty referenced it in an order dated March 6, 2026, denying a search warrant application for Fort's Google/YouTube account—a warrant wholly unrelated to T-Mobile subscriber information or call logs.

Fort's motion lacks merit and should be denied for several reasons. *First*, there is no Court order that the government violated. *Second*, the PPA is not applicable to Fort because she is a suspect in a crime, and the accompanying regulations note that Attorney General approval is not required when seeking third-party records (like the call logs from T-Mobile) when the member of the media may be the perpetrator of a crime unrelated to *lawful* newsgathering. 28 C.F.R. § 50.10(c)(3)(ii)(B). *Third*, the regulations implementing the PPA did not apply to Fort's situation and thereby did not require notice to her of the summons or subpoena seeking phone subscriber and call log data, the PPA specifically bars Fort from litigating whether the government abided by the regulations. *See* 42 U.S.C. § 2000aa-11. *Fourth*, the regulations themselves make clear that they do not create any rights on behalf of putative journalists or other defendants. *Fifth*, the government's use of § 1509 summonses was valid. *Sixth*, the material obtained via the summonses is not covered by the PPA because it is not material "possessed" by Fort with the purpose of disseminating. Further, subscriber data and toll logs are third-party records in which Fort does not have a protected Fourth Amendment interest.

In short, Fort attempts to convert the PPA into an expansive "reporter's privilege" while conjuring an imaginary "order" prohibiting the government from obtaining third-party data and then smears the prosecution with baseless allegations of misconduct.

## STATEMENT OF FACTS

### A. The Offense Conduct

On Sunday, January 18, 2026, a large mob of agitators descended on Cities Church in St. Paul, Minnesota. The agitators conspired to disrupt a liturgical worship service in "a coordinated takeover-style attack." (Dkt. 144 at 3.) Because of this attack, the pastor and congregants were forced to end their worship service. (*Id.*) Several congregants fled the Church, fearing a mass shooting. (*Id.* at 12.) In the rush to escape, one congregant suffered an injury to an elbow when she slipped on an icy, unused sidewalk. (Dkt. 23-1 at ¶ 43.)

The agitators, including defendant Fort, gathered for a "pre-operation briefing" the morning of January 18, 2026, before their attack on the Church. (Dkt. 144 at 8.) Defendants Armstrong and Allen explained how the protest would be conducted at the church, with the group entering in two waves, and practiced various chants. Here's a photo capture showing Fort:



Along with the other defendants, Fort traveled to the Church to engage in the planned takeover-style operation. (Dkt. 144 at 11.) Once inside the Church, Fort — together with other defendants — "physically obstructed [the] pastor's freedom of movement" and refused to leave the Church when asked by the pastor to do so. (*Id.* at 15.) Here's a photo of that:



In text messages found on Armstrong's cellphone, defendant Fort and Armstrong exchanged text messages to coordinate Fort's arrival. (*E.g.*, "Me ETA is 10:10 unless you want me to meet you there"; "That's fine. We'll see you there."; "Ok need addy"; and "Meet at back door"; etc.)

Later that afternoon, from 2:38 — 2:41 p.m., a few hours after defendants invaded the Church for their "protest" operation, defendants Fort and Armstrong chatted via text messages in which Fort acted like a fellow activist and ally — *not* an "independent journalist" — when talking about the success of their operation:

| | |
|---|---|
| Armstrong: | [In reference to a video]: Ok. Can I share it on Facebook? |
| Armstrong: | Or just Insta? |
| Fort: | Yup it will be on both |
| Armstrong: | Ok. Then, i'll wait for you to post. |
| Fort: | Yea his up close of the Pastor is powerful |
| Fort: | Girl I was nervous |
| Fort: | My mom goes to Summit Church |
| Fort: | 🤣 |
| Armstrong: | 🤣🤣🤣 |
| Fort: | I had to look up that address like |
| Armstrong: | That's wild! I can totally understand. . . . |

### B. General Procedural History

On or about January 20, 2026, the Government obtained a complaint and arrest warrant against defendants Armstrong, Allen, and Kelly for a violation of 18 U.S.C. § 241 (Conspiracy Against Rights). (Dkt. 23-1.) Based on the factual summary set forth in the complaint, the Court declined to find probable cause as to certain other defendants, including defendant Fort.

On January 29, 2026, a federal grand jury issued an indictment against the first nine defendants, including defendant Fort. (Dkt. 39.)

On February 26, 2026, the grand jury issued a superseding indictment charging an additional 30 defendants. (Dkt. 144.) All of the defendants are charged with the same two charges: (1) Conspiracy Against Federally Secured Rights, in violation of 18 U.S.C. § 241; and (2) Interference with the Free Exercise of Religion at a Place of Religious Worship, in violation of 18 U.S.C. § 248(a)(2).

