**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

NEKIMA VALDEZ LEVY ARMSTRONG, *et al.*,

Defendants.

Case No. 0:26-cr-00025-LMP-DLM

**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS BASED ON LACK OF CONGRESSIONAL AUTHORITY FOR FACE ACT (ECF 610, 614, 615, 650, 677, 687, 706, 736, 745)**

## INTRODUCTION

Defendants ask this Court to take the drastic measure of invalidating an act of Congress under the Commerce Clause. According to Defendants, the statutory protection for houses of worship codified at 18 U.S.C. § 248(a)(2) ("FACE Act") exceeds Congress' power. Every court to consider this argument has rejected it, and this Court should do the same. *First*, the FACE Act's house of worship protections are facially within Congress' powers under the Commerce Clause because they protect people and things involved in interstate commerce and a rational basis exists for concluding that the type of conduct at issue here — the obstruction of access to religious institutions — taken in the aggregate, substantially affects interstate commerce. *Second*, Congress had the authority to enact the FACE Act pursuant to Section 5 of the Fourteenth Amendment ("the Enforcement Clause") because Congress intended to remedy state authorities' refusal to provide equal protection in law enforcement services for houses of worship. Accordingly, this Court should affirm the validity of the FACE Act and deny Defendants' motions to dismiss.

## BACKGROUND

### A. Legislative History

Congress enacted 18 U.S.C. § 248(a)(2) as part of the Freedom of Access to Clinic Entrances Act of 1994, Pub. L. No. 103-259, 108 Stat. 694 (1994). As relevant here, the FACE Act has two objectives: (1) protecting access to reproductive health services and (2) protecting the exercise of religious freedom at places of religious worship. *See* 18 U.S.C. § 248(a)(1)-(3). The Act imposes criminal penalties upon individuals who engage in a prohibited activity, *id.* § 248(b), and also creates a civil right of action for a person "aggrieved" by prohibited conduct, *id.* § 248(c).

The earliest form of the bill addressed only incidents of violence and nonviolent obstruction at abortion clinics. *See* 136 Cong. Rec. S3091-93 (1990) (statement of Sen. Cranston). Yet, the bill would never pass in its original form. As an early co-sponsor of the House version acknowledged, "few issues [] divide the American public as much as the issue of abortion. The debate over whether or not a woman should legally be able to terminate a pregnancy generates strong emotions from people on both sides of the issue, and the controversy will no doubt rage on for years." 137 Cong. Rec. SE1189-90 (1993) (statement of Rep. Levine).

The bill waned in Congress until pressure mounted for its passage following the March 10, 1993, murder of abortionist David Gunn, M.D. *See, e.g.*, 139 Cong. Rec. H1175 (daily ed. March 11, 1993) (statement of Rep. Morella); 139 Cong. Rec. S2722 (daily ed. March 11, 1993) (Rep. Mikulski); 139 Cong. Rec. H1174 (daily ed. March 11, 1993) (Rep. McDermott); 139 Cong. Rec. H1217 (daily ed. March 11, 1993) (Rep. Schroeder); 139 Cong. Rec. H1175 (daily ed. March 11, 1993) (Rep. Kreidler and Rep. Maloney); 139 Cong. Rec. H1170-71 (daily ed. March 11, 1993) (Rep. Schumer);

139 Cong. Rec. E611 (daily ed. March 11, 1993) (Rep. Norton); 139 Cong. Rec. E600 (daily ed. March 11, 1993) (Rep. Engel); 139 Cong. Rec. H1177 (daily ed. March 11, 1993) (Rep. Nadler); 139 Cong. Rec. H1300 (daily ed. March 11, 1993) (Rep. Hutchinson); 139 Cong. Rec. E716 (daily ed. March 11, 1993) (Rep. Porter) (all urging passage of the FACE Act following Dr. Gunn's murder). While condemning the murder of Dr. Gunn, pro-life lawmakers, including Senator Hatch, continued to oppose the bill. *See* S. REP. NO. 103-117, at 47-49 (1993) ("Like millions and millions of other Americans opposed to abortion, we categorically condemn the March 1993 killing of Dr. David Gunn . . . . [The FACE Act] is not, however, a well-honed or appropriate federal response to the problem of violence outside abortion clinics.").

In 1994, Congress finally passed the bill, but only after it reached agreement on a key compromise. Senator Hatch introduced an "amendment prohibiting violence and obstruction at places of religious worship," and the House accepted the change during conference, recognizing the "appropriate new Federal protection for religious freedom at places of worship." 140 Cong. Rec. S5595, S5596 (1994) (statement of Sen. Kennedy). In proposing the house of worship amendment, Senator Hatch explained that places of worship were "under attack throughout the country." 139 Cong. Rec. S15660 (statement of Sen. Hatch). He pointed to various attacks against houses of worship, including an arsonist who "set fire to at least 17 . . . churches throughout Florida and to churches in Tennessee and Colorado"; activists who "exposed churchgoers at St. Patrick's Cathedral to a pornographically altered portrait of Jesus, invaded the cathedral, screamed, waved their fists, and tossed condoms in the air," and "planned similar disruptions throughout the country"; and attacks against

Catholic leaders in the District of Columbia, Boston, Los Angeles, New York, and other cities. *Id.*

Senator Hatch noted that activists in San Francisco "pushed and shoved churchgoers, threw rocks and eggs at them, and destroyed church property," but "[t]he police failed to respond to calls for more assistance and made no arrests." *Id.* Relatedly, during a subcommittee hearing, then-Representative Schumer questioned a rabbi, who explained that local police arrested individuals who disrupted St. Patrick's Cathedral but that "nothing happened" thereafter. *See* Abortion Clinic Violence: Hearing Before the Subcomm. on Crime & Criminal Justice of the H. Comm. on the Judiciary, 103d Cong. 162 (1993) (statement of Yehuda Levin). Representative Schumer responded that he would "fully support" using the FACE Act to address that issue. *Id.* (statement of Rep. Schumer).

