**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

NEKIMA VALDEZ LEVY ARMSTRONG, *et al.*,

Defendants.

No. 0:26-cr-00025-LMP-DLM

**GOVERNMENT'S OPPOSITION TO DEFENDANT FORT'S MOTION TO DISMISS BASED ON THE FIRST AMENDMENT (DOC. 592)**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

LEGAL STANDARD ..... 4

ARGUMENT ..... 7

I. Fort's Alleged Conduct Is Not Protected by the First Amendment ..... 7

A. Journalists Are Not Above the Law ..... 7

B. The First Amendment Does Not Bar the FACE Act Charge ..... 12

C. The First Amendment Does Not Bar the Conspiracy Charge ..... 22

D. The FACE Act and Section 241 Are Content-Neutral As Applied ..... 25

II. The FACE Act Is Not Void for Vagueness ..... 34

CONCLUSION ..... 39

## INTRODUCTION

Defendant Fort argues that she cannot be prosecuted for her alleged federal crimes because she decided to livestream them. That is not how the First Amendment works. This Court therefore should deny her Motion to Dismiss under the First Amendment, Doc. 592 ("Mot.").

The United States charged Fort with multiple felonies because she was a member of a large mob that descended upon a church, disrupted its worship services, physically obstructed the movement of its congregants and pastors, prevented parents from reaching their crying children, and made at least one congregant fear that a mass shooting was about to happen. A grand jury indicted dozens of members of this mob. These defendants must stand trial, and a jury will decide whether they committed the charged crimes.

But Fort thinks she is special. She asserts that because she was "gathering and publishing the news," Mot. 52, she has a constitutional right to barge into a church and physically obstruct a pastor attempting to lead a worship service. Journalists have no right to do what non-journalists may not; the FACE Act "prohibits the obstruction of [houses of worship] without regard to the issue motivating the speech" of the obstructor. *Hart*, 212 F.3d 1066, 1073 (8th Cir. 2000). Just as Fort's codefendants have no right to violate the FACE Act because they are protesting ICE, *see* United States' Opp. to Joint

First Amendment Motion to Dismiss, Doc. 892, Fort has no right to violate the Act because she is livestreaming a protest of ICE.

Journalists are not above the law, no matter how many "regional Emmy nominations" they have earned. Mot. 5. Because the First Amendment does not give journalists free rein to defy federal law when they purportedly are "engaged in journalism," Mot. 53, Fort is not entitled to a get-out-of-jail-free card.

Fort's fallback arguments that the FACE Act and Section 241 are not content-neutral as applied and/or are void for vagueness are baseless. The FACE Act is "content-neutral" because it criminalizes conduct, not speech, *United States v. Dinwiddie*, 76 F.3d 913, 924 (8th Cir. 1996), and it is not void for vagueness because the terms "force," "threat of force," and "physical obstruction," 18 U.S.C. § 248(a), are sufficiently clear that "a person of ordinary intelligence" (presumably including journalists) has "fair notice of what is prohibited." *United States v. Williams,* 553 U.S. 285, 304 (2008).

Accordingly, this Court should deny Fort's motion to dismiss in its entirety.

## BACKGROUND

On Sunday, January 18, 2026, Fort and her codefendants descended on Cities Church in St. Paul, Minnesota. According to the superseding indictment, they conspired to disrupt a liturgical worship service in "a coordinated takeover-style attack" that they called Operation PullUp. Doc. 144 at ¶ 3. Because of this attack, the pastor and congregants were forced to end their worship service. *Id.*

The superseding indictment alleges that Fort and her codefendants gathered for a "pre-operation briefing" the morning of January 18, before their attack on the Church. Doc. 144 at 8-9 (Overt Act 13). She received "instruction on how the operation would be conducted." *Id.* at 9 (Overt Act 14).

Fort then "traveled to the Church to engage in the planned takeover-style operation." Doc. 144 at 11 (Overt Act 20). She entered the Church, where she "approached the pastor and largely surrounded him … stood in close proximity to the pastor in an attempt to oppress and intimidate him, and physically obstructed his freedom of movement." *Id.* at 15 (Overt Act 35).

Fort has moved to dismiss under the First Amendment. She argues that "[a]t all relevant times, [she] was functioning as a journalist and engaged in conduct that lies at the core of the First Amendment's protections." Mot. 50-68. She also raises an as-applied challenge to the content-neutrality of the FACE Act based on the theory the United States has "refus[ed] to prosecute others"

whom she claims "engaged in substantially similar conduct." Mot. 68-76. Lastly, she asserts that the FACE Act and Section 241 are unconstitutionally vague if applied to her. Mot. 76-78.

## LEGAL STANDARD

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. Amend. I. Congress therefore may not criminalize constitutionally protected speech or journalism. *E.g.*, *United States v. Stevens*, 559 U.S. 460 (2010). Indictments alleging speech or conduct that is protected by the First Amendment must be dismissed. *See United States v. Hobgood*, 868 F.3d 744, 747 (8th Cir. 2017).

When ruling on a motion to dismiss under Rule 12(b), courts "accept the government's allegations as true, without reference to allegations outside the indicting document." *United States v. Steffen*, 687 F.3d 1104, 1107 n.2 (8th Cir. 2012). The "analysis of [a] motion to dismiss is limited to what is contained in the indictment." *United States v. Hansmeier*, 988 F.3d 428, 432 n.2 (8th Cir. 2021).

