**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NEKIMA VALDEZ LEVY ARMSTRONG, *et al.*,<br><br>Defendants. | No. 0:26-cr-00025-LMP-DLM<br><br>**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM** |

The United States submits this consolidated opposition in response to the following defense motions to dismiss, which are largely duplicative in arguing that the indictment should be dismissed for failure to state a claim:

A. Defendants' Joint Motion to Dismiss Counts One and Two for Failure to State an Offense (Doc. **547**);

B. Defendant Fort's Motion to Dismiss Superseding Indictment for Failure to State an Offense (Doc. **593**);

C. Defendant Lemon's Motion to Dismiss the Superseding Indictment for Failure to State an Offense (Doc. **609**), with a Joinder by Defendant Buete (Doc. **615**);

D. Defendant Bollman's Motion to Dismiss for Failure to State an Offense (Doc. **706**);

E. Defendant Beute's Motion to Dismiss (Doc. **721**); and

F. Defendant Okar's Motion to Dismiss for Failure to State an Offense (Doc. **745**).

Many, if not all, of these motions also contain other arguments for dismissal, including First Amendment objections, challenges to Congress' authority under the Commerce Clause to enact the FACE Act, and various forms of alleged misconduct (*e.g.*, vindictive and selective prosecution). The Government has separately addressed all of those arguments in separately-filed opposition briefs. To the extent necessary, the Government incorporates those arguments herein as part of this response to the above-listed motions.

## INTRODUCTION

On Sunday, January 18, 2026, a mob of approximately 39 people descended on Cities Church in St. Paul, Minnesota, and disrupted its morning worship service in a premeditated attack that targeted the church because one if its pastors is an ICE officer. The mob was comprised of all 38 defendants charged in this case. Upon their arrival, the mob trespassed into the church, and through sheer force of numbers physically seized control of a large portion of the nave at the front of the chapel and refused requests to leave. They disrupted the service by blowing whistles and participating in loud chants, conduct that many parishioners actually perceived as threatening and intimidating because, among other things, the many defendants confronted them within inches during face-to-face encounters, the chants made reference to firearms, shooting, and seeming demands that the parishioners put their hands up.

As members of the mob, defendants physically obstructed congregants who attempted to move throughout the church, get to their children in a basement classroom, and as they attempted to exit the church. The physical obstruction and intimidating conduct also forced an end to the service, as it was impossible to continue with the sermon or the communion service, in which pastors walk throughout the nave distributing communion. As the indictment alleges and the discovery materials support, some of the congregants feared for their safety, and in the chaos, one fleeing congregant slipped on an icy, unused sidewalk and suffered an elbow injury.

As alleged in Count One the superseding indictment, each defendant conspired, in violation of 18 U.S.C. § 241, to execute this takeover-style invasion of Cities Church, and all of the defendants engaged in various overt acts in furtherance of the conspiracy "to oppress, threaten, and intimidate multiple persons, including the clergy, staff, and congregants of the Cities Church, in the free exercise and enjoyment of the rights and privileges secured to them by the laws of the United States," namely, "exercise of the First Amendment right of religious freedom at a place of religious worship," as secured by 18 U.S.C. § 248(c) (FACE Act). In Count Two, the indictment alleges that all of the defendants committed, and aided and abetted the commission of, a violation of 18 U.S.C. § 248(a)(2) (Injure, Intimidate, and

Interfere with Exercise of Right of Religious Freedom at Place of Worship by Means of Force, Threat of Force, and Physical Obstruction)

Defendants primarily argue that dismissal is warranted because (in defendants' view) the indictment does not allege facts sufficient to prove that they in fact conspired to "oppress, threaten, and intimidate" the parishioners in violation of § 241. As to Count Two, they likewise argue that the facts alleged in the indictment are insufficient to prove that each of them engaged in conduct that violated § 248(a)(2) of the FACE Act. In so doing, they ask the Court to ignore standard pleading rules, which make clear that an indictment is sufficient if it merely sets forth the elements of the charged offense in the words of the statute itself." *See Hamling v. United States*, 418 U.S. 87, 118 (1974). They also invite the Court to make factual findings that the Government cannot prove its case (no trial needed), even though a grand jury has issued two indictments in this case. As part of that effort, they ask the Court to evaluate the allegations in an artificially atomized way, that ignores defendants' joint, coordinated, mob-like action and the natural and probable consequences of their mob action. Some of the motions make other misleading and invalid arguments as well.

As explained below, the defense arguments lack merit. The indictment properly states both charged offenses. All of the motions should be denied.

## PROCEDURAL HISTORY

On January 29, 2026, a grand jury returned a two-count indictment against the first eight defendants, including many of the primary movants here, including Nekima Armstrong, Chauntyll Allen, William Kelly, Don Lemon, Georgia Fort, and Jerome Richardson. (Doc. 39.) Count One alleges that Defendants conspired against rights in violation of 18 U.S.C. § 241. Count Two alleges that Defendants violated the FACE Act, 18 U.S.C. § 248(a)(2).

On February 26, a grand jury returned a superseding indictment ("indictment") charging the same two counts. (Doc. 144.)