### C. The Government's FIRST § 1509 Summons Re. Defendant Fort's Telephone

On or about January 20, 2026, the Government (via DHS-ICE agents who were working with Government counsel) issued a § 1509 summons to T-Mobile US, Inc. to obtain Subscriber Information and Call Information regarding two telephone numbers, including at least one number that was believed to be associated with defendant Fort. (*See* Ex. "G" at 2-3.) That

summons asked for responsive records for an approximate 30-day period from December 19, 2025 to January 20, 2026. (*Id.* at 3.)

For purposes of this case, there was nothing unusual about that summons. To be more precise, it had nothing to do with Fort's claimed status as a "journalist" (however one may regard that claim); it was due to her status as a *suspect* who the Government was investigating along with all of the other conspirators who invaded Cities Church on the morning of January 18, 2026. During the period from January 19, 2026 to February 26, 2026, the Government issued § 1509 summonses for subscriber and call detail telephone records regarding all of the other 37 defendants as part of the investigation of this case. On March 25, 2026, a similar summons was issued for another person who was later identified by the Government but has not yet been charged.

As the timing of this summons (Ex. "G") makes clear, it was not served in disregard of, or to flout, an order of this Court, namely, the later-issued orders that are the premise of defendant Fort's motion.

### D. February-March 2026: Rejection of Certain Search Warrants, Including One Re. Fort's YouTube Account

During the course of this investigation, the Government applied for various search warrants regarding certain digital devices (*e.g.*, cellphones seized from certain defendants) and social media accounts. Many of those

search warrants were approved and issued by the Court, and some of those investigative efforts led to the seizure of relevant evidence.

On or about February 24, 2026, the Government submitted applications for various search warrants. *See* Case Nos. 26-mj-205, 26-mj-206, 26-mj-207, 26-mj-208, and 26-mj-209. One of the requested warrants related to the cellphone of defendant Ian Austin, and the others related to social medica accounts, including defendant Fort's YouTube account.

Unfortunately, none of those warrant applications passed muster. On February 24, 2026, the Court (per the Honorable John F. Docherty, United States Magistrate Judge) issued an order denying all five search warrant applications. (Ex. "A.") Judge Docherty found that the affidavit supporting the warrant application lacked probable cause. In addition, Judge Docherty took issue with the language in the application that sought "subscriber" and "account owner" data. (Ex. "A" at 4 n.2.) Judge Docherty noted that it was possible that "subscriber" meant to refer to the owner of the YouTube account, but found it was more plausible to interpret the term "subscriber" data to mean that the Government sought a list of all individuals who had subscribed to Fort's YouTube channels, information he determined was irrelevant. (*Id.*)

As Judge Docherty surmised in the alternative, the Government never intended to seek such data. Rather, the warrant application used the term

"subscriber information" by reference to the "basic subscriber information" nomenclature associated with 18 U.S.C. § 2703(c)(2), while in fact seeking information about the person or persons who created and controlled the content published on the YouTube channels. The Government neither needed nor desired a roster of channel subscribers.

On February 25, 2026, the Government resubmitted the warrant applications, and again, in a nearly duplicate order, Judge Docherty denied the warrant applications for lacking probable cause. (Ex. "B.") Significantly, neither order directed the Government to do anything specific or places any specific restrictions or prohibitions on the Government with respect to the investigation. The only thing Judge Docherty ordered was that "[i]f these applications are revised and re-submitted, they must be re-submitted to the undersigned, and not to another magistrate judge." (*Id.*)

Some days later, the Government resubmitted four of the five search warrant applications to Judge Docherty. (The warrant application designated Case No. 26-mj-209 was not resubmitted.) In an order dated March 6, 2026, Judge Docherty denied the warrant application relating to the cellphone of defendant Austin for a lack of probable cause. (Ex. "C.") As for the three warrant applications on the YouTube accounts, including the one for Fort, Judge Docherty decided to keep the applications "under advisement" pending further briefing after the Government notified counsel for the

defendants of the warrant applications. (Ex. "C" at 1, 8.) Judge Docherty acknowledged that the Court's concerns regarding "subscriber" and "account owner" data had been resolved. (Ex. "C" at 2-3.) Based on a then-recent decision by the district court for the Eastern District of Virginia in *The Matter of the Search of Real Property and Premises of Hannah Natanson ("Natanson")*, 2026 WL 510727 (E.D. Va., Feb. 24, 2026), the Court noted that it had concerns relating to the three YouTube warrant applications. (*See* Ex. "C" at 4.)