**B. <u>The Offense Conduct</u>**

On the morning of January 18, 2026, congregants of Cities Church gathered for Sunday worship service inside the church building in Saint Paul, Minnesota. (ECF 144 ¶ 1-2.) During the service, a group of approximately forty people, including each Defendant, entered the sanctuary in a coordinated operation to seize physical control over a large part of the church sanctuary and thereby used force, threats of force, and physical obstruction to intimidate and interfere with the congregants. (*See* ECF 144.) The crime was livestreamed on the church's livestream and on various defendants' social media accounts — including accounts with massive global reach. (ECF 144, at 8); *see also* B. Steinberg, Don Lemon to Launch Fast Channel on Linear, Streaming Venues (Sept. 4, 2026) https://variety.com/2026/tv/news/don-lemon-

channel-fast-launch-1236851556/ (noting that Lemon has more than 10 million followers across his various platforms).

Compliance with secular law, except to the extent it conflicts with divine law, is a basic tenet for many of Christian faith. *See, e.g.,* Romans 13:1-2 (generally instructing followers to subject themselves to the law); Titus 3:1 (reminding that followers should obey the law); 1 Peter 2:13-14 (same); *cf.* Acts 5:29 (instructing compliance with divine law rather than men). That includes all such secular law (even immigration laws), not just those laws that happen to be to the defendants' tastes. The Southern Baptist Convention, of which Cities Church is a member, recently published a resolution "reaffirm[ing] support for lawful immigration enforcement," including deportation and removal. *See* On Immigration, Human Dignity, and the Rule of Law, Southern Baptist Convention, June 13, 2026, https://www.sbc.net/resource-library/resolutions/on-immigration-human-dignity-and-the-rule-of-law/.

Yet, to defendant Armstrong and others, the church's association with the ICE Officer and his family was unacceptable because the congregants and the ICE Officer are Christians. (ECF 144 at 6-7.) "How can you be a pastor of a church but overseeing ICE agents in the field?" defendant Armstrong asked rhetorically, explaining later that she, herself, was a pastor and she "knows what the word says." *See* Don Live On The Scene: Live from Minneapolis, at 1:14:55 (Jan. 19, 2026); https://thedonlemonshow.substack.com/p/don-live-on-the-scene-live-from-minneapolis. Armstrong further said, "How dare somebody claim to be a pastor while overseeing evil. Absolutely not." (*Id.* at 1:15:40.) Others yelled, "false prophets" while she spoke. (*Id.*) Armstrong explained that the attack on the church would push

the church to "get [their] house in order." (*Id.*) Put simply, the victims' Christian faith was a factor in defendants' decision to target the church.

Prior to the attack on the church, organizers researched the church on the internet, conducted and transmitted digital reconnaissance, exchanged text messages about the approach to the building, and promoted "Operation PullUp" through Instagram and Facebook. (ECF 144 ¶ 8, Overt Acts 1-12.) On the morning of the service, Defendants gathered at a shopping-center parking lot for a pre-operation briefing at which the target and manner of operation were disclosed. (*Id.*, Overt Acts 13-14.) The organizers divided participants into two waves, with the first wave directed to enter clandestinely without activist-identifying clothing and to then stand and join in the obstructive activity after the second wave entered and started the protest. (*Id.*, Overt Acts 18-20.)

Per the superseding indictment, defendant Lemon began livestreaming from the staging area; took steps to preserve the target's secrecy; thanked Armstrong after she described the operation as "clandestine" and intended to "disrupt business as usual"; said that he would see her there; and told his audience that he would not disclose the operation's location. (ECF 144 ¶ 8, Overt Acts 15-17.) Defendants drove from the pre-meeting location to the church. While traveling to the Church, Lemon allegedly urged the vehicle to catch up with the others and again cautioned that the operation should not be disclosed. (*Id.*, Overt Acts 20-22.) He then entered the sanctuary while livestreaming. (*Id.*, Overt Acts 22-23.)

The defendants interrupted the sermon, physically occupied aisles and rows, obstructed the movement of congregants within the church, caused the service to end, and interfered with congregants' access to exits and the Church's childcare area.

(ECF 144 ¶¶ 3-4, ¶ 8, Overt Acts 23-31, 38-40.) It alleges that Lemon described a young congregant's experience as "traumatic and uncomfortable," which he acknowledged was the purpose, stating separately that "the whole point" of the operation was "to disrupt." (*Id.* ¶ 8, Overt Acts 32-33.) After conferring with Armstrong to locate the pastor, Lemon approached the pastor with other defendants, obstructed the pastor's movement while questioning him, threateningly admonished the pastor to not touch him (contact that happened, as video shows, because Lemon stood inches away from the pastor), remained in the church after being told to leave, and later physically obstructed congregants at the main door. (*Id.* ¶ 8, Overt Acts 35-40.)

### C. <u>Pending Charges</u>

Count One charges each defendant with a violation of 18 U.S.C. § 241 — conspiracy to oppress, threaten, and intimidate clergy, staff, and congregants in the exercise of religious freedom at a place of worship, a right secured under federal law by the FACE Act. (*Id.* ¶¶ 5-8.) Count Two charges each defendant with violating, and aiding and abetting a violation of, § 248(a)(2) — to oppress, threaten, and intimidate clergy, staff, and congregants in the exercise of religious freedom at a place of worship force by force, threat of force, and physical obstruction, with a resulting bodily injury to one congregant. (*Id.* ¶¶ 9-10.)

### D. Defendant's Constitutional Challenges to the FACE Act

In a series of motions, Defendants challenge Congress' authority to enact the FACE Act house of worship protections, which are set forth in 18 U.S.C. § 248(a)(2).[1] First, Defendants contend that the house of worship provision falls outside Congress' lawmaking authority under the Commerce Clause because the provision regulates local, non-economic conduct, lacks a jurisdictional element and worship-specific congressional findings, and has only an attenuated relationship to commerce. (*See* ECF 610 at 4-15; 650 at 11-13; 677 at 11-13; 687 at 5-17; and 706 at 14-17.) Many Defendants also contend that the Enforcement Clause in Section 5 of the Fourteenth Amendment cannot support the provision because the statute regulates only private actors who obstruct houses of worship. (*See* ECF 610 at 15-17; 677 at 12; 687 at 5; and 706 at 15.)