Contrary to Fort's assertion, the "applicable standard" does not "differ[] from a typical prosecution" in cases that "directly implicate[] the First Amendment." Mot. 43. The cases Fort cites do not support her manufactured legal standard. Mot. 43-44. *Miller v. California*, 413 U.S. 15 (1973), and *Cohen v. California*, 403 U.S. 15 (1971), concern challenges to convictions, not

indictments. *NAACP v. Button*, 371 U.S. 415 (1963), *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and *Philadelphia Newspaper, Inc. v. Hepps*, 475 U.S. 767 (1986), are civil cases. Three of the remaining cases are diversity-jurisdiction defamation cases scraped from the bottom of the barrel. *Nunes v. Lizza*, 12 F.4th 890, 898 (8th Cir. 2021), explains that the Eighth Circuit formerly considered the "literary context" and the "public context" of a supposedly defamatory statement but added that these factors "no longer control [the] analysis." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 696 (11th Cir. 2016), states that "New York courts generally analyze the totality of the statements" when evaluating defamation claims.[1] And in *Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020), the Eighth Circuit observed that "the nature and extent of an individual's participation in [a] particular controversy" controls whether the individual is "a limited purpose public figure," an inquiry that has nothing to do with this case.

Of the cases Fort cites, only *Schenck v. United States*, 249 U.S. 47 (1919), which predates the Federal Rules of Criminal Procedure, features a challenge to an indictment, and the Supreme Court did not hold that courts can "consider

[1] Fort misleadingly omits the phrase "New York courts" from this quotation. Mot. 47.

the full circumstances" that Fort wants this Court to examine, Mot. 43, namely decontextualized snippets of evidence that have not been subjected to adversarial scrutiny, *e.g.*, Mot. 11 n. 32 (statements of codefendant Levy Armstrong). Rather, *Schenck* examined the allegations in the indictment and a document incorporated by reference into the indictment. 249 U.S. at 49-51.

To be sure, context matters. But at this stage, "the full context," Mot. 47, is limited to the allegations contained in the indictment and other matters appropriate for judicial notice. The United States does not dispute that courts should "resolv[e] First Amendment cases," like any other case, "at the earliest possible junction." Mot. 45 (quoting *Green v. Miss USA, LLC*, 52 F.4th 773, 800 (9th Cir. 2022)). The need for expeditious resolution of First Amendment litigation does not give courts license to ignore Rule 12's requirements that the allegations in the indictment must be accepted as true and that defendants cannot introduce unauthenticated evidence of conduct unalleged in the indictment. When, as here, there are unresolved factual questions, the "earliest possible junction" is a trial.

# ARGUMENT

## I. Fort's Alleged Conduct Is Not Protected by the First Amendment

Even if Fort were "operating in her capacity as a journalist," Mot. 51, the First Amendment does not bar this prosecution.[2] The FACE Act and Section 241 are generally applicable criminal statutes, and the enforcement of such "general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) ("*Cowles Media*").

### A. Journalists Are Not Above the Law

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. Amend. I. The United States does not dispute that Fort is a professional journalist, that the Constitution provides robust (but not unlimited) protections to journalists reporting on matters of public concern, or that honest journalism is essential to republican governance. However, Fort's profession does not immunize her

---

[2] Fort claims she "was indisputably operating in her capacity as a journalist," and that evidence "conclusively establishes this undisputed point." Mot. 51. As explained in greater detail in its forthcoming opposition to Fort's Motion to Dismiss for Failure to State an Offense, the United States contends that Fort was not acting solely in her capacity as a journalist. Nevertheless, it is irrelevant for the purposes of this opposition whether Fort was purporting to act as a journalist.

from prosecution. Journalists are not special. They must obey criminal laws, just like everyone else.

"[N]ewsmen are not exempt from the normal duty" to follow the law. *Branzburg v. Hayes*, 408 U.S. 665, 685 (1972). They enjoy "no special immunity from the application of general laws" and "ha[ve] no special privilege to invade the rights and liberties of others." *Associated Press v. NLRB*, 301 U.S. 103, 132-133 (1937) ("*NLRB*"). The press is not "a privileged institution," and "the liberty of the press … is no greater than the liberty of every citizen of the Republic." *Pennekamp v. Florida*, 328 U.S. 331, 364 (1946) (Frankfurter, J., concurring).

Over the past century, the Supreme Court has "consistently rejected the proposition that the institutional press," and, by extension, independent journalists, "has any constitutional privilege beyond that of other speakers." *Citizens United v. FEC*, 558 U.S. 310, 352 (2010).[3] Fort acknowledges some of these cases only in passing, Mot. 57, but they are fatal to her argument that she cannot be prosecuted because she "at all relevant times [was] engaged in journalism, Mot. 52.

---

[3] There is no constitutional distinction between the institutional press and independent journalists. *See Citizens United*, 558 U.S. at 352; *Obsidian Fin. Group, LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) (The "protections of the First Amendment do not turn on whether the defendant was … formally affiliated with traditional news entities.").

In *NLRB*, 301 U.S. at 131, a news agency demanded immunity from federal labor law, asserting that it abridged the freedom of the press by restricting its asserted "absolute and unrestricted freedom to employ and discharge those who … edit the news." The Supreme Court disagreed. It explained that the "Associated Press is not immune from regulation because it is an agency of the press," "has no special immunity from the application of general laws," and enjoys "no special privilege to invade the rights and liberties of others." *Id.* at 132-133; *see also Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 192–193 (1946) (similar).

In *Associated Press v. United States,* 326 U.S. 1 (1945), a news agency demanded immunity from federal antitrust law. The Supreme Court held that the "First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity." *Id.* at 20. "Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not." *Id.*

In *Branzburg*, journalists demanded immunity from a grand-jury subpoena, asserting that it burdened their First Amendment right to refuse to reveal their sources. The Supreme Court recognized the "significance of free speech [and] press … to the country's welfare" but nevertheless held that the journalists had an "obligation to … respond to grand jury subpoenas as other citizens do." *Branzburg*, 408 U.S. at 681-682. Journalists are not "exempt from

these obligations" because "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 682. Grand-jury subpoenas "serv[e] substantial public interests" and accordingly "may be enforced against the press as against others, despite the possible burden that may be imposed." *Id.* at 683.

In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), a news channel demanded immunity from copyright law. The Supreme Court explained that the First Amendment does not "immunize the media when they broadcast a performer's entire act without his consent." *Id.* at 575. Although "entertainment itself can be important news," the press has no special "privilege … to film and broadcast a copyrighted dramatic work without liability." *Id.* at 575, 578.