## OFFENSE CONDUCT

### A. January 17, 2026: Conspiracy Forms Against Church

The conspiracy began to percolate on or about January 17, 2026. (Doc. 144 at 6.) Armstrong received text messages from a local MPR "news correspondent" advising her that a named ICE officer (who he referred to as "the local ICE overseer") "is a pastor at [Cities Church]," a fact that Armstrong deemed "outrageous." (*Id.*) Almost immediately, Armstrong started doing internet searches to confirm the tip and to identify a location for a pre-operation briefing at the parking lot of a local shopping center. (*Id.*)

Later that day (January 17, 2026), defendants Allen and Strong conducted reconnaissance around the Cities Church in preparation for the

next day's takeover operation at the Church. (*Id*. at 7.) They literally videotaped it like they were casing the joint or a robbery, documenting their observations, including the location of parking areas, where they could "pull up." (*Id*.) Allen noted that "my thoughts are to be able ***to clog up this whole alleyway right here***." (*Id*.)

Allen texted her reconnaissance video Armstrong for their use in preparing for the planned assault (*i.e.*, "takeover operation") against the Church. (*Id*. at 7.) Later that day, defendants Armstrong, Allen, and Cullar-Doty exchanged text messages to plan the operation against the Church, with one asking if church members would be able to see the mob of protestors as they approached to the chapel. (*Id*.)

Continuing on January 17, 2026, defendant Armstrong prepared a flyer advertising an anti-ICE action dubbed "Operation PullUp" and telling like-minded agitators (later identified as their co-defendants) where to meet to prepare for the operation, and exhorting them to "be ready to mobilize." (*Id*. at 7.) Armstrong later posted the flyer on two Instagram accounts controlled by her, "@nekimal" and "@racialjusticemn." Several defendants[1] then began posting the flyer on various social media accounts. (*Id*. at 8.)

---

[1] Those defendants included Allen, Doty, Edwards, Okar, Perry. Like the MPR "news correspondent," defendant Okar claims that he is an independent photo-journalist — an objective, neutral reporter who was at the church just to document

On the same day, defendant Armstrong exchanged text messages with a person who advised her of defendant Lemon's plan to travel to Minneapolis for the Operation PullUp action. (*Id.* at 8.) The term is street-gang slang for when gang members will "pull up" on opposing gang members for the purpose of starting a confrontation, and defendants were clearly looking for a confrontation at the church.

### B. January 18, 2026: Pre-Operation Briefing at Local Parking Lot

On the morning of January 18, 2026, virtually all of the defendants gathered for a pre-operation briefing led by Armstrong and Allen at the parking lot of Cub Foods, in St Paul, MN. (*Id.* at 8-9.) Armstrong and Allen advised the other co-conspirators about the target of their operation (*i.e.*, Cities Church), provided the address, and provided instruction on how the operation would be conducted once they arrived at the Church. (*Id.* at 9.)

At the pre-op briefing, Allen led other co-conspirators in chants that they would use at the Church, including, "This is what community looks like," "ICE out of Minnesota," and "Justice for Renee Good!" (*Id.* at 10.) Allen urged her co-conspirators they have a "duty to fight for our freedom" and "a duty to win." (*Id.*) As the group prepared to head toward the church,

---

the protest. The indictment, however, alleges that he had a role in organizing the protest by distributing the flyer.

Allen directed her co-conspirators to "stay bumper-to-bumper, make sure everybody gets through the light," and she made efforts to confirm that everyone "ha[d] the address." (*Id.*)

At the pre-op briefing, Armstrong also provided instruction and operational guidance to her co-conspirators, including the following: (a) the "first wave" of agitators should enter the Church essentially in an undercover capacity and position themselves around the Church sanctuary; (b) they should not sit together and should not wear "anything that is activist-identifying"; and (c) those who had "anything activism identifying" should wait and come in with the "second wave." (*Id.* at 10.)

Defendant Lemon was a the pre-op briefing session with his co-conspirators, and his statements made clear that he had prior knowledge of Armstrong's plan for the church. (*Id.*) He explained to his audience that he was in Minnesota with an organization that was gearing up for a "resistance" operation against the federal Government's immigration policies, and he took steps to maintain the operational secrecy of the operation by reminding certain co-conspirators to not disclose the target of the operation. (*Id.*) Although he now claims he was there to just get the news, Lemon stepped away momentarily from Armstrong and Allen so his microphone would not accidentally divulge certain portions of the planning session. (*Id.*)

During a discussion with Armstrong at the pre-op briefing, Lemon thanked her for what she was doing and assured her he was "not saying … what's going on" (*i.e.*, he was *not disclosing* the target of the operation). (*Id.*) Armstrong explained that "Operation Pullup" was a "clandestine" operation in which she and other agitators would "show up somewhere that is a key location, [where the targets] don't expect us … , and we disrupt business as usual. That's what we're about to go do right now." (*Id.* at 9-10.) Lemon closed by telling her that he'd see her at the targeted location. (*Id.*) Before heading to the church with his co-conspirators, Lemon told his livestream audience, "We're going to head to the operation. ***Again, we're not going to give any, any of the information away***" (*i.e.*, operational details that would disclose where he and his co-conspirators were heading).[2]

### C. <u>January 18, 2026: Defendants' Assault on Cities Church</u>

Continuing on January 18, 2026, the defendants then traveled to Cities Church to conduct their takeover-style operation against the church. (*Id.* at 11.) While enroute to the church, Richardson told Lemon that they had to "catch up" to the others, and Lemon replied, "Let's go, catch up." (*Id.*) Because he was still livestreaming, Lemon told his two associates, Richardson and Beute, "Don't give anything away" (*i.e.*, don't divulge

---

[2] Understandable. After all, why would a "journalist" want to communicate information to his audience?

information about the operation), and advised his audience, "We can't say too much. We don't want to give it up." (*Id.*) This communication proves that Richardson and Beute also knew details about what the operation would entail once they all got to the church.