In his March 6, 2026 Order, Judge Docherty criticized the Government for not drawing the Court's attention to the PPA, its accompanying regulations, and its potential applicability to the warrant for Fort's YouTube account. (Ex. "C" at 4-5.) Judge Docherty noted that the PPA prohibits "a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials [or documentary materials] possessed by a person reasonably believed to have a purpose to disseminate to the public [via some] form of public communication." (Ex. "C" at 4-5 (citing 42 U.S.C. § 2000aa(a), (b)).) Judge Docherty noted the PPA's "suspect exception," which allows the Government to search and seize "work product" or "documentary materials" if "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials

related." (Ex. "C" at 5 (citing 42 U.S.C. § 2000aa(a)(1), (b)(1)).) However, the Court noted there was some question about whether that exception might apply in the context of a warrant for data held by YouTube.

Judge Docherty's order noted that the search warrant application sought content from Fort's YouTube account, which might be considered in the "possession" of YouTube, rather than Fort, and that might take the search and seizure outside the scope of the PPA's prohibitive scope. (Ex. "C" at 5-6.) Judge Docherty emphasized the "suspect exception" turned on who "possessed" the sought-after materials, stating "the question of who possesses the materials become critical." (Ex. "C" at 5.)[1]

Judge Docherty also noted that the PPA requires the Attorney General to promulgate implementing regulations (42 U.S.C. § 2000aa-11), and he observed that the Government set forth no facts in the warrant applications indicating whether it had complied with the regulations in 28 C.F.R. § 50.10. (Ex. "C" at 6.) Judge Docherty recognized that "these regulations are for the internal regulation of the actions of government counsel," but he deemed the

---

[1] As noted below, the PPA's core, prohibition has a similar limitation — it relates to a search warrant for materials "possessed" by a putative journalist. Thus, if materials are not "possessed" by a putative journalist, the PPA has no application by its terms. Moreover, if the materials were "possessed" by such journalist (*e.g.*, defendant Fort) who is a suspect, the PPA still does not bar the use of a search warrant because the putative journalist is a "suspect."

regulations as an indication of "the Government's understanding of general, Fourth Amendment reasonableness in this context." (*Id.*)

For these reasons, the Court determined that adversarial briefing on these issues would be of assistance *for purposes of its further review* of the warrant applications. For that purpose, the Court directed the Government "to give 'reasonable and timely' notice … to the defendants of these warrant applications," at which point the Court indicated it "[would] then request briefing and argument before making a decision." (Ex. "C" at 7.) Consistent with that view, the Court held that the Government may delay disclosure of the warrant applications if the Government sought further review of the order by a district judge. (*Id.* at 8.)

To be clear, Judge Docherty ***did not*** find or conclude that the Government violated the PPA or any other statute or regulation. Defendant Fort's contrary suggestion is not true. The whole point of Judge Docherty's order was to simply flag issues that the Court thought needed further development before it could rule on the search warrant applications.

**E. March 23, 2026: The Government Opted to Simply Drop the YouTube Warrants and Moot the PPA Issues**

The Government researched the issues raised in the Court's March 6, 2026 Order and found the PPA and *Natanson* decision to be inapplicable and of no concern, as we explained in a later filing on May 15, 2026. (*See* Ex. "E"

at 1-5.) The Government prepared a draft brief to address those issues. Ultimately, however, the Government determined — rightfully or wrongfully — that further efforts in support of the YouTube warrant applications would likely be a wasted effort. Moreover, as the Court's order noted (Ex. "C" at 3), the Government recognized that it could obtain some subset of materials via subpoena. In addition, the videos of defendants Lemon, Fort, and Kelly had all been made public, and warrants were not needed to secure or authenticate the videos.

Accordingly, the Government simply decided to drop the effort to get search warrants for the subject *YouTube* accounts.[2] On March 23, 2026, the Government's case agent sent an e-mail to chambers advising the Court that the Government had elected to simply withdraw the subject warrant applications. In the Government's view, that mooted the PPA issue and the Court's need for further briefing. (*See* Ex. "E" at 1.)

**F. <u>April 2026: The Government Issued Additional § 1509 Summonses, Including One for Fort's T-Mobile Records</u>**

In or around April 2026, the Government's HSI-ICE agents, who are part of the Department of Homeland Security (DHS), issued other § 1509

[2] For clarity, the subject warrant application related to a *YouTube* account, not *T-Mobile* toll records for Fort's cellphone.

summonses regarding defendants Armstrong, Cullars-Doty, and Fort, including one regarding Fort's T-Mobile records for a broader period of time.[3] The broader scope reflected a determination that records within that range were potentially relevant to other legitimate investigative avenues (no longer being pursued), which are not solely limited to the charges in the pending indictment.

The new § 1509 summons regarding Fort's T-Mobile records was served on or about April 12, 2026. (*See* Def. Ex. "E" at 2.) The T-Mobile summons sought subscriber and call logs for phone numbers associated with defendants, including Fort. T-Mobile complied with the summons and provided the requested data. The Government subsequently produced this data in discovery.[4]

---

[3] The Government also issued a § 1509 summons to Google/YouTube seeking the basic subscriber/account owner information related to Fort's YouTube account. Google declined to fulfill it because it interpreted the § 1509 summons as limited to its now obsolete role as a Customs Service enforcement tool used to police the importation of prohibited merchandise. (Dkt. 642-6.)