## ARGUMENT

## I. Legal Standard

When ruling on a motion to dismiss under Rule 12(b), courts "accept the government's allegations as true, without reference to allegations outside the indicting document." *United States v. Steffen*, 687 F.3d 1104, 1107 n.2 (8th Cir. 2012). The "analysis of [a] motion to dismiss is limited to what is contained in the indictment." *United States v. Hansmeier*, 988 F.3d 428, 432 n.2 (8th Cir. 2021). Rule 12 does not permit a district court to make determinations based on facts intertwined with the elements or merits of the offense charged. *See United States v. Turner*, 842

[1] Each Defendant raised this challenge either in a motion to dismiss (DOC. Nos. 610, 650, 677, 687, 706) or a motion to join granted by this Court (DOC. Nos. 614, 615, 736, 745).

F.3d 602, 605-06 (8th Cir. 2016) (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)) (Rule 12 does not permit a district court to make determinations based on facts intertwined with the elements or merits of the charged offense).

Congressional statutes are presumed constitutional. *United States v. Morrison*, 529 U.S. 598, 607 (2000). Courts can "invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Id.* When Congress enacts a statute on the theory that the activity regulated substantially affects interstate commerce, the scope of judicial review is limited. *See Gonzalez v. Raich*, 545 U.S. 1, 22 (2005). Courts "need not determine whether [defendants'] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.*; *see also United States v. Lopez*, 514 U.S. 549, 557 (1995).

## II. <u>**The FACE Act is Facially Constitutional Under Congress' Commerce Clause Authority**</u>

This Court should deny Defendants' motions to dismiss because the house of worship provision is a valid enactment that is well within Congress' authority to regulate interstate commerce. Defendants argue that the house-of-worship provision "regulates criminal conduct that is not economic in nature" and "does not have a substantial effect on interstate commerce." (ECF 687, at 8-9; *see also* ECF 706, at 16; ECF 650, at 11-12; ECF 610, at 5-6.) As explained below, however, these arguments reflect a misunderstanding of applicable law and are without merit.

The Constitution grants to Congress the power "[t]o regulate Commerce . . . among the several States . . . ." U.S. Const., Art. I, § 8, cl. 3. "Congress may use this commerce power: [(1)] to regulate the channels of interstate commerce, [(2)] to

regulate or protect the instrumentalities of interstate commerce or people or things involved in interstate commerce, and [(3)] to regulate conduct that has a substantial effect on interstate commerce." *United States v. Dinwiddie*, 76 F.3d 913, 919 (8th Cir. 1996) (citing *Lopez*, 514 U.S. at 558-59).

When analyzing the third category, the Supreme Court has focused on four factors: "(1) whether the regulated activity was economic; (2) whether the statute contained an express jurisdictional element; (3) whether Congress made legislative findings linking the regulated activity to interstate commerce; and (4) whether there was a link between the regulation and interstate commerce." *United States v. Morrison*, 529 U.S. 598, 610-12 (2000); *Lopez*, 514 U.S. at 559. "While congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, . . . the absence of particularized findings does not call into question Congress' authority to legislate." *Raich*, 545 U.S. at 21.

Courts considering this issue have uniformly affirmed Congress' authority to enact the FACE Act under the Commerce Clause. This is so on at least the second and third categories of the Commerce Power. *First*, the FACE Act's house-of-worship provision "protect[s] . . . people [and] things involved in interstate commerce," namely, houses of worship and their congregants. *Second*, the house-of-worship provision "regulate[s] conduct that has a substantial effect on interstate commerce" in that the provision regulates access to places of worship, institutions that provide services and engage in other conduct that are, in part, economic in nature, and there is a strong link between the regulated conduct and interstate commerce. Accordingly, this Court should deny the motions on this ground alone.

### A. <u>There are Constitutional Applications of the FACE Act</u>

Defendants bring a facial challenge to Section 248(a)(2).[2] To prevail on their facial challenge, Defendants must "establish … that the law is unconstitutional in *all* of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added). "If some applications are constitutional, then facially speaking, the statute is too." *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir.), *cert. denied*, 145 S. Ct. 304, 220 L. Ed. 2d 100 (2024)."

There are many constitutional applications of Section 248(a)(2). Notably, two other district courts have upheld Section 248(a)(2) as a lawful exercise of power under the Commerce Clause, and these decisions "serve[] as … non-hypothetical example[s]" of constitutional applications of Section 248(a)(2) "that defeat[] any claim

---

[2] All but Defendant Richardson classify their challenge as a facial claim. (ECF 610 at 3, n.3; ECF 706 at 14; ECF 677 at 11; ECF 687 at 12.) Defendant Richardson, however, challenges the law "as applied" to a "local church service" where the "connection to interstate commerce, if any, is extraordinarily attenuated." (ECF 650 at 12.) First, an "as applied" challenge here fails for the same reason a facial challenge fails — because "case law firmly establishes Congress'[s] power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich,* 545 U.S. at 17. Second, it is unclear that an "as applied" challenge is legally tenable. *See United States v. Bowers*, 594 F.3d 522, 530 (6th Cir. 2010) (rejecting "case-by-case analysis" implicated by defendant's "as applied" challenge); *United States v. Maxwell*, 446 F.3d 1210, 1215 n. 5 (11th Cir. 2006) ("[Raich ] leaves some doubt as to whether, in the Commerce Clause context, an as-applied challenge may ever be sustained so long as Congress may constitutionally regulate the broader class of activities of which the intrastate activity is a part."). While the Eighth Circuit has entertained "as applied" challenges to Congress's authority under the Commerce Clause, the Circuit has yet to strike down a statute based one. *See, e.g.*, *Monson v. Drug Enf't Admin.*, 589 F.3d 952, 962 (8th Cir. 2009) (rejecting marijuana farmers challenge to federal Controlled Substances Act as applied to industrial hemp); *United States v. Corum*, 362 F.3d 489, 493 (8th Cir. 2004) (rejecting as applied challenge to digital threats prosecution); *cf United States v. Hall*, 171 F.3d 1133, 1140 (8th Cir. 1999) (divided panel found Commerce Clause could not sustain federal ban on unregistered silencer, but Taxing Clause could). Accordingly, Defendant Richardson's "as applied' challenge does not entitle him to dismissal.