In *Cowles Media*, a newspaper that breached a promise of confidentiality demanded immunity from state promissory-estoppel law. The Supreme Court held that the First Amendment does not "prohibit[] a plaintiff from recovering damages, under state promissory estoppel law, for a newspaper's breach of a promise of confidentiality given to the plaintiff in exchange for information." *Cowles Media*, 501 U.S. at 665. The Court surveyed a "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental

effects on its ability to gather and report the news." *Id.* at 669 (collecting cases). The Court upheld the application of state promissory-estoppel law because it "is a law of general applicability [that] does not target or single out the press." *Id.* at 670.

Fort demands immunity from the FACE Act and Section 241 because she was "engaged in journalism" and was "observ[ing] and report[ing] on others." Mot. 53, 63. She "suggest[s] that freedom of the press requires immunity from law to which the general public is not exempt." *Kansas City Star Co. v. United States*, 240 F.2d 643, 665 (8th Cir. 1957). The Supreme Court and the Eighth Circuit have time and again rejected "the proposition that there is one brand of justice for some people and a different brand for others." *Id.* at 666. Journalists such as Fort "must answer for their actions in the same manner as anyone else." *Id.*

Fort briefly attempts to distinguish some of these journalists-aren't-special cases as holding only that the press must follow laws "that do not directly implicate their role as the press." Mot. 57. But she fails to explain how the conduct in these cases—terminating reporters, protecting confidential sources, and broadcasting television—is not a core function of the press. If the Copyright Act can restrict a broadcast of "important news," *Zacchini*, 433 U.S. at 578, then the FACE Act can restrict a journalist's livestream of "important news."

### B. The First Amendment Does Not Bar the FACE Act Charge

According to the indictment, Fort interfered with the right of religious freedom at a place of religious worship because she "approached the pastor and largely surrounded him … stood in close proximity to the pastor in an attempt to oppress and intimidate him, and physically obstructed his freedom of movement." Doc. 144 at 15. Because the First Amendment does not protect force, threats of force, or physical obstruction, even by journalists, this Court should deny Fort's motion to dismiss the FACE Act charge.

**1.** The FACE Act prohibits "physical obstruction," which is defined as "rendering impassable ingress to or egress from … a place of religious worship, or rendering passage to or from … [a] place of religious worship unreasonably difficult or hazardous." 18 U.S.C. § 248(a)(4). Federal courts of appeals agree that the Act "governs conduct[,] not speech." *United States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000). *See also, e.g.*, *United States v. Hart*, 212 F.3d 1067, 1073 (8th Cir. 2000); *United States v. Weslin*, 156 F.3d 292, 298 (2d Cir. 1998); *United States v. Wilson*, 154 F.3d 658, 662-663 (7th Cir. 1998). That is because physical obstruction is not free speech within the meaning of the First Amendment. "Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message." *Gregg*, 226 F.3d at 267-268.

The Supreme Court also has held that obstruction is not free speech. In *Cameron v. Johnson*, 390 U.S. 611, 612 n.1 (1968), the Court upheld a state statute that prohibited "engag[ing] in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises." The Court explained that the prohibition of obstruction "does not abridge constitutional liberty since such activity bears no necessary relationship to the freedom to distribute information or opinion." *Id.* at 617 (cleaned up); *see also Langford v. City of St. Louis*, 3 F.4th 1054, 1059-1059 (8th Cir. 2021) (upholding an ordinance that "forbids a person to position herself in a way that obstructs the reasonable flow of traffic," even if the person is protesting).

Fort argues that she allegedly obstructed the pastor because she was "gathering and reporting the news." Mot. 58 (emphases omitted). That is irrelevant. The FACE Act "prohibits the obstruction of [houses of worship] without regard to the issue motivating the speech" of the obstructor. *Hart*, 212 F.3d at 1073. That Fort's "speech is intermingled with such [obstructing] conduct does not bring with it constitutional protection." *Cameron*, 390 U.S. at 617. Her conduct therefore does not fall within the FACE Act's carve-out for "expressive conduct … protected from legal prohibition by the First Amendment." 18 U.S.C. § 248(d)(1). *Contra* Mot. 48-49.

**2.** The Eighth Circuit's decision *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (en banc), forecloses Fort's First Amendment argument. In *Action*, the district court, pursuant to 42 U.S.C. § 1985(3), enjoined two activist groups "from continuing to disrupt the religious services of a … Catholic parish." *Id.* at 1229. The activists repeatedly "staged demonstrations" inside a cathedral. *Id.* On one occasion, they "entered the cathedral during services, marched down the center aisle, and formed a line in front of the communion rail." *Id.* "[U]sing an amplifier," one demonstrator shouted the groups' "demands" that the archbishop discipline Catholic police officers who supposedly violated suspects' constitutional rights and that the church use its resources to "for the benefit of economically deprived black people." *Id.*[4] Another time, the activists "went directly to the communion rail and sat down, blocking the area where the service was to be held. The service was then cancelled." *Id.* at 1230. The following week, they "walked down the center aisle," and at least one activist "chant[ed], 'Racists, racists–white Christian racists.'" *Id.*

The Eighth Circuit affirmed the injunction. As relevant here, the court determined that the injunction "does not detract from the defendants' own

[4] Specifically, the activists demanded that the archbishop "place all police officers of [his] religious jurisdiction, guilty of firing at Black fleeing suspects, wounding or killing a Black fleeing suspect, under disciplinary action of the church and make it public." *Gannon v. Action*, 303 F. Supp. 1240, 1243 (E.D. Mo. 1969).

First Amendment rights." *Action*, 450 F.2d at 1232. The court acknowledged that the defendants were "stimulated to disrupt the church services by racial and economic motives" and had "a right to voice their opinion that the plaintiffs have not fulfilled their obligation to the black community." *Id.* at 1232. To that end, the activists could "engage in peaceful pamphleteering and picketing on public property" or "make requests upon the plaintiffs if such requests are not joined with threats to disrupt church services and are not otherwise unlawful." *Id.* The court held, however, that the activists did "not have a right to enter the cathedral and disrupt the church services of the plaintiffs. Such disruption is an intolerable violation of the rights of those engaged in worship." *Id.* at 1233.