After arriving at the church and while still in his vehicle, Lemon apparently pondered a rule that he might have learned about in "J-School" — something about the law. Rhetorically, he mentioned to Richardson and Beute, "I don't think we can go ahead. I don't think we can go inside, right?" (*Id.* at 11.) Lemon then answered his own question: "**No, no, no**." (*Id.*) Nonetheless, just moments later, Lemon, Richardson, and Beute entered the church shortly thereafter and joined their co-conspirators in the protest operation against the Church. (*Id.*)

According to the plan (*i.e.*, conspiracy) sketched out by Armstrong and Allen at the pre-op briefing, all of the defendants entered the church sanctuary in a coordinated manner. (*Id.* at 11.) The first wave positioned themselves among the congregants, and the second wave led by Armstrong and Allen, commenced the disruptive takeover operation, in which the first wave of agitators then actively joined. (*Id.*)

As the pastor was beginning his sermon, Armstrong interrupted the service with loud declarations about the church harboring a "Director of ICE" and declaring that the time for Judgment had come. (*Id.* at 12.) That caused

some in the church to wonder what kind of judgment the protestors were there to deliver. Other defendants immediately joined in by yelling and blowing whistles in a takeover attack on the Church, all of which quickly caused the situation in the Church to become chaotic, menacing, and traumatizing to Church members. (*Id.*)

While inside the Church, most of the defendants (but not all) led and/or joined together in various chants, some of which included, "ICE Out!"; "Justice for Renee Good!"; "Hands Up, Don't Shoot!"; and "Stand Up, Fight Back!" (*Id.* at 12.) At the same time, some of the defendants blew on whistles to disorient and agitate the church members, and some made hostile and aggressive gestures to the congregants. (*Id.*) The congregants and church staff "perceived [the defendants' conduct] as threats of violence and a potential prelude to a mass shooting." (*Id.*) Some later noted that the then-recent shooting at a local Catholic church immediately came to mind, and it caused them to "fear for their safety." (*Id.* at 2.)

While inside the Church, defendants collectively oppressed, threatened, and intimidated the Church's congregants and pastors. (*Id.* at 12.) They did so by physically occupying most of the main aisle and rows of chairs near the front of the Church and then refusing to leave; by engaging in menacing and threatening behavior; by (for some) chanting and yelling loudly at the pastor

and congregants; and/or by physically obstructing them as they attempted to exit and/or move about within the Church. (*Id*. at 12.)

Defendant Austin stood with other defendants in and around the main aisles in the Church (as part of the center obstruction) "to intimidate the Church members and obstruct and interfere with their freedom of movement, approached the pastor and congregants in a menacing manner, and, near the end of the operation, loudly berated the pastor with questions about Christian nationalism and Christians wanting to have their faith be the law of the land." (*Id*. at 13.)

Defendant Lundy participated in the disruptive takeover operation with other defendants by standing in the main aisle with the others and contributing to the physical obstruction and intimidation of the congregants, participating loudly in some of the chants (*e.g.*, one saying that the targeted ICE agent must be "Out! Out!") and punching his fist in the air. (*Id*. at 13.) Likewise, defendant Crews personally participated in the disruptive takeover operation with other defendants by standing in and around the main aisle with the others and contributing to the physical obstruction and intimidation of the congregants and participating in some of the chants. (*Id*.)

While inside the Church, defendant Kelly worked to disrupt the service and intimidate the pastor and congregants by aggressively approaching the pastor (with his cellphone video camera engaged) and yelling, "This ain't

God's house! This is the house of the devil!" (*Id*. at 14.) Kelly approached one female congregant, who was with two young children, and demanded to know in a hostile manner why she was not involved in and supportive of the takeover operation. (*Id*.) Kelly screamed "Nazi" in faces of other congregants and asked child congregants, "Do you know your parents are Nazis? They're going to burn in hell!" (*Id*.)

Defendant Dunlap personally participated in the disruptive takeover operation with other defendants by holding up an anti-ICE sign and chanting "ICE Out!" (*Id*. at 14.) He also screamed, "We have nothing to lose but our chains!" (*Id*.)

The intimidating effect of this conduct had the intended and desired effect, as Lemon acknowledged on his livestream video. (*Id*. at 14.) Lemon told his audience about congregants leaving the Church and about a "young man" who Lemon described as "frightened," "scared," and "crying." (Id. at 14.) Lemon candidly observed that the congregants' reactions were understandable because the experience was "traumatic and uncomfortable," ***which he said was the purpose***. (*Id*. at 14-15.) As the operation continued, Lemon also tacitly acknowledged the illegal nature of it by expressing surprise that the police had not yet arrived at the Church and admitting his knowledge that "the whole point of [the operation] is to disrupt." (*Id*. at 15.)