[4] Count one of the Superseding Indictment is a conspiracy charge. Accordingly, it is reasonable for the government to investigate whether some of the co-conspirators, including Fort, communicated with each other on or around the date of the crime. The existence of a relationship and communications during a broader period of time are relevant facts, and the relevance is not delimited by the pending indictment.

**G. <u>The Court's Unsealing Order</u>**

On May 1, 2026, Judge Docherty thereafter issued an order to show cause why the warrant application should remain under seal. (Ex. D.) In response, the Government said that it *did not object* to unsealing the warrant applications. (Ex. "E.") In its response, however, the Government wanted to note a few things for the record since the proceedings were being made public.

Specifically, the Government wanted to explain that Judge Docherty's concerns regarding the PPA were not well-founded in any respect. ***First***, the *Natanson* decision from the Eastern District of Viriginia — cited by Judge Docherty as potentially applicable — was not applicable and was, in fact, contrary to Eighth Circuit precedent. (*See* Ex. "E" at 2-4.) Regardless of what the law may be in the Fourth Circuit, we explained that "[b]ecause the Privacy Protection Act ***does not require*** an application for a search warrant to describe any exception to the Act," it was error to assume or "impos[e] such a requirement … in this case." *Citicasters, Inc. v. McCaskill*, 89 F.3d 1350, 1356 (8th Cir. 1996) (reversing district court for wrongly holding that defendants in a PPA case could invoke exceptions to the PPA only if those exceptions were cited in the affidavit for the subject search warrant). Thus, there was no failure to disclose anything that we "should have."

***Second***, although Judge Docherty correctly noted that the affidavits did not cite to the PPA (and did not need to do so, *see supra*), the Government explained that they provided a description of the defendants' participation in the charged offense conduct and their use of YouTube accounts to post the videos that were clearly sufficient to enable the Court's independent consideration of whether the PPA had any potential applicability. Thus, in apparent contrast to the *Natanson* case, there was no lack of candor to warrant any such criticism.

***Finally***, the Government explained (as we do here again) that the PPA clearly had no application to the search warrant regarding Fort's YouTube account. In contrast to the *Natanson* case, we explained that an exception to the PPA's provisions — namely, the "suspect exception" — is clearly applicable here in the Government's view and is plainly supported by facts in the subject warrant applications. As the Court's order acknowledged (Order at 5), the PPA's provisions do not apply when there is "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." *See* 42 U.S.C. § 2000aa(a)(1), (b)(1). In this case, the supporting affidavits plainly stated that each of the subject defendants (Don Lemon, Georgia Fort, and William Kelly) were indicted on or about January 29, 2026, for the offense conduct that occurred inside Cities Church on January 18, 2026, and the statements

of probable cause all clearly showed that the requested search warrants related to the charged offense conduct.

Thus, the Government had "probable cause to believe that the person possessing such materials has committed . . . the criminal offense to which the materials relate." *See* 42 U.S.C. § 2000aa(a)(1), (b)(1). Indeed, that was not just a "belief"; we had an indictment establishing probable cause at the time we sought the warrants. The Court raised a question about whether the subject defendants (as opposed to YouTube) were the "person(s)" who "possessed" the information for purposes of the "suspect exception." The Government submitted that the accountholder-defendants are in "possess[ion]" of the materials on their YouTube accounts, and any suggestion that YouTube is the relevant "person" here misapplied the PPA and would improperly thwart the intent of Congress when it placed the "suspect exception" into the PPA. (Ex. "E" at 4-5.)

On May 26, 2026, Judge Docherty unsealed the warrant applications. (Dkt. 524 at 3.) None of the aforementioned search warrant applications were to T-Mobile or any other telecommunications provider.

### H. <u>The Parties' Meet & Confer Effort</u>

On August 5, 2026, counsel for Fort sent a letter to the government asserting the prosecution violated the PPA and Judge Docherty's order by using § 1509 summonses. The letter demanded that the government lodge

the data obtained from T-Mobile with the court until the issues highlighted in the letter were adjudicated. The letter also threatened to ask the Court for an order to show cause why the government should not be held in contempt for violating the orders. During a meet-and-confer on Friday August 7, 2026, the government explained to Fort's counsel why the allegations in the letter were legally and factually misplaced. The government nonetheless agreed to sequester the T-Mobile data and instructed agents not to examine the data until further notice.[5]

## ARGUMENT

### I. The Government Did Not Violate Any Clear and Unambiguous Order When It Sought Data from T-Mobile.

The government did not violate any court order. Judge Docherty's orders relate solely to the search warrant applications for Fort's, Lemon's and Kelly's YouTube account. The orders had no bearing on any investigative