of facial invalidity." *United States v. Roof*, 10 F.4th 314, 384-385 (4th Cir. 2021). Additionally, the Eighth Circuit and three other courts of appeals have held that the neighboring and similar provisions of Section 247, which prohibits the destruction of religious property and the obstruction of persons in the free exercise of religious beliefs, are facially constitutional. Those decisions support a finding of constitutionality here.

Although case law on the constitutionality of Section 248(a)(2) is sparse, both federal courts to consider the issue held that the house of worship provision is a valid exercise of Congress' power to regulate commerce under the Commerce Clause. In *New Beginnings Ministries v. George*, No. 2:15-cv-2781, 2018 WL 11378829, at *2 (S.D. Ohio 2018), the district court considered the constitutionality of the house-of-worship provision in a civil action brought by the church against topless protestors who blocked entrances and exits to the church and church parking lot, took photographs or videos of the parishioners, held signs in protest, and used vulgar and profane language toward the parishioners. There, the district court rejected a Commerce Clause challenge to Section 248(a)(2) on the ground "that places of religious worship engage in interstate commerce, and the prohibited conduct in [the] FACE [Act] affects their ability to engage in that commerce, and in light of the presumption of constitutionality," provided a rational basis for Congress's exercise of power under the Commerce Clause. *Id*. at *8.

Likewise, in *Jingrong v. Chinese Anti-Cult World Alliance*, 314 F. Supp. 3d 420, 440 (E.D.N.Y. 2018) , *reversed on other grounds*, 16 F.4th 47, 48-49 (2d Cir. 2021) (declining to reach Commerce Clause issue because alleged conduct did not even occur at a house of worship), the district court examined the constitutionality of the house-

of-worship provision in an action brought by a Chinese religious group who sued opponents attempting to suppress their proselytization efforts in a heavily pedestrian-traveled area near the temple. The court held that Section 248(a)(2) is a valid exercise of Congress' power to regulate commerce under the Commerce Clause. *Id*. The court explained as follows:

> Based on the evidence and common sense notions about religion, as widely practiced in the United States, religious activity and commerce overlap: Congress had a rational basis for concluding that violence and intimidation at places of religious worship could substantially affect interstate commerce.

*Jingrong*, 314 F. Supp. 3d at 440.

Moreover, every court to have considered the constitutionality of the FACE Act's clinic-access provision, 18 U.S.C. § 248(a)(1), has found that part of the Act to be within Congress' legislative powers. When considering the constitutionality of subsection (a)(1), the Eighth Circuit held that the "FACE [Act] is within Congress' commerce power" as it "falls within both the second and third of these categories of commerce power." *See Dinwiddie*, 76 F.3d at 919 (affirming constitutional validity of § 248(a)(1) as applied to abortion clinics). As the Eight Circuit explained, "*Lopez* does not call on us to hold that FACE is beyond Congress' power to regulate activity that substantially affects interstate commerce." *Id*. at 921.

*Dinwiddie* is in accord with the decisions of all other courts of appeals that have considered Commerce Clause challenges to Section 248(a)(1), the FACE Act's provision regarding reproductive-health clinics. The other Circuits have held uniformly that the FACE Act is a valid exercise of Congress' power under the Commerce Clause. *See Terry v. Reno*, 101 F.3d 1412, 1415-18 (D.C. Cir. 1996), *cert.*

*denied*, 520 U.S. 1264 (1997); *United States v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999); *United States v. Gregg*, 226 F.3d 253, 261-67 (3rd Cir. 2000) *cert.* denied, 532 U.S. 971 (2001); *Hoffman v. Hunt*, 126 F.3d 575, 582-88 (4th Cir. 1997), *cert. denied*, 523 U.S. 1136 (1998); *United States v. Bird*, 124 F.3d 667, 672-82 (5th Cir. 1997), *cert. denied*, 523 U.S. 1006 (1998); *United States v. Wilson*, 73 F.3d 675, 679-88 (7th Cir. 1995), *cert. denied*, 519 U.S. 806 (1996); *United States v. Soderna*, 82 F.3d 1370, 1373-74 (7th Cir. 1996), *cert. denied*, 519 U.S. 1006 (1996); *United States v. Hart*, 212 F.3d 1067, 1074 (8th Cir. 2000), *cert. denied*, 531 U.S. 1114 (2001) (following *Dinwiddie*); *Cheffer v. Reno*, 55 F.3d 1517, 1519-22 (11th Cir. 1995). The Supreme Court has denied review of these decisions when sought.

Congress had a "rational basis" for determining that Section 248(a)(2) proscribes conduct that affects interstate commerce. *Raich*, 545 U.S. at 22. In determining whether regulated conduct is commercial, courts consider how prohibited conduct operates upon the regulated institution or activity rather than asking only whether the conduct itself is a sale or service. *See, e.g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252-58 (1964) (examining the motel's operation and its relationship to interstate travelers); *Katzenbach v. McClung*, 379 U.S. 294, 299-305 (1964) (examining the burden discriminatory practices at a restaurant imposed on interstate commerce).

Houses of worship plainly have a significant effect on interstate commerce. For example, one district court has held that "[p]laces of religious worship . . . are economic," given that approximately 331,000 formal houses of worship in the United States generated $74.5 billion in annual revenue, accounting at the time for about one percent of gross national product and half of all charitable giving. *Jingrong*, 314

F. Supp. 3d 420 at 440; *see also New Beginnings*, 2018 WL 11378829, at *7 ("Religious activities, and places of religious worship, have a substantial effect on interstate commerce.").