The conduct of the activists in *Action* is similar to the alleged conduct of Defendants here, including Fort's conduct. In both cases, defendants entered a church during worship services, physically blocked key locations, and forced the cancellation of the services. *See* Doc. 144 ¶ 8 (Overt Acts #24-39). There are only two notable differences between the cases, but neither is of legal significance here. First, *Action* concerned an injunction under 42 U.S.C. § 1985(3), and this case is a prosecution under the FACE Act. A plaintiff's cause of action has no bearing on whether a defendant's conduct is protected by the First Amendment. Second, Fort livestreamed, whereas the *Action* activists chanted. But the FACE Act applies "without regard to the issue

motivating the speech," *Hart*, 212 F.3d at 1073. Thus, it makes no difference that *Action* says nothing about whether members of the *press* are free to *cover* such a protest," Mot. 58-59. Once again, the press has to follow the law.

**3.** Fort offers four reasons why the First Amendment supposedly allows her to ignore federal criminal law as long as she is "report[ing] on others." Mot. 63. None has merit.

First, Fort points out that the "First Amendment guarantees the right of the press to publish and disseminate information, especially on matters of public concern." Mot. 53. True enough. But Fort conflates the publishing of a video, which is protected by the First Amendment, with the conduct that facilitates the filming of a video, which is not necessarily protected. *See Stevens*, 559 U.S. at 466 (holding that while filming animal cruelty can be constitutionally protected, animal cruelty itself is not). Journalists cannot ignore generally applicable laws simply because they are livestreaming. *Supra* Part I.A.

Fort claims to have been "observ[ing] and report[ing] on others," but that doesn't matter. Mot. 62. That the "commission of crime" is an "event[] of legitimate concern to the public," *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 492 (1975), does not give a journalist license to defy criminal laws because her intent is to film "unlawful conduct by others." Mot 2-3. The right to film newsworthy events is not unlimited. *See Rice v. Kempler*, 374 F.3d 675, 678

(8th Cir. 2004) (There is no "First Amendment right to videotape, photographs, or make audio recordings of government proceedings that are by law open to the public."). Just as a journalist cannot obstruct a courthouse with the intent of making a documentary on protestors who obstruct courthouses, *see Cameron*, 390 U.S. at 617, Fort cannot engage with co-conspirators in the conduct of creating a physical obstruction in violation of the FACE Act simply because her role in the conspiracy is to film the actions of her co-conspirators and the effect they have on their victims. Her motives for violating the Act are irrelevant. *Hart*, 212 F.3d at 1073.

Fort almost understands this point. She observes that the Eighth Circuit has reached what she calls the "unremarkable conclusion that protesters [do] not have the right to trespass and then record themselves solely because the First Amendment protects recording." Mot. 57 n.75. However, she simultaneously argues that journalists have the right to violate the FACE Act and then record others solely because the First Amendment protects recording.

Second, Fort asserts that "the First Amendment protects the right to *gather* the news." Mot. 55. True, but the right is not unlimited. Some newsgathering tactics are illegal. "It would be frivolous to assert … that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter … to violate valid criminal laws." *Branzburg*, 408 U.S. at 691 (1972). Reporters may not "steal[] documents" or commit

"wiretapping" to obtain "newsworthy information." *Id.* Likewise, "[t]he press may not with impunity break and enter an office or dwelling to gather news." *Cowles Media*, 501 U.S. at 669. Nor may the press enter "trespassed property" to film newsworthy events. *Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1071, 1082 (8th Cir. 2024).[5] Accordingly, Fort may not physically obstruct worshippers in violation of the FACE Act just because her role in the conspiracy is livestreaming the takeover operation to amplify its intimidating effect.

The FACE Act does not "criminalize routine reporting practices." Mot. 56. The Act does not criminalize the "constitutionally protected news-gathering activities" of "photographing, filming, or otherwise documenting" at arguably unlawful "protest scenes." *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 116 (D. Minn. 2021). It does not criminalize the "act of *making* an audio or audiovisual recording" or the "right to disseminate the resulting recording." *ACLU v. Alvarez*, 679 F.3d 583, 595-596 (7th Cir. 2012). Nor does it criminalize

---

[5] Fort asserts that *Animal Legal Defense Fund* did not decide whether laws that prevent trespassers from filming are constitutional "as applied against the press." Mot. 57 n.75. But the plaintiff trespassers in that case "record[ed their protests to share with the public to draw attention to their activities and to record wrongdoing." *Animal Legal Def. Fund*, 89 F.4th at 1075. Other plaintiffs sent their "video recordings to … media outlets." *Id.* If there is no First Amendment right for trespassers to send their videos to the media, there is no right for the media to trespass and create the videos themselves.

the mere act of "being near" individuals who are committing crimes. Mot. 58. Instead, it criminalizes force, threats of force, and physical obstruction. The indictment specifically alleges that Fort physically obstructed the pastor and that all of the Defendants (including Fort), acting as a mob, jointly used force and threat of force when they trespassed into the church, physically seized control of a large portion of the church and thereafter refused to leave, all while engaging in threatening and physically intimidating conduct that, made many congregants fear for their safety.

Third, the First Amendment's "special protection" of "speech on matters of public concern" does not help Fort. Mot. 60. The United States does not dispute that Fort has reported on matters of public concern, but it is prosecuting her for her participation in a conspiracy involving force, threats of force, and physical obstruction of the pastor and the congregants of Cities Church, not her reporting. Thus, she mistakenly relies on *Snyder v. Phelps*, 562 U.S. 443 (2011), which addressed the legality of *speech itself*. Mot. 60-61. In *Snyder*, the Supreme Court held that speech on a matter of public concern could not give rise to tort liability even though the speech occurred near a church and in connection with a funeral. The defendants spoke "on public land," and the result of the case may have been different had they entered the church itself. *Snyder*, 562 U.S. at 454. The "choice of when and where to

conduct … picketing is not beyond the Government's regulatory reach." *Id.* at 456.