While the takeover operation was underway, Lemon approached Armstrong to ask her for assistance in locating the pastor. (*Id*. at 15.) Lemon asked, "Who is the person that we should talk to? Is there a pastor or something?" (*Id*.) Armstrong pointed toward the front of the Church, but, in a statement that admits he awareness of the threatening and intimidating nature of the protest, she noted that the ***pastor "might have run away***." (*Id*. at 15.)

With other co-conspirators standing nearby, Lemon, Richardson, Beute, and Fort all approached the pastor and largely surrounded him (to his front and both sides), and a railing behind him. (*Id*. at 15.) All four of those defendants stood in close proximity to the pastor "in an attempt to oppress and intimidate him, and physically obstructed his freedom of movement while Lemon peppered him with questions to promote the operation's message." (*Id*.) While talking with the pastor, Lemon stood so close to the pastor that Lemon caused the back of the pastor's right hand to graze Lemon, who then admonished the pastor, "Please don't push me." (*Id*.) Although the pastor told Lemon and the other defendants to leave the Church, the defendants ignored the request and continued with their protest. (*Id*.)

After causing most of the congregants to flee, some of the defendants engaged in a chant proclaiming, "Who shut this down? We shut this down!" (*Id*. at 15.)

Some of the defendants "blocked the stairs leading to the Church's childcare area and made it difficult and hazardous for parents to retrieve their children, causing some to take alternative routes in or around the Church." (*Id*. at 16.) At one point, Lemon posted himself at the main door of the Church, where he confronted some congregants and physically obstructed them as they tried to exit the Church building to challenge them with "facts" about U.S. immigration policy. (*Id*.) As a minivan full of congregants, including children, was preparing to depart from the Church, Kelly walked in front of the minivan and angrily yelled at the children, and Armstrong and Fort stood in the driveway in front of the minivan, some yards away, while Fort interviewed Armstrong. (*Id*. at 16.)

As the indictment alleges elsewhere, the defendants' conduct constituted the use of force, a threat of force, and a physical obstruction, in violation of the FACE Act. (*See Id*. at 18, Count Two.) The threatening and intimidating nature of the defendants' conduct was shown through the reactions of other congregants and church staff. (*Id*. at 2, 16.) Some congregants "took steps to implement an emergency plan," and "young children were left to wonder, as one child put it, if their parents were going to die." (*Id*. at 2.)

## LEGAL STANDARD

Rule 12(b)(3) imposes minimal burdens on the Government. The Rule allows a defendant to move to dismiss an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). To defeat a motion to dismiss under Rule 12(b)(3), the Government must show that an "indictment adequately states an offense." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2000). An adequate indictment must "contain[] all of the essential elements of the offense charged, fairly inform[] the defendant of the charges against which he must defend, and allege[] sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *Id.*

The adequacy standard is not a high bar. "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." *Sewell*, 513 F.3d at 821; *see also United States v. Just*, 74 F.3d 902, 904 (8th Cir. 1996) (same). Thus, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself." *Hamling*, 418 U.S. at 118. An indictment is "insufficient only if an essential element of substance is omitted." *United States v. White*, 241 F.3d 1015, 1021 (8th Cir. 2021) (quotation marks omitted). As with all other indictments, an indictment alleging a specific-intent offense must allege each element of the offense and is insufficient only if it fails to do so.

Contrary to several Defendants' assertion, the Government does not need to satisfy a heightened pleading standard because this case supposedly implicates the First Amendment. (*See* Joint Mot. 11; Lemon Mot. 6-7.) Rule 7 requires only that an indictment contain "the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Rule contains no exception to this pleading standard when a defendant claims his alleged crimes are "expressive conduct." (Lemon Mot. 7.)

Several defendants attempt to conflate another First Amendment challenge with their motions challenging the sufficiency of the indictment. However, motions to dismiss under Rules 7 and 12 are not proper vehicles to challenge the sufficiency of the Government's evidence, and the pleading standard does not vary depending on whether a defendants claims to be a "journalist" or the offense conduct involves expression of political views. (*See* Opps. re. First Amendment Objections.) Indeed, neither rule mentions the First Amendment or expressive conduct. Sections 241 and 248 do not address pleading standards. Moreover, because "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), defendants' theory would require the Government to meet extra-textual, heightened pleading standards in indictments alleging "an apparently limitless variety of conduct." *United*

*States v. O'Brien*, 391 U.S. 367, 376 (1968). The law, however, does not impose such burdensome pleading requirements on the Government.

## ARGUMENT

### I. Count One States an Offense — a Conspiracy Under § 241

Section 241 provides as follows: "If two or more persons conspire to injure, oppress, threaten, or intimidate any person … in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same … [T]hey shall be fined … or imprisoned." 18 U.S.C. § 241. For purposes of the § 241 offense alleged in Count One, there are three elements that must be proved:

1. two or more persons reached an agreement or understanding to injure, oppress, threaten, or intimidate one or more persons in the free exercise or enjoyment of the First Amendment right of religious freedom at a place of religious worship, or because they have engaged in the exercise of that right;

2. the defendant voluntarily and intentionally joined in the agreement knowing of its purpose and intending to help accomplish that purpose; and

3. The targeted victim(s) must have been present in a State, Territory, Commonwealth, Possession, or District of the United States.