[5] In contrast to the approach taken by defendant Fort, counsel for defendant Lemon expressed concern that materials the Government seized pursuant to the search warrant of his cellphone might reveal unrelated journalistic endeavors. In response, the Government engaged in weeks of amicable discussions to narrow the scope of the warrant and establish a unique filter-review process to protect Lemon's concerns regarding the attorney-client privilege and legitimate journalism endeavors that were unrelated to the charged offense conduct. Although the Government had obtained a warrant to search Lemon's Apple account, we voluntarily declined to search that data because Lemon's counsel were being cooperative regarding the cellphone. Fort's counsel have made no such effort.

process issued to T-Mobile. Fort has recast Judge Docherty's inquiry about the applicability of the PPA, into an unequivocal prohibition and limitation of the government's investigation into Fort. Judge Docherty's orders are not that explicit or far-reaching, and none relate to T-Mobile. Fort is not entitled to conjure up such an expansive order based on court orders denying unrelated search warrant applications and a faulty interpretation of the PPA. Accordingly, Fort's contempt threats are baseless. *See In re Robinson*, 342 Fed. Appx. 235, 236 (8th Cir. 2009) (reversing criminal contempt because the court order "was neither sufficiently specific to be enforceable, nor clear and unambiguous"); *see also C.H. Robinson Co. v. Medco, Inc.*, 406 F.3d 1066, 1071 (8th Cir. 2005) (contempt only available for violating an order sufficiently specific to be enforceable); *Imageware, Inc. v. U.S. W. Commns.*, 219 F.3d 793, 793 (8th Cir. 2000) (finding of contempt requires the order in question to be clear and unambiguous).

## II. The Protections of the PPA are Not Available to Fort.

As a threshold matter, the PPA is not applicable to Fort or to the T-Mobile summons.

***First***, the suspect exception to the PPA applies to Fort because she is an indicted co-conspirator. The government will have much more to say on this topic in its response to Fort's motion to dismiss under the First Amendment (Dkt. 592). But to summarize, Fort maintains that she was

engaging in journalism when she entered Cities Church on January 18, 2026 with a group of activists intent on disrupting the church service in protest of immigration enforcement actions in the Twin Cities. The government, as reflected in the Superseding Indictment, maintains that Fort conspired with others to interfere with or intimidate, by force, threat of force, or by physical obstruction, the congregants in Cities Church of their lawful right to exercise their First Amendment right of religious freedom.

Other than talking with her friend and fellow activist Nekima Armstrong after leaving the church, Fort did not interview individuals at the pre-op briefing or at the church.[6] Fort, like the other activists, stood in the Cub Foods lot listening to the instructions and information being conveyed by defendants Armstrong and Allen. She displayed no visible press credentials, carried no visible camera or notebook, and made no effort to interview or engage with any of the other activists present. Indeed, Fort exhibited a remarkable lack of journalistic curiosity when she concedes that she quickly departed the pre-brief to go sit in her car. Dkt 592 at 12. Not the behavior one would expect from a journalist. Yet Fort knew exactly where to go to

---

[6] Journalists "are not exempt from the normal duty" to follow the law, *Branzburg v. Hayes*, 408 U.S. 665, 685 (1972), and enjoy "no special privilege to invade the rights and liberties of others." *Associated Press v. NLRB*, 301 U.S. 103, 133 (1937).

"cover" Operation Pull-Up at Cities Church, even though she departed the pre-briefing in the Cub Food lot before defendant Levy-Armstrong provided the address of the church to the other defendants. *Id.*

And once inside the church, Fort made no effort to clearly identify herself as a member of the press. Other than displaying a camera with a homemade logo, Fort did not wear any prominently displayed press credentials. *Cf. Binion v. City of St. Paul*, 788 F. Supp. 2d 935, 948 (D. Minn. 2011) (allowing PPA claim to proceed in part because plaintiff was wearing clearly marked press badge); *Benjamin v. Peterson*, 2013 WL 3097271, 2013 U.S. Dist. LEXIS 85000 at *16 (D. Minn. June 18, 2013) (same). Fort blended in with all the other defendants, several of whom were using their phones to document the illegal disruption.[7] And, again, she made no effort to interview

[7] The Reporters Committee on Freedom of the Press has published a useful guide for journalists entitled "How to Protect Yourself When Covering a Protest." Ex. F. The guide is available on the Committee's website and was also linked to by the Minnesota Society of Professional Journalists, which published a "Resource Guide for Journalists Covering Metro Surge." The guidance cautions journalists covering protests to: (1) clearly identify as a journalist; (2) wear press credentials prominently; (3) avoid looking like one of the protestors; and (4) be aware of the situation to avoid breaking the law. *See* Reporters Committee tips for covering protests, Reporters Committee for Freedom of the Press (Updated May 7, 2024), available at www.rcfp.org/tips-for-covering-protests/; Resources for Minnesota Journalists covering Operation Metro Surge, Minnesota Society of Professional Journalists (Jan. 26, 2026), available at www.mnsjp.org/2026/01/26/resources-for-minnesota-journalists-covering-metro-surge/. Fort did none of these things.

any of the parishioners to inquire about their thoughts of having a church leader affiliated with ICE or their opinion about Operation Metro Surge. Based on the indictment, Fort's conduct was well within the scope of the PPA's suspect exception.