These courts are correct. In the United States, houses of worship usually are non-profit organizations funded primarily through donations, and a large portion of those donations occur during periodic worship services. That was especially true in 1994, before electronic payment platforms became ubiquitous in American commerce. Today, the commonplace practice of e-giving underscores the interstate commercial nature of religious institutions and their charitable activities. *Cf. United States v. Jinian*, 725 F.3d 954, 968 (9th Cir. 2013) (holding a federal wire-fraud statute falls within the Commerce Clause because "[w]ires are channels or instrumentalities of interstate commerce") (citation omitted)).

Indeed, by limiting the protections to religious practice at a place of religious worship — rather than religious practice at any place — Congress cabined the Act's reach to only interference at physical houses of worship that, as a class, engage in substantial economic activity. *See Raich*, 545 U.S. at 16-17 (recognizing Congress's power to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce"). By contrast, where Congress intended to protect only the "right to worship," untethered to a place of commerce, Congress included a jurisdictional element. *See* 18 U.S.C. § 247(a)(2), (b) (punishing whoever "intentionally obstructs, by force or threat of force . . . any person in the enjoyment of that person's free exercise of religious beliefs . . . and the circumstances [] are that the offense is in or affects interstate or foreign commerce.").

Because the FACE Act regulates activity that is economic in nature, this factor weighs in support of Congress' authority to enact it.

Additionally, "[c]hurch buildings are used for a broad range of educational, recreational, and financial activities" and "broadly contribute to commercial activity." *Hari*, 67 F.4th at 909. For example, houses of worship often host commercial businesses such as schools, daycares, and gift shops, and sports leagues. "[H]ousing a daycare center whose function is to provide child care services in exchange for payment singlehandedly transforms a place of worship into a building that is actively employed for commercial purposes." *United States v. Gillespie*, 452 F.3d 1183, 1188 (10th Cir. 2006). Congress could have rationally concluded that threats against worshipers affect the demand for, and interstate market in, the goods and services offered by these businesses. Whether these businesses "make a profit does not change the analysis of whether [they are] a commercial activity." *United States v. Terry*, 257 F.3d 366, 370 (4th Cir. 2001).

Put in economic terms, attendees fund houses of worship, support their interstate charitable activities and missionary work, and purchase other goods and services made available by such religious institutions. Houses of worship provide differentiated "club goods" — benefits that are non-rivalrous (one individual's use does not diminish another's) but excludable (limited to members). In return, they receive contributions of time, money, and behavior to increase the overall utility of members. *See* Laurence R. Iannaccone, Introduction to the Economics of Religion, 36 J. Econ. Literature 1465, 1480–81 (1998), https://www.jstor.org/stable/2564806; *see also* Sriya Iyer, The New Economics of Religion, Inst. for the Study of Lab. (IZA) Discussion Paper No. 9320, at 25–48 (Aug. 2015), https://docs.iza.org/dp9320.pdf.

Using or threatening the use of force against worshipers, or physically obstructing worshipers, impedes, deters, discourages, and limits this economic exchange.

This case provides a good, real world example of how a house of worship is engaged in and affects interstate commerce and how the offense conduct thus affects commerce. Here, Cities Church is a non-profit organization that funds its activities through donations (*e.g.*, tithes and offerings). (*See* Declaration of Cities Church in Support of this Opposition Brief, at 1 (filed under seal).) Many of these donations (approximately 62%) were provided to the Church through internet payments, including a portion (approximately 4%) from out-of-state donors. (*Id.* at 2, ¶¶ 4-5.) These donations then fund church overhead costs, including a mortgage obtained through an out-of-state lender (*Id.* ¶ 9), as well as ministry initiatives and foreign missions. (*Id.* at 2-3.)

Cities Church is a member of the Southern Baptist Convention ("SBC"), an association that is based in Nashville, Tennessee and consists of approximately 50,000 like-minded churches and church-type missions. (*Id.* ¶ 6.) The Church is also a member of the Minnesota-Wisconsin Baptist Convention ("MWBC"), an association that consists of scores of churches in those two states. (*Id.* ¶ 7.) The Church supports ministries and activities of both the SBC and MWBC through annual contributions. (*Id.* ¶¶ 6-7.) In addition, the Church provides financial support for foreign missions as well as other out-of-state ministry initiatives. (*Id.* ¶ 8.) Those ministry activities include helping to establish churches to serve migrant communities from various countries. (*See* DHS Report of Investigation #556 at 2.)

Finally, the defendants' offense conduct interfered with and terminated a worship service that the Church was livestreaming over the internet. That video provided important evidence of the defendants' offense conduct. Moreover, as the Court's own records show, approximately 20% of the defendants are out-of-state interlopers who traveled to Minnesota to engage in the offense conduct and related actions.

All of this economic activity is squarely within Congress's authority to protect, and conduct that threatens such activity — namely, the type of conduct prohibited by the FACE Act — is within Congress' power to regulate because it substantially affects interstate and foreign commerce.

### B. There is a Strong Link Between Access to Houses of Worship and Interstate Commerce

Next, the link between access to a house of worship and interstate commerce is strong considering the interstate nature of churches. *See United States v. Morrison*, 529 U.S. 598, 613 (2000) (fourth factor examines whether the regulated conduct is attenuated from interstate commerce). In 1995, the Catholic Church, for example, had approximately 19,587 parishes across the United States. *See* Catholic Church in United States of America, https://gcatholic.org/dioceses/country/US?tab=stat (last visited Oct. 6, 2026). As of 2026, approximately 40,039 churches were part of the Southern Baptist Convention. *See* The Association of Religion Data Archives, Southern Baptist Convention (1845-Present), https://www.thearda.com/us-religion/group-profiles/groups?D=770 (last visited Oct. 6, 2026). Thus, when Congress enacted the FACE Act many houses of worship were constituent parts of large, national religious organizations.