Fort's remaining cases are also easily distinguishable. In *Branzburg*, 408 U.S. at 667-678, journalists who reported on illegal conduct received subpoenas but were not charged with conspiracy. Fort cites the case as supporting the proposition that journalists who "report the [illegal] conduct they observed" should not be "charged as a conspirator." Mot. 62. Just because the journalists in *Branzburg* were not charged with conspiracy, presumably because there was no evidence they conspired, does not mean that journalists can never be charged with a conspiracy that began before their reporting. Fort also claims that *Goyette v. City of Minneapolis*, 2021 WL 5003065 (D. Minn. Oct. 28, 2021), applies the "same reasoning" and "exempted journalists from otherwise lawful dispersal orders." Mot. 62. *Goyette* does no such thing. The court did not hold that journalists are exempt from dispersal orders on First Amendment grounds. Rather, when imposing the challenged orders, the governor "expressly "exempte[d]" all "members of the news media" from the curfews. *Id.* at *2, 5. States may, of course, choose to provide more legal protections to journalists than the First Amendment requires. *Cf.* 42 U.S.C. Chapter 21B (Religious Freedom Restoration Act).

Fourth, Fort insists that "the First Amendment guarantees the right to not to be deterred from ongoing reporting on matters of public concern."

Mot. 63. While the United States may not take certain actions that deter reporting, such as imposing prior restraints, it may enact generally applicable statutes that target "nonspeech" and have "incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). As applied here, the FACE Act is one such statute. It targets the "nonspeech" conduct of use of force, threats of force, and physical obstruction and has an "incidental" effect on journalism only insofar as it prevents journalists from using force, threats of force or physically obstructing worshippers and pastors.

Nevertheless, Fort suggests that this prosecution violates the First Amendment because it has a "chilling effect[]" "on her reporting." Mot. 64. Even if a mere chilling effect were enough to render the FACE Act unconstitutional as applied to Fort, a jury must decide whether Fort has, as she claims, "refrained from reporting on the Cities Church protest or its aftermath precisely because she is facing criminal prosecution." Mot. 35-36. [6] This Court need not accept Fort's self-serving assertion of the facts at this stage.

---

[6] Perhaps Fort "declined to cover the subsequent protests outside the church," Mot. 36, to bolster her vindictive-prosecution defense that this prosecution is "intended to send a message to other journalists to deter them from covering the government in ways that its officials dislike," not because she honestly feared unspecified "new, additional charges." Doc. 594 at 41-42.

### C. The First Amendment Does Not Bar the Conspiracy Charge.

Fort's attempt to dismiss the conspiracy charge suffers from the same fatal flaw as her FACE Act argument. She has not been charged "for reporting and for interacting with news sources." Mot. 67. Rather, the indictment alleges that she and her codefendants engaged in a "coordinated" FACE Act violation. Doc. 144 ¶ 3. That alleged conduct plainly violates Section 241.

Again, Fort's unproven and self-serving assertion that she was acting "solely as a journalist" is beside the point. Mot. 50. Journalists are not immune from conspiracy charges arising out of their desire to report on the news.

Fort's "But-I'm-a-Journalist!" defense "confuses the intent to enter into an agreement to violate federal [law] with the purpose or goal which motivates one to enter into such an agreement." *United States v. Badolato*, 701 F.2d 915, 921 (11th Cir. 1983). Federal appellate courts routinely have affirmed the conspiracy convictions of journalists who, like Fort, claim that their sole purpose was to report on newsworthy events. These courts have held that a journalist's purpose is irrelevant, so long as he intended to conspire.

In *Badolato*, a journalist worked alongside drug traffickers to traffic and sell marijuana. He was convicted of conspiracy and "argued that he was doing undercover research for a movie script about large scale drug operations and

had no intent to engage in the conspiracy." *Badolato*, 701 F.2d at 919. The Eleventh Circuit held that the First Amendment does not immunize an "investigative journalist and film-maker" from conspiracy charges because the journalist's "only purpose was to gather information for a movie script." 701 F.2d 915, 921. What a journalist "hope[s] to achieve by entering into" a conspiracy "is of little consequence," even if he only "wants to write a book." *Id.* at 921-922. "Regardless of what the [journalist] hopes to get out of it"—protesting ICE or reporting on the protest—"conspiracy is a criminal act." *Id.* at 922.

*United States v. Wells*, 873 F.3d 1241 (10th Cir. 2017), is directly applicable. There, a county commissioner "organized a protest" against the federal government's land-management policies, and a journalist who "reported on local news of interest" joined him on an ATV ride through closed federal land. *Id.* at 1248. The journalist "interviewed [the commissioner] on video and reposted [the commissioner's] Facebook posts inviting others to the protest ride." *Id.* The journalist was convicted of conspiracy to operate off-road vehicles on closed federal land, and the Tenth Circuit rejected his First Amendment defense. The court explained that the jury reasonably found that he "acted not merely as a journalist reporting on issues important to his local community, but as a coconspirator who agreed … to ride … on ATVs." *Id.* at 1256.

Likewise, in *United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000), an investigative journalist reporting on a plane crash met with a pilot participating in the investigation. He pressured the pilot into giving him physical evidence recovered from the wreckage, and he later wrote "a front-page article" describing the evidence. *Id.* at 715. The journalist was convicted of conspiracy to remove parts from an aircraft involved in an accident. On appeal, he argued that he lacked "guilty intent," but the Second Circuit held that was irrelevant. *Id.* at 723. What mattered is that he conspired to "knowingly remove[] parts of or property from an airplane that had been involved in a crash." *Id.*

As these cases demonstrate, a journalist is not immune from conspiracy charges even though her sole motive is to report on the news. *Contra* Mot. 67. If, as the indictment alleges, Fort "coordinated" a FACE Act violation with her codefendants, Doc. 144 ¶ 3, then the First Amendment poses no obstacle to a conspiracy conviction of Fort.[7]

---

[7] Fort insists she cannot be convicted of conspiracy because the protest inside Cities Church was "First Amendment-protected conduct" or "protected speech." Mot. 65-66. The relevant question in the conspiracy inquiry is not what actually happened inside Cities Church but what Fort and her codefendants conspired to do.