*See United States v. McDermott*, 29 F.3d 404, 408 (8th Cir. 1994); *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth*

*Circuit* at 205 (2025) (corrected, modified). Although it has done so here, the United States is not required to allege — or even prove — an overt act. *United States v. Rehak*, 2008 WL 2828886, at *10 (D. Minn. July 21, 2008).

### A. The Indictment Adequately Alleges All Three Elements of a Section 241 Violation

Defendants' motions to dismiss Count One should be denied because the indictment alleges "all of the essential elements" under Section 241. *See Sewell*, 513 F.3d at 821.

*First*, the indictment alleges that the existence of a criminal agreement to injure, oppress, threaten, or intimidate. Defendants each "conspired and agreed" with co-conspirators "to injure, oppress, threaten, and intimidate multiple persons." (Doc. 144. at 4.) Defendants Armstrong and Allen, along with others, "organized the operation targeting [Cities] Church," and all of the co-conspirators met at a prearranged location for a "pre-operation briefing." (*Id.* at 5.) At this briefing, Armstrong and Allen provided instructions "about the target of their operation" and "on how the operation would be conducted." (*Id.* at 5.) In accordance with these instructions, all of the co-defendants then traveled to, entered, and disrupted worship in Cities Church in accordance with the conspiracy. *Id.* at 8-11.

*Second*, the superseding indictment alleges that all of the defendants intentionally joined the conspiracy with the intent to further that objective.

(Doc. 144 at 6, ¶ 8.) Some of the moving defendants argue that the indictment has failed to plead that they knowingly participated in the conspiracy. However, that is not true. Count One of the indictment contains the key allegation of intent, namely, that all of the defendants "conspired and agreed with one another to oppress, threaten, and intimidate multiple persons, including the clergy, staff, and congregants of the Cities Church, in the free exercise and enjoyment of the rights and privileges secured to them by the laws of the United State." (Doc. 144, at 4-5, ¶ 6.) The indictment also alleges that defendants engaged in a variety of overt acts "[i]n furtherance of the conspiracy and to accomplish the object thereof." (*Id.* at 6, ¶ 8.) Nothing more is required.

The Government need not allege specific facts at this time. *Hamling*, 418 U.S. at 118; *Sewell* 513 F.3d 821. Regardless, it has done so. As discussed above, the indictment alleges that virtually all of the defendants attended the "pre-op briefing," received "instruction on how the operation would be conducted," and — pursuant to such instructions — entered Cities Church to execute the protest operation. (See Doc. 114 at 2-16.) While inside the church, the defendants, collectively and some individually, acted "in an aggressive and hostile manner," "physically occup[ied]" the main aisle, and "loudly berated the pastor." (*Id.*) The United States does not have to prove — much less allege in an indictment — that any individual defendant

"organized the protest, planned its objectives, selected the location for the purpose of interfering with worship, instructed others, or agreed in advance to deprive congregants of religious exercise." (Mot. 9.) *See United States v. Hewitt*, 999 F.3d 1141, 1147 (8th Cir. 2021) ("mutual knowledge with joint action" can be "probative of conspiratorial agreement").

That's not the way conspiracies and joint criminal activity, with each criminal aiding and abetting the others, work. In drug-trafficking conspiracies, for example, some conspirators will work with suppliers; others will prepare and package the drugs; others will negotiate drug sales; others will transport or ship narcotics. In a bank robbery, some of the crooks will enter the bank, make the threatening demands, and walk out with the bank funds, while other will serve as lookouts and as a getaway driver. That's the way concerted criminal behavior works. Each defendant does not personally have to commit each essential act constituting commission of a charged crime.

Some of the defendants deny that they had the requisite criminal intent, and they claim the indictment's allegations are insufficient to prove such intent. Again, however, this ignores the controlling pleading standard. The Government does not have to prove its case on a pretrial motion to dismiss. Moreover, as defendants know, intent is often proven through circumstantial evidence, and the allegations establish ample grounds to infer

defendants, in fact, acted with the requisite criminal intent. *See United States v. Magleby*, 241 F.3d 1306, 1312. (10th Cir. 2001) (intent may be inferred from circumstantial evidence, including all the defendant's words, acts, and omissions).

Under settled law, defendants may be presumed to intend the natural and probable consequences of their actions. *See United States v. Mahoney*, 247 F.3d 279, 283 (D.C. Cir. 2001) (holding that defendant's actions contributed to the obstructive effect of the protestors' joint action at an abortion clinic, and the evidence of intent was sufficient because it was a "foreseeable and intended consequence of his action[s]"); *United States v. Dillard*, 795 F.3d 1191, 1201 (10th Cir. 2015) (holding that FACE Act's intent requirement may be satisfied from evidence of the act itself because "normally the actor is presumed to have intended the natural consequences of his deeds").