The facts of *Sennett v. United States* are analogous to Fort's case. 778 F.Supp.2d 655 (E.D. Va. 2011), *aff'd*, 667 F.3d 531 (4th Cir. 2012). There, the purported journalist, Sennett, received a tip that there would be a demonstration at a hotel hosting delegates to an International Monetary Fund meeting. The reporter arrived at the location early in the morning along with a crowd of activists who then proceeded to vandalize the hotel. 667 F.3d at 533. Security cameras recorded Sennett videoing the vandalism and mixing with other protestors, but (unlike Fort) she did not enter the lobby of the hotel where the vandalism took place. *Id.* Police eventually identified Sennett and obtained a search warrant for her residence. Police were aware that Sennett was a photojournalist when they executed the search warrant. Unlike Fort, however, the government never charged Sennett with a crime. *Id.* at 534. Sennett sued the United States for violating the PPA, but the district court granted summary judgment because the United States asserted Sennett fell within the suspect exception and that there was sufficient probable cause to believe that Sennett was involved in criminal activity. *Id.* at 535 (citing 778 F.Supp.2d at 666). The Fourth

Circuit affirmed on appeal, thus holding that the PPA did not apply to Sennett because her conduct fell within the suspect exception. *Id.*

Here, Fort's conduct falls even more squarely into the suspect exception. Unlike Sennett, who did not go into the lobby where the vandalism occurred, Fort entered the Cities Church sanctuary with the other mass group of defendants. Numerous videos capture Fort standing with the other defendants at the pre-meeting and then again inside the church among the other defendants as they take over and disrupt the church service, some of whom obstructed parishioners while others engaged in threatening behavior. Even more significant, a grand jury indicted Fort for her conduct, a fate Sennett avoided.

Similarly, in *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, another case Fort gives short shrift to, the court held that the plaintiff's conduct fell within the suspect exception because the plaintiff arguably engaged in trespass in setting up the hidden cameras that then trigged the law enforcement investigation. 499 F.3d 553, 567 (6th Cir. 2007). Hence, the defendant was not bound by the PPA restrictions when it searched for and seized additional hidden cameras on the property because there was probable cause that the plaintiff committed the crime of trespass. Likewise, here, the government was not bound by the PPA's restrictions when it launched investigative process regarding Fort, including using the § 1509 summonses.

There was probable cause that Fort engaged in criminal conduct, as the grand jury found.

***Second*****,** the PPA statutory and regulatory restrictions apply only to searches and seizures (presumably pursuant to a warrant), and not material obtained by subpoena or summons. "Indeed, the purpose of the Act was to encourage the use of subpoenas to obtain material." *Doe v. Di Genova*, 642 F.Supp. 624, 631 (D.D.C. 1986) (citing legislative history). And even if the T-Mobile summons violated the regulatory guidelines, the PPA specifically states that failure to comply with the guidelines cannot be litigated, "and a court may not entertain such an issue as the basis for the suppression or exclusion of evidence." 42 U.S.C. § 2000aa-12.

Moreover, the accompanying regulations state that they do not "create any right or benefit … enforceable at law or in equity by any party against the United States." 28 C.F.R. § 50.10(i). Fort's instant motion ignores and runs afoul of this prohibition. Likewise, the motion is also invalid because Congress deemed "a private cause of action as the exclusive remedy to ensure that the protections of the Act would be effective." *Citicasters*, 89 F.3d at 1355 (citing 42 U.S.C. § 2000aa-6).

***Third***, Fort's reliance on the PPA is further misplaced because she never "possessed" the T-Mobile data. Courts have traditionally viewed subscriber data and call or toll logs as third-party data, in this case T-Mobile.

*See, e.g.*, *United States v. Brown*, 2025 WL 3057623, 2025 U.S. Dist. LEXIS 215710 (D. Minn. Nov. 3, 2025) (affirming use of administrative subpoena for phone subscriber and log data under the third-party disclosure doctrine). As Judge Docherty emphasized, a key question regarding the applicability of the PPA as well as the suspect exception is whether the data or material sought by the government is in the possession of the journalist or a third-party.[8] And here, even Fort concedes that "the materials sought were held by T-Mobile." Dkt. 641 at 12-13. Thus, any subpoena or administrative summons directed at Fort for the subscriber and call logs would have been fruitless, since she, correctly, could have declined compliance by asserting she did not possess the requested data.