Houses of worship also frequently involve interstate travel on the part of clergy and attendees. For example, the Gospel Fellowship Association offers an "interim pastor" service for which local churches "must provide furnished housing, utilities, and internet service for their interim pastor." *See* The Interim Pastor Ministry, GFA Missions, https://gfamissions.org/interim-pastor-faqs/ (last visited Oct. 6, 2026). Clergy from national or international institutions frequently speak to local congregations, and local worship services are often streamed online to viewers across the nation.

In addition, houses of worship directly affect niche markets of goods sold in interstate commerce. Take as examples sacramental alter and kosher mevushal wines, which many Christians and Jews use in religious services. *See* Open Plaza, Fruit of the Vine, https://www.htiopenplaza.org/read/fruit-of-the-vine (last visited Oct. 6, 2026). As of 2016, just three companies "produce the vast majority of sacramental wine in the [United States]." *See* N. Hines, How the Church Saved the Wine Industry During Prohibition, Vine Pair (2016), https://vinepair.com/articles/how-the-church-saved-the-wine-industry-during-prohibition/. "Kosher wine in America," for its part, "is a multimillion-dollar business." *See* J.E. London, America's Kosher Wine Scene, Jewish Telegraphic Agency (2013); https://www.jta.org/2013/02/28/ny/americas-kosher-wine-scene. That is not to mention the many other ways in which religious institutions engage in interstate economic activity, such as running charities, hospitals, funding missionaries, and more.

The magnitude of economic activity implicated by houses of worship is enormous. In 1994, when the FACE Act was adopted, approximately 42% of people

in the United States attended religious services. *See* Barna Group, Religious Activity Increasing in the West (2004); https://www.barna.com/research/religious-activity-increasing-in-the-west/. By some accounts, the Southern Baptist Convention that year alone received approximately $5.5 billion in "total gifts." *See* W.R. Johnston, SBC giving, financial data, Johnston Archive (2008), https://www.johnstonsarchive.net/baptist/sbcdata2.html. A 2016 study estimated the annual income from individual donations to churches in the United States at $74.5 billion. *See* Brian J. Grim & Melissa E. Grim, The Socio-Economic Contribution of Religion to American Society: An Empirical Analysis, 12 Interdisc. J. Rsch. on Religion 3, 9 (2016). The study's "most conservative estimate" of "the economic value of religion to U.S. society" — $378 billion annually — focused only upon "the revenues of faith-based organizations" and exceeded "the global annual revenues of tech giants Apple and Microsoft combined." *Id.* at 2.

Moreover, the congressional record demonstrates that Congress enacted the house-of-worship provision to combat a documented national problem. When Senator Hatch proposed the religious-access amendment, he told the Senate that peaceful access to worship was being attacked nationwide through an "interstate campaign of harassment, physical assaults, and vandalism." 139 Cong. Rec. S15660 (Nov. 3, 1993).

Here, the FACE Act violation perpetrated by defendants had a significant tie to interstate commerce. Defendants targeted Cities Church, which is affiliated with the interstate Southern Baptist Convention ("SBC") — an entity headquartered in Tennessee. (Declaration of Cities Church, at 2 (under seal). Cities Church is also affiliated with the Minnesota-Wisconsin Baptist Convention ("MWBC") — an

associated of Baptist churches throughout the two states. (*Id.*) Cities Church makes annual contributions to both conventions. (*Id.*) The church also funds foreign missions and ministry initiatives out of state. (*Id.*) Many of the funds are collected through the internet — a channel of interstate commerce. (*Id.*) Some of the donations received by the Church are made by donors who live out of state. (*Id.*) These funds are used to pay the church mortgage, which is held by an out-of-state lender. (*Id.*)

Finally, the Church service disrupted by the defendants' offense conduct was being livestreamed by the Church via the internet and the Church's website. Moreover, defendants intended for their crime to have an interstate reach by livestreaming it on YouTube and other internet-based apps. (ECF 144, at 8-10.) As noted above, approximately 20% of the defendants traveled from out-of-state to engage in the offense conduct and/or related activities. Because there is a strong link between the regulated conduct and interstate commerce, this factor also supports a rational basis for Congress's exercise of power under the Commerce Clause.

## III. <u>Congress is Constitutionally Authorized to Regulate Crimes Obstructing Houses of Worship Under the 14th Amendment's Enforcement Clause</u>

The FACE Act house of worship provision was also within Congress' powers to enact under the Enforcement Clause of the Fourteenth Amendment. The Fourteenth Amendment forbids States from denying the "equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 5 of the Fourteenth Amendment generally empowers Congress to enact legislation to enforce the amendment. *United States v. Morrison*, 529 U.S. 598, 621-24 (2000).

There are "two paths by which Congress" may "validly exercise[] its Section 5 enforcement power." *McDaniel v. Syed*, 115 F.4th 805, 821 (7th Cir. 2024). Under the first path, Congress may enact prophylactic legislation that examines whether the legislation is congruent with and proportional to the pattern of violations. *Id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 522-34 (2004), and *Flores*, 521 U.S. at 520). Alternatively, Congress may take the second path and provide a remedy for "conduct that . . . represents a violation of the Fourteenth Amendment." *Id.* (discussing *United States v. Georgia*, 546 U.S. 151 (2006)). Under this route, a law "need not satisfy the congruence and proportionality inquiry" because it is providing "a remedy for an actual constitutional violation" and not imposing "'prophylactic' legislation." *Id.*

Congress' chosen remedy need not run against the state officials whose conduct violated the Constitution. While *Morrison* correctly observed that the Enforcement Clause governs "only state action," 529 U.S. at 607, this is properly construed as including wrongs perpetuated by private actors and facilitated by state officers' constitutional violations, such as the discriminatory failure to protect citizens from the violation of their rights by private actors (*e.g.*, the Klan). *See generally Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202-06 (2023); *Strauder v. State of W. Virginia*, 100 U.S. 303, 306 (1879), *abrogated by Taylor v. Louisiana*, 419 U.S. 522 (1975).