### D. The FACE Act and Section 241 Are Content-Neutral As Applied.

Fort argues that the FACE Act and Section 241 are not content-neutral as applied because the United States supposedly has "refused to prosecute a host of others who, at least under the government's theory of this case, also violated the law." Mot. 68.[8] This Court should reject her efforts to shoehorn her nonexistent selective-prosecution defense into a First Amendment defense.

**1.** The First Amendment prohibits content-based restrictions on speech. "[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). A law is facially content-based if it restricts "particular speech because of the topic discussed or the idea or message expressed" or if the law "cannot be justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-164 (2015). Facially neutral statutes such as the FACE Act and Section 241 are content-based as applied if "officials must examine the content of the speech to determine

[8] Fort does not bring a facial challenge to the FACE Act. That would be foreclosed by Eighth Circuit precedent recognizing that the "FACE Act does not impose content-based restrictions on speech; rather, it prohibits the obstruction of reproductive health services without regard to the issue motivating the speech." *Hart*, 212 F.3d at 1073.

whether it is prohibited" under "the facts of [the] case." *Ness v. City of Bloomington*, 11 F.4th 914, 923-924 (8th Cir. 2021).

Fort's assertion that the FACE Act is unconstitutional as applied is meritless because officials need not "examine the content of [her] speech to determine whether it is prohibited." To determine whether a defendant has violated the FACE Act, a court must inquire whether the defendant (1) used "physical obstruction," (2) "to injure, intimidate, or interfere with" (3) a person who was "exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). Crucially, this Court need not examine the content of a defendant's speech. A defendant who physically obstructs worshippers violates the FACE Act regardless of what (if anything) he says. It makes no difference whether the defendant calmly expresses pro-religion messages, screams anti-religion slurs, reads the Twins box score, sings in Swedish, conducts an interview, reports for a video audience, or remains silent. *Hart*, 212 F.3d at 1073. The United States has alleged, *inter alia*, that Fort and her codefendants "approached the pastor and largely surrounded him … and physically obstructed his freedom of movement," Doc. 144 at 15, and the truth of that allegation does not turn on what Fort said.

Ironically, Fort invites this Court to engage in a content-based interpretation of the FACE Act. In demanding journalistic immunity, Fort

seemingly recognizes that the Act may lawfully prohibit "chanting or other protest activity" while simultaneously asserting that "conduct[ing] interviews" is protected by the First Amendment. Mot. 14-15. Under Fort's interpretation of the Act, this Court must "examine the content of the speech to determine whether it is prohibited." *Ness*, 11 F.4th at 923.

Fort's as-applied challenge to Section 241 fails too. Section 241 and other "laws against conspiracy … criminalize speech … that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. These laws are constitutional because the underlying speech "ha[s] no social value and thus … enjoy[s] no First Amendment protection." *Id.* Such criminalization of speech "is permitted" because the statute targets "speech integral to criminal conduct." *United States v. Hobgood*, 868 F.3d 744, 747 (8th Cir. 2017) (quotation marks omitted). Because "speech is not protected by the First Amendment when it is the very vehicle of the crime itself," *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970), Section 241 cannot be unconstitutional as applied to Fort's alleged conspiracy.

**2.** Fort does not argue that the FACE Act requires officials to consider the content of her speech, nor does she assert a First Amendment right to conspire. Instead, ignoring the law governing as-applied challenges, she argues that the FACE Act and Section 241 are unconstitutional as applied because "the government targeted [her] while allowing other coverage it deems

more favorable." Mot. 73. She claims the United States is targeting her "for engaging in an anti-ICE action" and is trying to "silence disfavored views" about ICE. Mot. 81-82.[9] This argument is baseless.

At the outset, Fort blurs the distinction between content-based restrictions on speech and viewpoint-based restrictions on speech. "When the government targets not subject matter, but particular views taken by speakers on a subject," it engages in viewpoint discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Fort does not argue that the United States is attempting to silence all discussion about ICE. *See* Mot. 3 ("[T]he government actually *encourages* journalists to provide *favorable* coverage of immigration enforcement."). Rather, she argues that the United States "targets that [anti-ICE] *viewpoint*." *Id.* at 71 (emphasis added).[10]

The distinction between content-based and viewpoint-based restrictions matters. "[W]hen someone challenges a law as viewpoint discriminatory ... he

---

[9] The indictment explains that Defendants engaged in "an anti-ICE action" targeting "the local ICE overseer" because Defendants' anti-ICE views are relevant to their motive. Doc. 144 ¶ 8. Defendants were not targeted for their anti-ICE speech but for their invasion of Cities Church. Had they protested ICE outside on a public sidewalk outside Cities Church, they would not have violated the FACE Act or Section 241.

[10] The United States has not "targeted the defendants for engaging in 'an anti-Ice action.'" Mot. 71. The indictment mentions Defendants' anti-ICE views because they explain Defendants' motives.

must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). Fort fails to do this. She has not identified a single person who has stormed a house of worship, interfered with the right of worship by disrupting a service and intimidating or physically obstructing worshippers, advanced a pro-ICE message while doing so, and was not prosecuted.[11]

Unable to demonstrate a content-based or viewpoint-based restrictions on speech, Fort resorts to arguing that the FACE Act and Section 241 violate the First Amendment because the United States has "refus[ed] to prosecute others who engage in substantially similar conduct." Mot. 72. That is a selective-prosecution argument, not a First Amendment argument. In any event, the argument is weak, which Fort perhaps recognizes given that she does not raise a selective-prosecution defense anywhere in her three separate motions to dismiss.