The indictment also alleges specifically that all of the defendants intended to interfere with the exercise of federal constitutional or statutory rights, "namely, exercise of the First Amendment right of religious freedom at a place of religious worship, as secured by" the FACE Act. (Doc. 144 at 4-5.) Under the leadership of Armstrong and Allen, defendants received instructions on how "to conduct a takeover-style attack" of Cities Church and then acted in accordance with those instructions. (Doc. 144 at 6.) A

"conspiracy to violate the FACE Act falls squarely within § 241's prohibition against conspiracies to violate a 'right' secured by the 'laws of the United States.'" *United States v. Oropesa*, 159 F.4th 912, 918 (11th Cir. 2025).

*Third*, the superseding indictment alleges that the offense was committed against the victims (*i.e.*, the congregants and pastors of Cities Church) while the victims were present in Saint Paul, Minnesota, within the District and State of Minnesota. (Doc. 144 at 2, 3, ¶¶ 1-2, 6.)

**B. Defendants' Counter-Arguments Lack Merit**

Notwithstanding the superseding indictment's allegation of Section 241's three elements, defendants make various arguments to challenge the sufficiency of the indictment. All of the arguments are invalid and should be rejected.

First, defendants Fort, Lemon, and the Joint Defendants argue that the Government has failed to allege facts that, if proven, would lead a reasonable person to believe the crime had been committed. (*See* Fort Mot. 14-15, 19-20 ("the government's factual narrative . . . does not actually establish the offense"); Joint Mot. 15-17 (arguing the indictment "does not allege a single fact that, if proven true, would establish" the crime); Lemon Mot. 10-13 (arguing that a "reasonable person" would not be physically obstructed or feel threatened by the Defendants' conduct).) However, this Court should reject Defendants' attempt to turn a challenge to the allegations of an indictment

into a motion for summary judgment. *Costello v. United States,* 350 U.S. 359, 363-64 (1956) (testing the sufficiency of the government's evidence should come at trial, not in a challenge to the indictment); *United States v. Hirsch,* 360 F.3d 860, 863 (8th Cir.2004) (refusing defendant's Motion to Dismiss that amounts to a request for judge to determine guilt or innocence based on facts properly left to the jury at trial).

Second, defendant Fort argues that the indictment "fails to . . . [specify the] right with which Fort supposedly conspired to interfere" because the indictment cites to the rights secured by the civil enforcement provision of the FACE Act—18 U.S.C. 248(c)—without citing the full language of the FACE Act. (Fort Mot. 16.) Yet, based on her own understanding of the applicable statutes, Fort herself concedes that a citation to 18 U.S.C. 248(c) incorporates by reference the language in 18 U.S.C. 248(a) which protects the right to exercise the First Amendment right of religious freedom at a place of religious worship and provides civil liability where that right is interfered with by force, threat of force or physical obstruction.

Again, the indictment is sufficient. An indictment does not have to allege the elements in precise statutory terms. *Hagnar v. United States,* 285 U.S. 427, 430 (1932). A count should be read in its entirety, including its use of statutory section numbers. *United States v. Denmon*, 483 F.2d 1093, 1095 (8th Cir. 1973) ("complete and comprehensive allegations of all the sections of

statutory language" not required so long as the indictment states fairly apprises the defendant of the nature of the charge).

Third, defendant Fort argues that Count One fails against her "because it is not 'clearly established' that the conduct she engaged in—reporting on a protest in a church—is prohibited by Section 241." (Fort. Mot. 17.) However, the indictment does not allege that Fort was "reporting on a protest in a church." (Fort. Mot. 17.) This argument starts to bleed into her First Amendment "I'm a journalist!" defense, which the Government addresses in separate briefing. Under the general pleading standards, the indictment is more than sufficient in alleging commission of the charged crimes. The indictment describes in painstaking detail the conspiracy that Forth and the other defendants joined in and how the defendants threatened and intimidated the congregants at Cities Church. Thus, this argument by Fort and the other defendants is without merit.

Fourth, many of the defendants urge the Court to make factual determinations regarding the sufficiency of the evidence to prove a variety of essential elements. Fort, Lemon, and the Joint Defendant, for example, urge the Court to make findings on whether "force" was used, whether defendants' conduct and words amounted to a "true threat," and whether the defendants' joint formation of a mob at the front of the church qualifies as a "physical

obstruction." Again, however, none of those arguments are proper at this stage of the case, and the Court cannot properly make any such findings.

The Eighth Circuit has made this clear in many cases over the years. In *United States v. Grubb*, 135 F.4th 604 (8th Cir. 2025), for example, the Eighth Circuit "conclude[d] that a 'trial on the merits' was needed to decide Grubb's pretrial motion to dismiss the indictment." *Id.* As the Circuit explained, "[t]here is no procedure in federal criminal cases equivalent to the motion for summary judgement in civil cases, and the Government has no duty to reveal all of its proof before trial." *Id.* (citing *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995)). As the Circuit further explained, "[p]ermitting summary judgement-like motions under Rule 12(b) 'would enable and end-run around the calibrated framework for discovery in criminal cases.'" Therefore, "Rule 12 permits pretrial resolution of a motion to dismiss the indictment ***only*** when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *Id.*; *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (cleaned up).