***Fourth***, the PPA's protective/prohibitive scope only applies to a journalist's "work product" and "documentary material." *See* 42 U.S.C. §§ 2000aa(a) and 2000aa(b). Under the PPA's plain statutory definitions, telephone toll records do not qualify as Fort's own "work product" or "documentary material." *See* 42 U.S. Code § 2000aa-7(a), (b) .

---

[8] Fort asserts that Judge Docherty's March 6 order "was clear that the various protections [of the PPA] applied with equal force to a warrant to a third party (YouTube)." Dkt. 641 at 15. That is wrong. The March 6 order said no such thing. Indeed, Judge Docherty made clear that applicability of the PPA and suspect exception turned on which party possessed the requested data. Ex. C at 5 ("[T]he question of who possesses the materials becomes critical.").

## III. The Government's Use of § 1509 Summonses was Valid

Government's use of § 1509 summonses was entirely proper, and, as noted *supra*, the data is third-party material in which Fort does not have a Fourth Amendment privacy interest. If Fort believes that the use of § 1509 summonses was improper, the solution is to move to suppress the information obtained via the summonses, as other defendants have done. Instead, Fort filed this motion which seeks to convert the PPA into a far reaching and unsupported "reporter's privilege" such that the use of an administrative summons to acquire third-party data is prohibited.[9]

Section 1509 allows the issuance of administrative summonses "[i]n any investigation … for ensuring compliance with the laws of the United States administered by the United States Customs Service." 19 U.S.C. § 1509. As explained in *United States v. Smajlovic*, a recent district court case from the Eastern District of Missouri, the creation of the Department of Homeland Security abolished the Customs Service and transferred all its responsibilities to DHS. 2026 WL 785026 at *3, 2026 U.S. Dist. LEXIS 59147

---

[9] The request for six months of data is a common practice by HSI with respect to § 1509 summons. This helps confirm that the phone in question is regularly used by the subscriber, which could be helpful in establishing probable cause when seeking a search warrant. As a practical matter, the government is not interested in calls or texts to or from Fort other than those of phone numbers associated with other defendants and/or calls or texts on or immediately before or after January 18, 2026, the date of the charged crime.

(E.D. Mo. Mar. 20, 2026) (citing Homeland Security Act of 2002, 6 U.S.C. § 203). *Smajlovic* involved an investigation into cyber-crime and child pornography. A host of other courts have similarly found that DHS has broad investigative powers and approved the use of § 1509 summonses for non-traditional customs investigations. *See, e.g., United States v. Merrell*, 88 F.Supp.3d 1017 (D. Minn. 2015) (approving use of § 1509 summonses in child pornography investigation); *United States v. Cray*, 673 F.Supp.2d 1368 (S.D. Ga. 2009) (same).

Historically, the legacy DHS agencies like the Customs Service or the Immigration & Naturalization Service ("INS") had broad investigative authority that have now been assumed by DHS. Indeed, 8 U.S.C. § 1103(a) specifically states that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [Immigration and Naturalization] and all other laws relating to the immigration and naturalization of aliens." Since its creation in 2002, DHS has assumed a broad investigative portfolio beyond legacy customs and immigration enforcement.

Although some of the related statutory provisions have not been updated to reflect the merger of Customs into DHS, 19 U.S.C. § 1589a states that Customs officers may "execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States"

and make lawful arrests without a warrant "for **any offense** against the United States … or for a felony, **cognizable under the laws of the United States**." *See, e.g., United States v. Jackson*, 2023 WL 7320614 at *11-12, 2023 U.S. Dist. LEXIS 199739 (D. Vt., Nov. 7, 2023) (noting traditionally broad investigative power of Customs Service now merged into DHS) (emphases added).

One historical responsibility that DHS inherited from the legacy Customs Service is the investigation of assaults on federal officers. DOJ's Justice Manual, which also has not been accurately updated to reflect the advent of DHS, notes that the Customs Service (now subsumed into ICE and HSI) typically maintains the authority to investigate assaults on its own federal officers. *See* Justice Manual § 9-65-600, Assaults on and Kidnappings of Federal Officers, (updated Jan. 2020). The Defendants, including Fort, invaded the church specifically to threaten or intimidate the acting Regional Director of Immigration and Customs Enforcement ("ICE"), an agency within DHS. This was an attempted assault on a federal officer, chargeable under 18 U.S.C. § 111, or 18 U.S.C. § 372. Because 6 U.S.C. § 203(1) transferred all "functions, personnel, assets, and liabilities of the United States Customs Service of the Department of Treasury" to DHS, it is DHS and its primary investigative and enforcement agency (HSI) that has the responsibility to investigate assaults or attempted assaults on ICE officials. The fact that —

to date — the investigation has resulted only in the filing of civil rights charges is irrelevant. The use of § 1509 summonses was an appropriate tool employed by HSI.