While a State can certainly deny equal protection with facially discriminatory laws, it can just as readily deny equal protection by failing to protect a class of citizens with facially neutral laws. *See, e.g., Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 696 (10th Cir. 1988) (equal protection claim based on police department's failure to investigate domestic violence calls); *cf. National Rifle Ass'n v. Vullo*, 602 U.S. 175,

198 (2024) (explaining "that the First Amendment prohibits government officials from wielding their power *selectively* to punish or suppress speech, directly or (as alleged here) through private intermediaries"). In short, the unequal enforcement of state law based on unlawful discriminatory factors (*e.g.*, race, religion, viewpoint, etc.) may itself constitute a violation of the Fourteenth Amendment.

Thus, under the Fourteenth Amendment, Congress is empowered to address such violations. *See Georgia*, 546 U.S. at 158-59. "[I]t does not follow that Congress is powerless to provide a remedy against private individuals when a state refuses to hold them accountable for their torts or crimes." *See* J. Mitchell, *Textualism and the Fourteenth Amendment*, 69 Stan. L. Rev. 1237, 1283-84 (2017). For example, "[i]f a state fails to provide equal protection and declines to punish private acts of violence, then it is hard to see why Congress should be disabled from providing the civil or criminal remedies that the state has unconstitutionally withheld." *Id.* "The private tortfeasors and criminals have not violated the Equal Protection Clause, but that should not preclude Congress from responding to a state's non-protection by directly supplying the legal remedies that the state was required to provide." *Id.*

Indeed, three justices of the Supreme Court endorsed this position when concurring with the high court's holding in *United States. v. Guest*—a decision affirming the right to interstate travel as a fundamental constitutional right to be protected against private interference. 383 U.S. 745, 762 (1966) (Clark, J., concurring). Writing in concurrence, Justice Clark stated plainly "there now can be no doubt that the specific language of s 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights." *Id.*

The Government's invocation of the Enforcement Clause is not a lark. Congress expressly stated that it passed the FACE Act based, in part, on its authority under the Enforcement Clause of the Fourteenth Amendment. Pub. L. 103-259, § 2 (May 24, 1994). The house-of-worship provision, as applied here, remedies the actual denial of equal protection of law by state and city law enforcement, who failed to protect Cities Church and its congregants based on their perceived viewpoint. This is exactly the kind of deprivation that Congress expressed concern about in enacting the house-of-worship provision. *See* 139 Cong. Rec. S15660 (statement of Sen. Hatch) (noting San Francisco police failed to make any arrests of agitators who threw rocks and eggs at churchgoers of a Catholic Church); *see also* Abortion Clinic Violence: Hearing Before the Subcomm. on Crime & Criminal Justice of the H. Comm. on the Judiciary, 103d Cong. 162 (1993) (statement of Yehuda Levin) (explaining that local police arrested individuals who disrupted St. Patrick's Cathedral but that "nothing happened" thereafter).

Likewise, here, local and state authorities failed to intervene, make any arrests, or file any state charges despite the fact that defendants' offense conduct is a clear violation of multiple state statutes. *See, e.g.*, Minn. Stat. § 609.28 (prohibiting interference with religious observances); Minn. Stat. § 609.72 (prohibiting "disorderly conduct," *i.e.*, making it a misdemeanor for any person to "engage in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others" in a public or private place, "knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace"); Minn. Stat. § 609.605(1)(b)(3) (prohibiting any person from intentionally

"trespass[ing] on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor"). Though Saint Paul PD police officers were on scene, officers intentionally chose not to intervene, despite at least one officer acknowledging that the agitators "already committed a crime . . . trespassing." (*See* Ex. 1, 0517_Disorderly_Conduct-4, at 13:40.) Even after victims made 17 separate calls to 911, police refused to enter the church property until the agitators left. (Ex. 2 (911 call (dispatcher informing that police should be inside the church since they were on scene).)

Although the defendants' offense conduct was captured on video from various vantage points, Saint Paul's City Attorney refused to bring a single charge against any defendant, not even the admitted leaders and organizers. *See* "ICE protesters who interrupted Minnesota church service won't face state charges, prosecutor says," NBCNews, Associated Press (June 4, 2026), https://www.nbcnews.com/news/us-news/ice-protesters-interrupted-minnesota-church-service-wont-face-state-ch-rcna348492. On June 3, 2026, City Attorney Irene Kao said in a statement that "current evidence is insufficient to meet that standard for criminal charges under Minnesota state statutes." *Id*. Of course. It's all so very complicated when you want it to be.

The response of Minnesota's top law enforcement officer, Attorney General Keith Ellison, was even more disturbing. Instead of offering support for the Cities Church victims after the crime, General Ellison went on defendant Lemon's YouTube show on January 19 and offered public support for the defendants. *See* Don Addresses The Church Drama Live, The Don Lemon Show (Jan. 19, 2026); https://www.youtube.com/watch?v=_59yCzWLhhg. When asked about "what

happened at the church and all that," General Ellison said that the defendants' offense conduct was simply a form of free expression that was protected by the First Amendment, and he mocked the Government's reaction as "tender" (*i.e.*, overly solicitous) about the interests of the church members. *Id.* (timestamp 6:45 to 8:15).[3]

The failure of these officials and their offices to take any action to enforce state law to protect Cities Church and its congregants, to punish the defendants' conduct, and to deter similar crimes, reflects a total dereliction of duty. These failures were intentional and reflect discriminatory enforcement based on the victims' identity and perceived views. Saint Paul City leadership broadcast that they shared Defendants' anti-ICE viewpoints. In the weeks before and after Defendants' assault on the Cities Church worship service, Saint Paul Mayor Kaohly Her called ICE tactics "reckless," "un-American," and "unacceptable," said agents targeted people "by the way that you look," and demanded Operation Metro Surge end immediately. *See* City of Saint Paul, Mayor Kaohly Her Statement on ICE Incident in Saint Paul (Feb. 11, 2026), https://www.stpaul.gov/news/mayor-kaohly-her-statement-ice-incident-saint-paul; Saint Paul Mayor 'Livid' ICE Wrongfully Targeted Family Friend, Star Trib. (Jan. 19, 2026), https://www.startribune.com/st-paul-mayor-livid-after-ice-wrongly-