Fort claims that her prosecution violates the First Amendment because three categories of people supposedly "engaged in substantially similar

[11] The result is the same if the alleged restriction on speech is deemed content-based. Fort cannot identify a single person who has stormed a house of worship, interfered with the right of worship by disrupting a service and intimidating or physically obstructing worshippers, advanced a message unrelated to ICE, and was not prosecuted.

conduct" but were not prosecuted. Mot. 72. None of these groups of people are remotely similarly situated to Fort.

First, Fort has the chutzpah to suggest that the United States should have prosecuted her victims: "The government has not prosecuted any of the parishioners who deliberately remained in the Church or the Church itself, both of whom recorded and disseminated the protest." Mot. 72.[12] Her attempt to compare herself to her victims is ludicrous. True, the parishioners "remain[ed] in the Church" (perhaps because Fort's codefendants physically obstructed their attempted exit) and "recorded and disseminated the protest." But they did not use "force or threat of force or … physical obstruction" to somehow "interfere[] with" their own "right of religious freedom." 18 U.S.C. § 248(a)(2). Nor did they conspire with each other to commit a federal felony.

Second, Fort complains that "the government has not prosecuted its own agents," even though ICE allegedly "has deliberately targeted churches and other houses of worship." Mot. 38, 72. Feigning obliviousness to the obvious, she pretends that the United States cannot "plausibly distinguish between disruptions at houses of worship by ICE agents … and disruptions by

---

[12] Fort does not explain how the "Church itself"—a corporate entity—can physically obstruct anyone. The fact that the Church subsequently disseminated footage, Mot. 38, is irrelevant because sharing footage of a past event cannot possibly amount to "force or threat of force or … physical obstruction." 18 U.S.C. § 248(a)(2).

protestors." Mot. 40. It should go without saying that law-enforcement officers are allowed to enforce the law. Unlike local journalists, they have "the right to use some degree of physical coercion or threat thereof" when making lawful arrests. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also* Max Weber, *Politics as a Vocation* (1946) ("[A] state is a human community that … claims the monopoly of the legitimate use of physical force.") (emphasis omitted).[13] The United States has not prosecuted ICE agents because federal law authorizes them to use force or threat of force to enforce immigration law. 8 C.F.R. § 287.8(a)(1)(H). And immigration law, of course, applies in houses of worship. *See Church Sanctuary for Illegal Aliens*, 7 Op. O.L.C. 168, 1983 WL 160504 (1983).

Third, Fort laments that the United States has not prosecuted journalists "who were present for various immigration raids in churches." Mot. 72. Fort has not identified any such journalists. She claims that "journalists were on scene" at an ICE raid at a church in North Carolina, but the video she cites shows journalists *outside* the church *after* the worship service. Mot. 39-40 and n.66. Fort provides no evidence that these journalists

---

[13] Available at https://tinyurl.com/3akvyydx at 4.

interfered with the right of religious worship, as is necessary to establish a FACE Act violation.[14]

**3.** Because the FACE Act is neither content-based nor viewpoint-based, either facially or as applied, strict scrutiny does not apply. *Contra* Mot. 74-76. To the extent the FACE Act prohibits journalism as applied to Fort, it imposes a content-neutral place restriction because it proscribes specified conduct that occurs at a "place of religious worship." 18 U.S.C. § 248(a)(2). This triggers intermediate scrutiny, *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 686 (8th Cir. 2012), meaning that the Act must be "narrowly tailored to serve a significant governmental interest, and … leave open ample alternative channels for communication of the information," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The FACE Act easily survives intermediate scrutiny. In *Hart*, the defendant challenged his conviction under Section 248(a)(1) on First Amendment grounds. The Eighth Circuit held that the United States satisfied

---

[14] In an apparent effort to establish viewpoint discrimination, Fort also complains that "the President pardoned over 20 people convicted of violating the FACE Act and/or engaging in a conspiracy to prevent access to reproductive health clinics." Mot. 42. Like Fort, these people were prosecuted—hence the pardons. The President's subsequent pardon of them therefore does not support a theory of selective or viewpoint-based prosecutions. In any event, "courts cannot examine" the President's use of the "conclusive and preclusive" pardon power. *Trump v. United States*, 603 U.S. 593, 609, 634 (2024).

"intermediate scrutiny" because "the government has a significant interest in protecting those seeking reproductive health services and in ensuring the availability of reproductive health services, and that the government's interest is not related to restricting free speech." *Hart*, 212 F.3d at 1073. "The FACE Act is narrowly tailored" to these interests "because it imposes criminal liability for only three types of activities: uses of force, threats of force, and physical obstructions." *Id.*

Although Fort fails to cite the case, *Hart* is controlling. By its reasoning, Section 248(a)(2) survives intermediate scrutiny. If the United States has a significant interest in ensuring access to reproductive-health services (a statutory right), it follows that the United States has an "interest in ensuring access to religious worship" (a constitutional right). *Edwards v. City of Santa Barbara*, 150 F.3d 1213, 1217 (9th Cir. 1998). The Act also leaves open an abundance of "ample channels" for Fort to interview the pastor, congregants, or protestors. She can speak to them in a public place, at their homes, in their cars, or over the phone. In fact, the FACE Act allows Fort to conduct interviews "anywhere and anytime" she wants except inside a place of religious worship

while congregants are exercising their First Amendment right of religious freedom.[15] *Weslin*, 156 F.3d at 298.

## II. The FACE Act Is Not Void for Vagueness

"A criminal statute is unconstitutionally vague in violation of the Fifth Amendment due process clause if it 'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'" *United States v. Turner*, 842 F.3d 602, 604 (8th Cir. 2016) (*quoting Johnson v. United States*, 576 U.S. 591, 596 (2015)). A defendant faces a heavy burden to show that a statute is void for vagueness. "The strong presumptive validity that attaches to an Act of Congress has led [the Supreme] Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat. Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). To survive a vagueness challenge, a statute need only set forth an "ascertainable standard of guilt." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). A statute is void for vagueness only if it "fails to provide a person of ordinary intelligence fair notice

---

[15] Fort can even conduct an interview inside a church during a worship services as long as she does not use "force or threat of force or … physical obstruction" and do not "injure[], intimidate[] or interfere[] with" the right of religious freedom. 18 U.S.C. § 248(a)(2).

of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304 (2008).