"In considering a motion to dismiss, a district court may not 'make factual findings when an issue is inevitably bound up with evidence about the alleged offense itself.'" *Grubb*, 135 F.4th 604 (quoting *United States v. Turner*, 842 F.3d 602 (8th Cir. 2016)). "If a district court 'determines that the

relevant factual evidence is undisputed in the sense that it is agreed to by the parties, pretrial resolution may be appropriate because 'a trial of the general issue would serve no purpose.'" *Grubb*, 135 F.4th 604 (quoting *United States v. Baxter*, 127 F. 4th 1087, 1090-91 (8th Cir. 2025). The Government is not required to present its case in response to a motion to dismiss, and dismissal is not justified based on "the government's refusal to come forward with evidence to support its case in the face of a defendant who has presented his own proof." *Pope*, 613 F.3d at 1260. "To warrant dismissal, it must be clear from the parties' ***agreed*** representations about the facts surrounding the commission of the alleged offense that a trial of the general issue would serve no purpose." *Id*. at 1261.

Because the indictment alleges all three elements of a Section 241 violation, the motion to dismiss Count One should be denied.

### C. Defendants' Motives for Participating in the Alleged Section 241 Conspiracy Are Irrelevant

The Joint Defendants further seek dismissal of Count One because Defendants' actions were motivated by political protest rather than an attack on religious person. (Joint Mot. 6.) That argument "ignores th[e] elementary distinction between intent and motive." *Rosemond v. United States*, 572 U.S. 65, 88 (2014) (Alito, J., concurring in part and dissenting in part). The indictment alleges that all of the Defendants *intended* to interfere with the

exercise of religious freedom at a place of religious worship. (Dkt. 144 at 3.) Their *motives* for doing so are irrelevant.

Intent and motive are "fundamentally distinct concepts." *Rosemond*, 572 U.S. at 88 (Alito, J., concurring in part and dissenting in part). Intent "refers to the mental state required by the particular statute which makes the act a crime." *United States v. Kabat*, 797 F.2d 580, 587 (8th Cir. 1986). Motive, in contrast, "reflects the ultimate end sought which compelled the defendant to act." *Id.* "Once … intent has been proven, it is immaterial that a defendant may also have had some secondary, or even overriding" motive. *Id.* By way of illustration, "[w]hen Jean Valjean stole a loaf of bread … he certainly intended to commit theft," even though his motive was "to feed his starving family." *Rosemond*, 572 U.S. at 88 (Alito, J., concurring in part and dissenting in part).

Section 241 is a specific-intent statute, not a specific-motive statute. It "require[s] that the offender must act with a specific *intent* to interfere with the federal rights in question," *United States v. Guest*, 383 U.S. 745, 754-55 (1966) (emphasis added), *i.e.*, an "intent to accomplish the precise criminal act that [he] is later charged with," *United States v. Robertson*, 606 F.3d 943, 954 (8th Cir. 2010). Section 241 does not, however, require that the offender must act with a specific *motive* to interfere with federal rights. *See Anderson v. United States*, 417 U.S. 211, 226 (1974) ("A single conspiracy may have

several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law.”).

Because Section 241 contains an intent requirement, not a motive requirement, the Government need not allege that Defendants entered into an agreement to interfere with religious worship. In *Guest*, the defendants were charged with conspiring to interfere with black citizens’ right of interstate travel. The Supreme Court noted that although the prosecution must prove a “specific intent to interfere with a Federal right,” that did not require showing of racial animus: “if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel … then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of [Section 241].” *Guest*, 383 U.S. at 760. And in *Anderson*, defendants conspired to rig a county election, which resulted in false votes being cast in a federal election. *Anderson*, 417 U.S. at 225. The Supreme Court held that defendants “err[ed] in seeking to attach significance to the fact that the primary motive behind their conspiracy was to affect the result in the local rather than the federal election.” *Id.*

As *Guest* and *Anderson* instruct, the Government need not show that any of the Defendants acted out of religious animus or that his primary motive was “deprivation of religious exercise.” (*Contra* Mot. 9.) Nor does it matter if the Defendants’ motive was to participate in a “political protest” or

to express their "opposition to federal immigration enforcement and a federal official."[3] (Mot 7-8.) Their "motives do not negative [their] intent under section 241." *United States v. Ehrlichman*, 546 F.2d 910, 931 n.98 (D.C. Cir. 1976).

What matters is whether Defendants' had *intent* to interfere with religious exercise, and the indictment alleges such intent. Defendants conspired to travel to Cities Church and disrupt a worship service, and then in fact disrupted the service by menacing congregants and the pastor. (Doc. 144 at 8-11.) Even for the defendants who did not organize the attack, their knowledge of location or setting reinforces that each defendant "purposefully" intended or "consciously desire[d]" to interfere with religious exercise, *United States v. Bailey*, 444 U.S. 394, 404-05 (1980). That is all the indictment must allege, and it does so.

## II. <u>Count Two States an Offense — Violation of § 248(a)(2)</u>

Section 248(a)(2) of the FACE Act contains the following three elements:

(1) A defendant used force or threat of force or physical obstruction

---

[3] As the Supreme Court repeatedly has recognized, political motives are not a defense to generally applicable criminal laws. *See generally United States v. O'Brien*, 391 U.S. 367 (1968); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 578 (1991) (Scalia, J., concurring) (collecting cases).