Courts have repeatedly held that the information typically sought via a § 1509 summons is subject to the third-party doctrine and that defendants do not have reasonable expectation of privacy for such data. *See United States v. Wellbeloved-Stone*, 777 Fed. Appx. 605, 607 (4th Cir. 2019) (internet and phone subscriber information); *Merrell*, 88 F.Supp.3d at 1032 (employment records from Minnesota Department of Economic and Employment Development); *United States v. Meyrand*, 2025 WL 1282638 at *1-2, 2025 U.S. Dist. LEXIS 84060 (E.D. Mo., May 2, 2025) (internet subscriber information) (citing *United States v. Wheelock*, 772 F.3d 825, 828 (8th Cir. 2014)). Even if the use of § 1509 summonses was improper—which it was not—there is generally no exclusionary rule applicable to statutory violations. *See Wellbeloved-Stone*, 777 Fed. Appx. at 607; *Smajlovic*, 2026 WL 785026 at *4 (same).

## IV. Fort Asserts a Reporter's Privilege that Does Not Exist

Fort's motion amounts to an effort to fashion an expansive reporter's privilege that has not been recognized by the Eighth Circuit. Contrary to Fort's motion, the PPA does not create some broadly applicable reporter's privilege. It simply affords the press an additional layer of protection beyond

the Fourth Amendment, unless they are, like Fort here, suspected of committing a crime. *See DePugh v. Sutton*, 917 F. Supp. 690, 696 (W.D. Mo. 1996).

Fort's motion implies that because she is a journalist, and because Judge Docherty raised the specter of the PPA in rejecting a search warrant for her YouTube account, Fort is now immune from all investigative processes, even process aimed at third parties like T-Mobile, notwithstanding that she's been indicted. But the government is unaware of any controlling Eighth Circuit precedent firmly establishing a qualified reporter's privilege, never mind one nearly as expansive as what Fort's motion advocates. *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 918 n.8 (8th Cir. 1997), *cert. denied*, 521 U.S. 1105 (1997). Moreover, district courts within the Circuit have declined to recognize a broadly applicable reporter's privilege barring disclosure of press material. *See, e.g., United States v. Hively*, 202 F. Supp. 2d 886, 891 (E.D. Ark. 2002); *In re Grand Jury Subpoena ABC, Inc.*, 947 F. Supp. 1314, 1319 (E.D. Ark, 1996).

In *Reporters Committee for Freedom of the Press v. AT&T, Co.*, the D.C. Circuit held that journalists "have no right to resist good faith subpoena duces tecum directed at third-party's business records." 593 F.2d 1030, 1050 (D.C. Cir. 1978). There, like here, the subpoena was directed at a third-party telecom provider and requested subscriber and call log data. Fort contends

that the case is no longer valid because it predates the PPA. Dkt. 641 at 14-15. Instead, Fort points to *New York Times Co. v. Gonzalez*, 459 F.3d 160 (2d Cir. 2006), and *Food Lion, Inc. v. Cap. Cities/ABC Inc.*, 951 F. Supp. 1211 (M.D.N.C. 1996), both of which recognized a reporter privilege to potentially resist subpoenas that could have resulted in the disclosure of confidential sources. But both those cases are distinguishable because in neither instance was the government investigating the journalists for committing a crime. Indeed, in *Gonzalez*, the government had not even asserted that a crime had occurred. 459 F.3d at 174 n.7. Here, a grand jury has found probable cause to indict Fort for two crimes. Hence, Fort's situation is more equivalent to that of the defendants in *United States v. Sanders*, 17 F. Supp. 2d 141 (E.D.N.Y 1998). There, the defendants asserted a "newsgathering" privilege under the First Amendment as the basis for a selective and vindictive prosecution claim. *Id.* The government twice issued subpoenas for toll records of one defendant even though the government knew he was a journalist. The government was attempting to determine who might have been defendant's source who disclosed confidential government information related to an airline crash. In both instances, the government acknowledged that it did not comply with PPA regulation 28 C.F.R. § 50.10. *Id.* at 147. Nonetheless, the court declined to allow defendants to pursue their vindictive and selective claims.

## CONCLUSION

For all the foregoing reasons, defendant Fort's motion should be denied.[10]

DATED: September 9, 2026.

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

ABRAHAM KAPLAN
Assistant United States Attorney

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Senior Trial Attorney

*/s/ Neville S. Hedley*
Neville S. Hedley
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 297-3424
E-Mail: neville.hedley@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

[10] The undersigned certifies that this brief is 6022 words, including headings and footnotes (other than this note) as measured by Microsoft Word.