---

[3] For the record, General Ellison's constitutional analysis is incorrect under both federal law and state law. *See Action v. Gannon*, 450 F.2d 1227, 1229-30, 1232 (8th Cir. 1971) (affirming injunction against activist group that was conducting disruptive protests inside Catholic cathedral during religious services; holding: "The defendants do not have a right to enter the cathedral and disrupt the church services of the plaintiffs. Such disruption is an intolerable violation of the rights of those engaged in worship."); *State v. Olson*, 287 Minn. 300, 302-04 (1970) (affirming conviction for breach of the peace for a defendant who disturbed religious service by loudly berating clergyman and refusing to leave church until forcibly ejected; holding that conduct was not protected free expression under the First Amendment or Minnesota's constitution).

targets-family-friend-escorts-him-undressed-into-cold/601566974. Police Chief Axel Henry likewise expressed anti-immigration enforcement sentiment, telling reporters that local officers had become "the rope in a tug of war" and accused ICE agents of stopping off-duty cops. *See* N. Woltman, 'Rope in a Tug of War': St. Paul Police Chief Talks About Department's Role in Recent ICE Action, Pioneer Press (Dec. 15, 2025); https://www.twincities.com/2025/12/15/axel-henry-st-paul-ice-action/.

This sentiment came from the top down. Governor Tim Walz called ICE's 2026 surge a "campaign of organized brutality" and an "occupation," likened agents to "armed, lawless gangs," and told residents to film them "to bank evidence for future prosecution." *See* Office of Gov. Tim Walz, Governor Walz Remarks on the Federal Government's Ongoing Presence in Minnesota (Jan. 14, 2026), https://mn.gov/governor/newsroom/press-releases; Nick Woltman, Walz to Trump on ICE Operations: 'End This Occupation', Pioneer Press (Jan. 14, 2026), https://www.twincities.com/2026/01/14/gov-tim-walz-to-give-7-p-m-address-on-immigration-enforcement-in-minnesota/; Walz: ICE Officers Engaged in 'Campaign of Organized Brutality', The Hill (Apr. 29, 2026), https://thehill.com/homenews/state-watch/5855289-tim-walz-ice-immigration-operation/. He later said he would "pack your damn bags" to get agents out of the state. *See* Gov. Walz Reacts to ICE Leaving Minnesota "Immediately", Revolt (June 10, 2026), https://www.revolt.tv/article/gov-tim-walz-operation-metro-surge-ends-minnesota-ice.

Attorney General Ellison also made clear that he shared Defendants' animus toward those perceived to have supported immigration enforcement. Ellison indicated that Minnesota would not devote state resources to federal immigration work and calling the immigration operations a source of "chaos and terror." *See*

Minnesota AG Keith Ellison Accuses White House of "Politics and Retribution", CBS News (Jan. 23, 2026); https://www.cbsnews.com/news/minnesota-ag-keith-ellison-accuses-white-house-of-politics-and-retribution/.

The message from Minnesota and Saint Paul officials was clear: immigration enforcement was the problem, and defendants were right to oppose them. By endorsing defendants' criminal actions against Cities Church, Saint Paul officials engaged in unjustifiable viewpoint discrimination in violation of the First Amendment by favoring one type of speech over another based on the views expressed. *Cf. National Rifle Ass'n v. Vullo*, 602 U.S. 175, 198 (2024) (explaining "that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries"). In short, state actors within the State of Minnesota have demonstrated that they apply and enforce state law depending on whether they like the perpetrators of crime or the victims thereof. That decision all depends, so it seems, on whether the perpetrators and their political views are in line with those of state public officials. As a result, through discriminatory enforcement, they have denied equal protection to Cities Church victims by allowing the defendants to trespass inside the church, unlawfully refuse a request that they leave, and engage in disorderly conduct that disrupted the church's religious services, all without any risk of legal punishment under state law.

In contrast, General Ellison has taken an entirely different approach to the protection of religious liberty — a "tender" one, as he might say — when a case involves protests at a mosque. In April 2020, Ellison's office submitted a brief to defeat a First Amendment challenge to the state's harassment law in a federal

lawsuit brought by a Minneapolis woman who argued that the law violated her First Amendment rights to monitor and record the activities of worshipers *outside* of a mosque. *See Ness v. City of Bloomington, et al.*, Case No. 0:19-cv-02882-ADM-DTS, Dkt. No, 89 (Apr. 17, 2020). In June 2015, as a member of the House of Representatives, Ellison signed a letter urging President Obama's Attorney General and Civil Rights Division to investigate whether a group of protesters in Phoenix violated the FACE Act by holding firearms during protests *outside* a Phoenix mosque. *See* https://embed.documentcloud.org/documents/2093485-ellison-carson-letter-on-phoenix-mosque/. As Ellison then explained (and presumably believed), "First Amendment rights are not absolute; they are limited to protect the safety and rights of others." *Id*. Indeed.

When Congress enacted the FACE Act, it invoked the Enforcement Clause of the Fourteenth Amendment because it knew (based on historical precedent) that some state and local officials — such as Mr. Ellison and Ms. Kao here — could not be trusted to equally enforce state laws to protect the rights that were the focus of the FACE Act — all of them, not just access to an abortion clinic. The Enforcement Clause empowered Congress to enact federal laws in precisely this context to address the denial of equal protection. Accordingly, the house of worship provision is a lawful exercise of Congress' authority under the Fourteenth Amendment.

/ /

/ /

/ /

/ /

/ /

## CONCLUSION

For the foregoing reasons, Defendants' motions should be denied.[4]

DATED: October 15, 2026.

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Senior Trial Attorney

*/s/ J. Katie Neff*
J. KATIE NEFF
Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (771) 333-0019
E-Mail: Jeri.Neff@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

[4] This brief includes a total of 7,747 words, excluding the caption and signature block.