The Supreme Court's leading void-for-vagueness cases invalidate statutes that use normative or highly imprecise language to define prohibited conduct. In *L. Cohen Grocery*, 255 U.S. at 89, the Court held that a statute prohibiting "unjust or unreasonable" prices was unconstitutional. In *Coates v. Cincinnati*, 402 U.S. 611, 612 (1971), the Court arrived at the same conclusion regarding a statute that prohibited "conduct … annoying to persons passing by." The Court likewise has invalidated statutes targeting "vagabonds" and "prowling by auto," *Papachristou v. City of Jacksonville*, 405 U.S. 156, 158 (1972); "stories or deeds of bloodshed," *Winters v. New York*, 333 U.S. 507, 508 (1948); wages "less than the current rate of per diem wages in the locality," *Connaly v. Gen. Const. Co.*, 269 U.S. 385, 388 (1926); and "loitering" by "criminal street gang members," *City of Chi. v. Morales*, 527 U.S. 41, 46 (1999).

The FACE Act is not so "standardless." *Williams*, 553 U.S. at 304. It prohibits "force or threat of force or … physical obstruction." These terms are crystal-clear. "Legislation which proscribes the use of force or the threat of force should not be found to be void for vagueness." *United States v. Gilbert* , 813 F.2d 1523, 1530 (9th Cir. 1987). "The term[] 'obstruct' … plainly require[s] no guessing at [its] meaning." *Cameron*, 390 U.S. at 616 (brackets omitted).

Likewise, the phrase "to injure, intimidate, or interfere with" mirrors language that courts have upheld against vagueness challenges. For example, the Ninth Circuit upheld a statute prohibiting "assault[ing], intimidat[ing], or threaten[ing]" airline personnel "so as to interfere with … [their] duties." *United States v. Tabacca*, 924 F.2d 906, 909 n.3 (9th Cir. 1991). The court held that the statute was not vague because it "does not criminalize general acts of 'threats' or 'intimidation'" but "clearly includes modifying language which provides parameters of conduct" governing where the acts must occur and the effects that they must have. *Id.* at 913. The Eleventh Circuit likewise has explained that the meaning of "harass" and "intimidate" "can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006).

Despite the FACE Act's clear text, Fort asserts that the statute is unconstitutionally vague because a journalist "in Fort's shoes faces the impossible task of guessing what is prohibited by the law." Mot. 77. A journalist in Fort's shoes need only read the statute to determine what it prohibits. To be sure, there are "marginal cases … where doubts might arise" as to whether the FACE Act prohibits certain conduct. *United States v. Harriss*, 347 U.S. 612, 618 (1954). For example, Fort asks how she could "enter a church … to report on a demonstration without being charged" and how she

could have interviewed the pastor "without standing in close proximity to him." Mot. 77 (quotation marks omitted).[16] But the existence of "marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo*, 332 U.S. 1, 7 (1947).

Fort also insists that the FACE Act is vague if "appl[ied] to core newsgathering and reporting." Mot. 77. She relies on Section 248(d)(1), which provides that the Act does not "prohibit any expressive conduct … protected from legal prohibition by the First Amendment to the Constitution," 18 U.S.C. § 248(d)(1). Her argument is difficult to follow, but she appears to assert an unqualified First Amendment right to "enter a church … to report on a demonstration," "observe events," and "conduct or capture an in-person interview" with a "source" of her choice during a worship service. Mot. 77-78. If the FACE Act prohibits these "journalistic activities," then the Act is unconstitutionally vague given the "limitation afforded by Section 248(d)(1)." Mot. 76-78. Fort's argument rests on the bizarre premise that the First

---

[16] Fort could have entered Cities Church at a different time from her co-defendants, sat in a pew or stood in a corner to ensure she was not physically obstructing anyone, or donned a jacket identifying herself as a member of the press to ensure that congregants would not have been threatened. Fort also could have waited until after the protest to interview Pastor Parnell. Journalists do not have a First Amendment right to interview whomever they want, wherever they want, and whenever they want.

Amendment itself is vague. Section 248(d)(1) unambiguously provides that any conduct protected by the First Amendment does not violate the FACE Act. Thus, "someone in Fort's shoes faces the impossible task of guessing what is prohibited by the law" only if she cannot determine whether the conduct is protected by the First Amendment.

Fort further claims that the FACE Act is vague because it "invites arbitrary enforcement." Mot. 78. Fort again offers the unhinged suggestion that the United States should have indicted her victims, *id.* at 78-79, but she fails to explain how the *statute itself* is "so standardless that it invites arbitrary enforcement," *Johnson*, 576 U.S. at 595. Fort's theory of vagueness leads to the absurd result under which a statute is vague simply because it is capable of arbitrary or selective enforcement—a problem intrinsic to a system in which "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974).

As a last-ditch effort to escape accountability, Fort invokes the rule of lenity. Mot. 79. The rule of lenity "requires resolving ambiguities in a criminal statute in the defendant's favor," *United States v. Wendt*, 168 F.4th 1068 (8th Cir. 2026), but the rule applies only when "grievous ambiguity or uncertainty exists in the statute involved," *United States v. Vig*, 167 F.3d 443, 449 n.9 (8th

Cir. 1999). As discussed above, there are no "grievous" textual ambiguities in the FACE Act, regardless of its application to marginal cases.

**CONCLUSION**

For the foregoing reasons, Fort's motion to dismiss should be denied.[17]

DATED: October 16, 2026.

DANIEL N. ROSEN
United States Attorney

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Acting Senior Litigation Counsel

*/s/ Joshua R. Zuckerman*
JOSHUA R. ZUCKERMAN
Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
E-Mail: joshua.zuckerman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

[17] This brief has 8,219 words, excluding the caption, table of contents, and signature block.