(2) The defendant intentionally injured, intimidated or interfered with or attempted to injure, intimidate or interfere with any person

(3) That person was lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship.

*See* 18 U.S.C. § 248(a)(2).

Here, again, the indictment adequately alleges these three elements. The indictment further adequately alleges aiding-and-abetting liability, an established theory of criminal liability that defendants' motions largely ignore. Thus, Defendants' motions to dismiss Count Two should be denied because the indictment alleges "all of the essential elements" under Section 248(a)(2). *Sewell*, 513 F.3d at 821.

*First*, the indictment states that Defendants used "force, threat of force, and physical obstruction." Doc. 144 at 17-18. That is enough to defeat a motion to dismiss because, again, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself." *Hamling*, 418 U.S. at 118. The Government plainly has alleged force, threat of force, or physical obstruction.

The Government is not required to plead specific "facts sufficient to satisfy the statute's definition" of "physical obstruction" (Lemon Mot. 11-15), but it nevertheless did. The FACE Act defines "physical obstruction" as "rendering impassable ingress to or egress from … a place of religious

worship, or rendering passage to or from such a … place of religious worship unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). The indictment alleges that Lemon and others "approached the pastor and largely surrounded him (to his front and both sides), stood in close proximity to the pastor in an attempt to oppress and intimidate him, and physically obstructed his freedom of movement while [he] peppered him with questions to promote the operation's message." (Doc. 144 at 15) (parenthetical in original). Indeed, because Count Two also alleges that Defendants *attempted* to commit a violation of § 248(a)(2), whether the obstruction was successful is "beside the point." *New York v. Rescue*, 705 F. Supp. 3d 104, 124 (S.D.N.Y. 2023).

*Second*, the indictment alleges that Defendants intentionally injured, intimidated, or interfered with Cities Church's congregants and pastor. The indictment states that Defendants "intentionally injured, intimidated, and interfered with … multiple persons." (Doc. 144 at 18.) More allegations are not required because the language used "track[s] the statutory language" and is therefore "sufficient." *Sewell*, 513 F.3d at 821. Nevertheless, the indictment again went beyond the bare minimum by further alleging that Defendant sought to "intimidate" and "menac[e]" the pastor and congregants and that he interfered with their religious worship by "loudly berat[ing] the pastor" during the religious service. (*Id.* at 9.)

*Third*, the indictment undisputedly (and indisputably) alleges that Defendant's victims were lawfully exercising the First Amendment right of religious freedom at a place of religious worship. The indictment alleges that Cities Church "is a Christian house of worship" and that Defendant and his co-conspirators disrupted "a liturgical service." (Doc. 144, at 1-2.)

Because the indictment alleges all three elements of a Section 248(a)(2) FACE Act violation, Defendants' motions to dismiss Count Two should be denied.

## III. The Indictment Adequately Alleges Aiding-and-Abetting Liability

The indictment also invokes aiding-and-abetting liability under 18 U.S.C. § 2(a), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Under Section 2(a), "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 181 (1994).

The indictment alleges that Defendants "each aid[ed] and abett[ed] one another." (Doc. 144, at 17-18.) That "track[s] the statutory language" of Section 2. *Sewell*, 513 F.3d at 821. Defendants Lemon and Fort argue that

they were merely acting as journalists, rather than aiding and abetting. (Lemon Mot. 16-18; Fort Mot. 12-14.) The Government must prove at trial that each defendant possessed the requisite *mens rea*, notwithstanding the camera in their hand or background as a journalist. It does not have to allege anything more at the indictment stage.

In any event, the indictment does detail how each defendant aided-and-abetted his co-conspirators' FACE Act violations. A "person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission." *Rosemond*, 572 U.S. at 76. The indictment alleges that Defendants met with co-conspirators and either gave or received instructions on how "to conduct a takeover-style attack" on Cities Church. (Doc. 144, at 5.) That shows Defendants' intent. The indictment also alleges each defendant then participated in that attack. (*Id.* at 10.) That establishes Defendant's "requisite act."

Finally, Defendants argue that the superseding indictment fails to allege "true threats" by failing to articulate the specific threatening statements made by defendants. (*See* Fort. Mot. 7; Joint Mot. 7; Lemon Mot. 9-11.) This argument, however, is also unavailable. First, the indictment is not required to allege specific facts, and the lack of specificity as to the threatening statements does not warrant dismissal. *See Hamling*, 418 U.S. at 118. Second, Defendants cite to no case requiring an indictment to negate

an affirmative defense. Third, the superseding indictment alleges more than mere threats to complete the crime. It also alleged physical obstruction, force, and conduct that amounts to threats of force. Thus, even if this Court were to find the threats did not amount to "true threats," Defendants would still not be entitled to relief.

## CONCLUSION

For the foregoing reasons, all of the subject defense motions to dismiss should be denied.[4]

DATED: October 16, 2026.

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Senior Litigation Counsel

*/s/ Robert J. Keenan*

ROBERT J. KEENAN
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
E-Mail: joshua.zuckerman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

[4] This brief contains 7,618 words, excepting the caption and signature block.